```
            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF OHIO
                  WESTERN DIVISION


                      - - -

MARK BROACH,              . Case No. 1:12-cv-066
                          .
          Plaintiff,      .
                          .
        - v -             . Cincinnati, Ohio
                          . Wednesday, August 28, 2013
CITY OF CINCINNATI,       . 9:51 a.m. Session
                          .
        Defendant.        . Day 6 of Jury Trial
..........................  Morning Session
              TRANSCRIPT OF PROCEEDINGS
  BEFORE THE HONORABLE STEPHANIE K. BOWMAN, MAGISTRATE JUDGE,
                      AND JURY

APPEARANCES:
For the Plaintiff:    ALPHONSE A. GERHARDSTEIN, ESQ.
                      JENNIFER L. BRANCH, ESQ.
                      JACQUELINE GONZALEZ-MARTIN, ESQ.
                      Gerhardstein & Branch Co., LPA
                      432 Walnut Street, Suite 400
                      Cincinnati, Ohio  45202

For the Defendant:    AUGUSTINE GIGLIO, ESQ.
                      JESSICA L. POWELL, ESQ.
                      Assistant City Solicitors
                      Room 214  City Hall
                      801 Plum Street
                      Cincinnati, Ohio  45202

Also Present:         Mark Broach
                      Roy E. Winston, Assistant Fire Chief

Law Clerk:            Joan P. Brady, Esq.

Courtroom Clerk:      Jan Lahley

Court Reporter:       Mary Ann Ranz
                      810 Potter Stewart U.S. Courthouse
                      100 East Fifth Street
                      Cincinnati, Ohio  45202

                      - - -
```

```
 1              WEDNESDAY, AUGUST 28, 2013

 2                Sixth Day of Jury Trial

 3              P R O C E E D I N G S

 4  BEFORE THE JURY:                          (9:51 A.M.)

 5          THE CLERK:  Judge, can I pass out the books first?

 6          THE COURT:  Yes, please.

 7      All right.  Thank you.

 8      Because we had an overnight break, I just want to remind

 9  you you're still under oath.

10          THE WITNESS:  Yes.

11          THE COURT:  All right.  Ms. Powell, whenever you're

12  ready.

13          MS. POWELL:  Thank you.

14                  LIEUTENANT DAVID A. LEMONS

15  a witness herein, having previously been sworn, resumed the

16  stand and continued to testify as follows:

17                  DIRECT EXAMINATION (Continued)

18  BY MS. POWELL:

19  Q.  Morning, Lieutenant Lemons.

20  A.  Good morning.

21  Q.  Okay.  I'm going to start off this morning by having you

22  go back to the Defendant's Exhibit No. 4.

23  A.  Okay.  My summary?

24  Q.  Yes.  I am going to have you go to your summary page.

25  A.  Okay.
```

1  Q.  Okay.  So, this is a three-page document, is that right?

2  A.  Yes, ma'am.

3  Q.  And what is on the third --

4     The first two pages is your written summary, is that

5  correct?

6  A.  That's correct.

7  Q.  And so what is on the third page of your summary?

8  A.  That would be Lieutenant Broach's disciplinary history.

9  Q.  And is it typical --

10    I mean, why would you attach that to a summary?

11 A.  Just so the -- my assistant chief would be able to read

12 the entire history of this employee.

13 Q.  And is that something you did just for Lieutenant Broach,

14 or do you do this for all of your summaries?

15 A.  We do it for all the summaries.

16 Q.  Okay.  And do you know if this page 3 of your memo, do you

17 know if this is all of Lieutenant Broach's disciplinary

18 history?

19 A.  To my knowledge.

20 Q.  Okay.  I'm gonna have you move on, talk a little bit about

21 did you ever play any role in going through Lieutenant

22 Broach's locker?

23 A.  Yes, I did.

24 Q.  When was that?

25 A.  Hmm, I can't recall the date exactly.

1  Q.  Do you remember if it was after, before, during your

2  investigation?

3  A.  I'm thinking it was after the investigation.  Somewhere

4  around September, October.

5  Q.  And you I think -- I believe you testified yesterday you

6  were aware that Lieutenant Broach was on stress leave?

7  A.  Yes, ma'am.

8  Q.  So, do you remember if Lieutenant Broach was still on

9  stress leave when you searched his locker?

10 A.  This may have been after he was removed from -- he was

11 ordered to take a psychological evaluation.  Fitness for duty.

12 Q.  Okay.

13 A.  It may have been during that time.

14 Q.  But do you know for certain?

15 A.  I don't know for certain, no.

16 Q.  Let me ask you this.  Do you remember the circumstances of

17 why you would have gone through Lieutenant Broach's locker?

18 A.  It was at the request of Captain Campbell.  He was missing

19 some documents, some performance ratings, that should have

20 been submitted by Lieutenant Broach.

21 Q.  And why would Lieutenant -- or why would Captain Campbell

22 ask you to get involved in looking at the locker?

23 A.  He just wanted a witness and everything documented.

24 Q.  And is that --

25     Why would you need a witness, or why would you want a

1  witness for that?

2  A.  In case that person comes back and says something was

3  planted in his locker, and there's a witness and everything's

4  documented.

5  Q.  Okay.  Do you recall whether the -- your search of

6  Lieutenant Broach's locker came up in your meetings with the

7  EEO?

8  A.  Yes, it did.

9  Q.  Okay.  If they came up with the meetings -- they came up

10 at the meetings with the EEO, does that mean it was before or

11 after the fitness-for-duty evaluation was made?

12 A.  It would have been before.

13 Q.  Okay.  Does that help you remember any better as to why?

14 A.  Yeah.  It was before.  Probably June.

15 Q.  Okay.  And what did you find when you looked through the

16 locker?

17 A.  We found some inspection -- building inspections and

18 performance ratings that we were looking for.

19 Q.  And what did you --

20     What was your conclusion when you found those documents?

21 A.  That he shouldn't have had official documents in his

22 personal locker.

23 Q.  And when you talk about "official documents," the

24 performance evaluations are one, is that right?

25 A.  Right.  They're kept in the office.

1    Q.  And the performance -- the building inspections?

2    A.  They're to be kept in the office.

3    Q.  Okay.  And we need to be careful about not talking over

4    each other for the court reporter.

5        But can you explain what the building inspection documents

6    were?

7    A.  They're just records of building inspections that the fire

8    company may have gone through.

9    Q.  Okay.  And are lockers private at the fire department?

10   A.  Yes, ma'am.

11   Q.  So does the department have a right to search them?

12   A.  If there's a need, yes.

13   Q.  And in this case what was your need to search Lieutenant

14   Broach's locker?

15   A.  To look for the performance ratings of his members.

16   Q.  Now, you're aware that Lieutenant Broach filed a complaint

17   of discrimination with the city HR office, is that right?

18   A.  Yes, ma'am.

19   Q.  And when did you become aware of that?

20   A.  Shortly after his return to duty.

21   Q.  So was that -- do you remember what -- when that was?

22   A.  I can't give you a specific date.

23   Q.  Did you know about that EEO complaint when you were doing

24   the investigation of the Ludlow fire?

25   A.  No, I did not.

1    Q.  And how did you become aware of those EEO charges with the

2    city?

3    A.  Lisa Berning brought them to my attention.

4    Q.  And was there anybody in the HR Division that told you?

5    A.  My assistant chief, yes.

6    Q.  Who would you have heard from first?

7    A.  My assistant chief.

8    Q.  And this was --

9        Again, the time frame was when?

10   A.  I can't recall the time frame.

11   Q.  Okay.  And did you play any role in the EEO meetings?

12   A.  Yes, I assisted Ms. Berning with the -- our terminology

13   and our policies and procedures.

14   Q.  Why would you need to do that?

15   A.  Like we've been going through the last couple days where

16   you mention firefighter terms you weren't aware of.

17   Q.  Can you just explain that in generic terms to the jury in

18   terms of what you mean?

19   A.  Just how we operate on a daily basis.  You guys wouldn't

20   understand some of the terminology.  I was there to kind of

21   help her with the terminology.

22   Q.  Did you have any role as an investigator at those

23   meetings?

24   A.  No, I didn't.

25   Q.  Would you have had an ability to bring charges out of

1  those meetings?

2  A.  No, I wouldn't.

3  Q.  Besides attending the EEO meeting for Lieutenant Broach,

4  have you attended other firefighter EEO meetings?

5  A.  Yes, I have.

6  Q.  And how many EEO meetings did you attend for Lieutenant

7  Broach?

8  A.  Four.

9  Q.  So four meetings?

10  A.  Yes, ma'am.

11  Q.  And those took place where?

12  A.  At Centennial --

13  Q.  Is that --

14  A.  -- Resources --

15  Q.  I'm sorry?

16  A.  Human Resources Department.

17  Q.  Okay.  And can you talk a little bit about -- I'm gonna

18  have you talk about each of those meetings to the best of your

19  knowledge.

20      I'm going to have you start by explaining when was the

21  first meeting that you remember having?

22  A.  I can't recall the dates, but I know the parties that were

23  there.  The first meeting was myself, Lieutenant Broach, and

24  Lisa.

25  Q.  And what was your understanding of the purpose of that

1   meeting?

2   A.  To get an understanding of Lieutenant Broach's complaint.

3   Q.  And did you learn the basis or did you gain an

4   understanding of Lieutenant Broach's complaint at that

5   meeting?

6   A.  No, we did not.

7   Q.  What did you learn?

8   A.  We -- that he wanted to relitigate all the discipline he's

9   had in his history, basically.

10      Lisa continued to ask him for the basis for his EEO

11  complaint.  "That's what we're here for."  All these incidents

12  have been heard and he has had his appeals and he lost his

13  appeals.  "Okay, now we're moving forward to your complaint

14  today."  And he said he had a stack of evidence that he wanted

15  to bring in.  And she was "Okay, that's good.  That's what we

16  want.  We want to get to the bottom of this complaint."  And

17  he continued to go on about the cases that he had in his

18  history and he wanted to relitigate the cases that were

19  already closed.

20  Q.  And when you talk about "cases," what are you referring

21  to?

22  A.  Prior disciplines he's had throughout his career.

23  Q.  And you said that he, Lieutenant Broach, indicated he had

24  a stack of evidence he would bring to a meeting?

25  A.  Yes.  The next meeting he would bring a stack of evidence.

1  Q.  And any next meetings that you had with the EEO concerning

2  Lieutenant Broach, did he bring any stacks of evidence?

3  A.  He brought a -- maybe a 4 x 4 index card or piece of paper

4  with some writing on it, and we were both, like, Where's the

5  stack of evidence that's to support your charges?  And he said

6  he's got it in memory, or something to that effect.

7  Q.  Okay.  So going back to that first meeting that you and

8  Ms. Berning, Lieutenant Broach had, can you remember anything

9  else that was discussed?

10  A.  He talked about Lieutenant Campbell wanting him to work on

11  a firefighter when he first arrived at Engine 34.  And Lisa

12  questioned him on, "What do you mean by working on this

13  firefighter?"

14      And he said, "Well, she wanted" -- "He wanted me to write

15  him up.  He was late."  Or if he was -- if he did anything, he

16  wanted paperwork on it.  And Lisa didn't understand that,

17  because she thought that's -- that's your job, that's for a

18  supervisor to write up an employee that's late or employee

19  that -- that has a discipline problem of some type.

20      And he thought that -- Captain Campbell wanted to go out

21  of his way to write him up for -- we -- me and Lisa didn't

22  understand what he was talking about.  Lieutenant Broach said

23  that the firefighter evidence was for an inferior firefighter,

24  meaning he wasn't a good firefighter.

25      Lisa suggested that he -- that Lieutenant Broach work hard

1  with him, train him, get him up to par, and Lieutenant Broach

2  didn't feel like that was his job; that should have been done

3  before he got there.  And Lisa -- I mean, she went back and

4  forth and saying, "Well, it's your job now; what you get paid

5  to do.  You need to do that.  But if you have to go the extra

6  mile to make sure the firefighter is ready for firefighter

7  duties, that's what you need to do."

8      Basically, the first meeting, we were kind of waiting on

9  the stack of evidence that he said he would present.

10 Q.  Did Lieutenant Broach ever tell Lisa Berning at that first

11 meeting that Captain Campbell had retaliated or was

12 retaliating against Ron Evans because Ron Evans had filed a

13 discrimination complaint some years earlier against Captain

14 Campbell?

15 A.  Well, I think the discussion was that when Lieutenant

16 Broach first arrived, he set Lieutenant Broach down and told

17 him every lieutenant that Firefighter Evans had worked under

18 has been written up by Firefighter Evans.  He's had problems

19 with every lieutenant.  So he kind of gave him a heads-up

20 that, Hey, you've got one guy that's had problems with every

21 lieutenant he's worked with and, you know, you'd better be on

22 your game, so to speak.

23 Q.  Was there any part of the conversation or discussion at

24 that first meeting that led you to believe or have any

25 concerns whatsoever that Lieutenant Broach had been

```
 1   discriminated against?

 2   A.  No.  No.

 3   Q.  And was there anything that took place in that -- where

 4   that was discussed in that first meeting that gave you any

 5   indication or concern that Lieutenant Broach had been

 6   retaliated against?

 7   A.  No.

 8   Q.  Okay.

 9   A.  Not that he presented.

10   Q.  Okay.  So you said there were four meetings.  When was and

11   what happened at the second meeting?

12   A.  At the second meeting, that was myself, Captain Campbell,

13   and Lisa.

14   Q.  And let me stop you.  I phrased my question poorly.

15       Do you remember when that second meeting was -- took

16   place?

17   A.  It was shortly after the first meeting.  Within a week.

18   Q.  And again, who was present?

19   A.  Myself, Captain Campbell, Lisa Berning.

20   Q.  What was discussed?

21   A.  We discussed him working on Lieutenant Broach.  And he

22   explained that he set him down when he first came in and

23   explained that Ron Evans had been a -- had written up every

24   lieutenant that he worked under, so he needed to be sharp.

25       She did ask him directly if you ordered him to work on Ron
```

1  Evans.  And he stated that he just told -- he kind of warned

2  him about him when he first came in.  That was his reply.

3  Q.  Did you have any doubts about Captain Campbell's veracity

4  at that second meeting you attended?

5  A.  No.

6  Q.  Did you have any doubts about Lieutenant Broach's veracity

7  at that first meeting you had with him?

8  A.  Yes.

9  Q.  And why did you doubt his truthfulness?

10 A.  Well, he kept stating that he had a stack of evidence and

11 this was his time to present his EEO complaint.  He wanted --

12 you know, it's his complaint.  "This is your complaint.  Give

13 us what's going on here."

14 Q.  Did you know that that first meeting was recorded?

15 A.  No, we didn't.

16 Q.  I'm sorry.  You did not?

17 A.  No, I didn't.

18 Q.  So there was a third and fourth meeting with the EEO, is

19 that correct?

20 A.  Yes.

21 Q.  Do you remember what the purpose of those two meetings

22 were?

23 A.  To try to come up with a solution, working solution, for

24 Lieutenant Broach and Captain Campbell.

25 Q.  And who -- who all attended that meeting?

6-14

```
 1   A.  Myself, Lieutenant Broach, Captain Campbell, and Lisa

 2   Berning.

 3   Q.  And what was -- was there --

 4       Could you describe the difference between what happened at

 5   the --

 6       First of all -- let me stop.  Do you remember when those,

 7   the third and fourth meetings, took place?

 8   A.  They were shortly after -- within a week of the second

 9   meeting.

10   Q.  And how close in time were the third meeting and the

11   fourth meeting?

12   A.  Maybe three days.  Maybe three days.

13   Q.  Okay.  And was there -- what was discussed at the third

14   meeting?

15   A.  The third meeting was pretty heated between Captain

16   Campbell and Lieutenant Broach.  In that third meeting,

17   Lieutenant Broach talked about a couple incidents that were

18   really a concern for everyone in the room.  He talked about an

19   incident where he made an extra-long fire on McMicken Avenue,

20   and when he pulled up to the scene, one of his firefighters

21   jumped off the apparatus and ran the opposite direction.

22   That's unheard of in the Fire Department.  I've never heard of

23   it.  But Lieutenant Broach failed to report this to the

24   Incident Commander, and that is probably the worst thing you

25   can do as far as at a fire:  Not knowing where your men are.
```

1  One man -- one of his guys ran off.  To me, that jeopardizes

2  the fire company itself, jeopardizes the citizens, the

3  property, and the other firefighters that are fighting the

4  fire in the building.  And for him not to report is -- is the

5  worst thing a lieutenant can do, because now you don't know

6  the condition of your firefighter who ran off.  You didn't

7  report this to your Incident Commander.  That should have been

8  reported immediately, a mayday should have been put out, and

9  that didn't happen.  And he never reported the incident at

10 all.

11 Q.  Did he give an explanation of why he didn't report it?

12 A.  He just said "Ron," as being Ron, "Ron is" -- "Ron is

13 scared of fire."  That's his -- that's his company.  He has to

14 report that.

15 Q.  Just to be clear, who was the firefighter?

16 A.  Ron Evans.

17 Q.  Do you know which fire that -- that happened at?

18 A.  It's the McMicken fire, three-alarm fire.  Costume store.

19 Q.  Were you at that fire?

20 A.  Yes, I was.  I was working at Ladder 29.

21 Q.  So this was before you were in Internal Investigations?

22 A.  Yes.

23 Q.  And what do you remember about that fire?

24 A.  It was a big fire.  I mean, it was a big fire.  It was on

25 the inside.  We all ended up having to exit the fire because

1  the building was engulfed, and we ended up on the exterior of

2  that.

3  Q.  And did you see, witness, Evans running?

4  A.  I didn't pay any attention.  I was focused on my men and

5  getting my men in and out safely.

6  Q.  Well, who raised the issue of Evans running at the fire?

7  A.  Lieutenant Broach.  That was the first I've ever heard of

8  it.

9  Q.  Okay.  And you talked about the building burning down and

10 being dangerous, right?

11 A.  Correct.

12 Q.  Wouldn't any firefighter need or want to run from a fire

13 in that situation?

14 A.  Not in the beginning.  All the fire companies were inside

15 the building.  At one point in time the fire overcame the

16 building and it ended up burning down.  But that's our job.

17 That's what we do every day.  We don't run from fires, or all

18 the buildings would burn down in the city.

19 Q.  When the -- Ron Evans running from a fire incident was

20 discussed at those -- at one of the October meetings, was it

21 discussed in a joking way at all?

22 A.  Yes.

23 Q.  And how so?

24 A.  He just -- I guess he was trying to say what type of

25 firefighter Ron was, and that the incident came up.

1   Q.  Did you think it was a joke?

2   A.  No, I didn't.

3   Q.  Do you think anybody else at the meeting thought it was a

4   joke?

5   A.  I don't think anyone thought it was a joke.

6   Q.  So, you indicated that Lieutenant Broach mentioned a

7   number of disciplinary incidents at those October meetings?

8   A.  Yes.

9   Q.  So what else -- what other incidents did he raise?

10  A.  Another incident that bothered me was the apparatus was

11  damaged one tour that he was on.  His driver reported it to

12  him and he failed to report it to his superior or the unit --

13  the oncoming unit.  And that -- that's also a serious incident

14  to me, because any time you have structural damage to a fire

15  apparatus, you jeopardize the lives of citizens and the fire

16  company, the firefighters that are working after you.

17      And if you make a run and the bumper falls off, which

18  there was damage to the bumper, and you don't report this

19  incident, then you kind of sabotage the next unit.

20  Q.  And just to be clear, who was raising these discipline

21  incidents at the October meetings?

22  A.  Lieutenant Broach.

23  Q.  Was it your intention to rehash past discipline?

24  A.  No, we were just trying to get to the basis of his

25  complaint.

1  Q.  And did you have an opinion as to whether the discipline

2  items that were mentioned in the meeting were -- that there

3  was just cause for them?

4  A.  Repeat your question.

5  Q.  Do you have an opinion as to the disciplinary items that

6  were raised by Lieutenant Broach?  Did you think that they had

7  merit to them?  Let me stop and ask you again in a different

8  way.

9     Based on what you heard, did you think that there had been

10  a basis for those past disciplinary --

11  A.  Yes.

12  Q.  -- actions?

13  A.  Yes.  They were all heard, they were all disciplined for,

14  every last one of the disciplines he brought up.  He even took

15  a few of them to the Peer Review Board, which is a board made

16  up of members of his own peers, and they sided with the

17  charges.

18  Q.  And --

19  A.  Excuse me.  I'm sorry.  And those members, most the time

20  there were two African-Americans and one Caucasian on that

21  board.

22  Q.  Have you ever served on the Peer Review Board?

23  A.  No, I have not.

24  Q.  Have you ever been before the Peer Review Board?

25  A.  No, I have not.

1   Q.  Do you have any knowledge as to whether the Peer Review

2   Board ever reverses charges?

3   A.  Yes, they do.  Probably 70 percent of the time.

4   Q.  I'm sorry.  What percentage?

5   A.  Seventy percent of the time.

6   Q.  Okay.  Will reverse the charge?

7   A.  Reverse the charge.

8   Q.  Okay.

9   A.  Or lessen the discipline.

10  Q.  So, based on the peer -- the peer review process and what

11  was discussed in the meeting, you didn't get any sense or

12  indication that the past discipline against Lieutenant Broach

13  was improper?

14  A.  No.  Not at all.

15  Q.  Do you remember any discussion at the October meetings

16  about Lieutenant Broach accusing Captain Campbell of being

17  disloyal?

18  A.  No, I don't.  I can't recall.

19  Q.  And do you recall any discussion at those October meetings

20  about Lieutenant Broach making an anonymous call to report

21  suspected intoxication?

22  A.  I remember discussion over it.  I think he denied it at

23  the meeting.

24  Q.  He denied what?

25  A.  Making the call.

1  Q.  And is it a problem for any firefighter to make an

2  anonymous call to report suspected alcohol intoxication?

3  A.  That's not the procedure.  The procedure is that you would

4  notify your supervisor and he would get a witness and both

5  parties would observe whoever the suspect is.

6  Q.  Is there a difference in duty on --

7       (Court reporter requested counsel to repeat.)

8  Q.  Is there a difference in the obligations of a regular

9  firefighter compared to an officer in terms of their

10 obligations to report suspected alcohol abuse or intoxication?

11 A.  He has more responsibility.  And that was one of the

12 problems with Lieutenant Broach:  All the incidents here, he

13 never wanted -- he didn't want to take responsibility for

14 anything he's done in his past.  Even the firefighter running

15 away from the fire, he didn't want to take responsibility for

16 that.  He didn't want to take responsibility for the incident

17 with the apparatus in the firehouse.  He thought that was

18 totally on the driver, even though the driver reported it to

19 him.  And that was sort of -- that was the reasoning for him

20 -- I guess Lisa deciding that he needed to be evaluated,

21 because he just wouldn't take responsibility for any of the

22 incidents that happened to him throughout his career.  He just

23 -- it was always somebody else's fault, always the

24 firefighter's fault.

25      Even at the -- the fire incident on the one that I did a

1  summary over, he wanted the firefighters to be responsible.

2  He wanted to write them up.

3      Even though it's his company, he didn't understand the

4  instructions.  You're the lieutenant.  What happens under your

5  company is your responsibility.  He doesn't understand that.

6  And we needed to --

7      I think Lisa wanted to have him evaluated because he

8  didn't understand the responsibilities of being a supervisor.

9  You're the supervisor.  This is your apparatus.  This is your

10  firehouse.  These are your men.  You're responsible for

11  training these men.  You're responsible for them going to a

12  fire and executing extinguishment, executing an emergency run,

13  emergency situation.  You're responsible for your guys'

14  actions at the scene.  He never understood any of that.

15  Q.  And what is the concern, sir, that a lieutenant doesn't

16  understand accepting responsibility for his team?

17  A.  His firefighters will leave without him because he's not a

18  good supervisor.  So -- and that's what happened in his case.

19  I mean, I've never had a firefighter run.  I've never seen

20  that happen throughout my career.  I've been a firefighter for

21  27 years; I've never seen a firefighter run away from a scene

22  at a fire.  I've never seen firefighters leaving me on the

23  apparatus to go extinguish a fire.  I've never seen that

24  happen, and it would only happen if you don't have command of

25  your team, if you're not a good lieutenant.

1  Q.  What kinds of safety concerns does inability or refusal to

2  supervise cause?

3  A.  Lives.

4  Q.  Can you explain that?

5  A.  Well, if you don't operate as a company, then you'll never

6  -- and your men expressly --

7      One of the men on the nozzle of the fire, the hose on the

8  Ludlow fire, he was -- I think he was a one- or two-year

9  firefighter.  And for him to run in and not have knowledge of

10  a leader like Broach -- you know, he's a 20-year guy, that --

11  that's dangerous.  Very dangerous.

12  Q.  Was there any discussion at either one of the October

13  meetings about whether Captain Campbell was a racist?

14  A.  Yes.

15  Q.  There was?

16  A.  Yes.

17  Q.  And what do you remember about --

18      What was that discussion?

19  A.  I think Broach brought up institutionalized racism.  And I

20  don't know where it came from, but he looked at me, like,

21  Yeah, you know what I'm talking about.

22      I said, "I don't know what you're talking about.  Can you

23  explain what you're talking about?"  I think Lisa made a

24  comment that it's okay for people to have racist feelings as

25  long as they don't act on them, and I think Broach took that

1    as she's being racist now.

2        And, I mean, people are gonna have their own thoughts.

3    Basically what she was trying to say is people are going to

4    have their own thoughts.  As long as they don't act on them,

5    then they don't cross that line.

6    Q.  Assuming for the sake of argument that Captain Campbell

7    was a racist, did you witness any of that in your work

8    relationship with him?

9    A.  No.  As a matter of fact, I think Lieutenant Broach and

10   Ron Evans tried to start a petition to remove Captain Campbell

11   from Engine 34, and in doing so they -- they -- I guess they

12   talked to some guys.  The other guys at the firehouse was

13   probably 14 -- there's probably 12 to 14 African-American

14   firefighters that work in that house, and all of them refused.

15           MR. GERHARDSTEIN:  Objection, Your Honor.  Sidebar?

16   SIDEBAR CONFERENCE:

17           MR. GERHARDSTEIN:  Objection's based on no foundation

18   for this hearsay testimony about the conduct of 14 other

19   officers.  And we're drifting way off of everything that's

20   documented in the transcripts of the EEO hearing or anything

21   that I've ever heard from this witness before.  So, I just

22   want to know that there is a foundation somewhere.

23           MS. POWELL:  This is based on -- based on things that

24   Lieutenant Evans has heard from other people.  There was a lot

25   of testimony from Lieutenant Broach hearing things -- bad

 1    things about Captain Campbell.  It was much as Lieutenant

 2    Broach's testimony:  Rumors.  It's the same thing.  There is

 3    no reason he shouldn't be able to testify to this.

 4              MR. GERHARDSTEIN:  Oh, Judge -- all right.

 5              THE COURT:  The petition he's talking about, is it

 6    regarding the email --

 7              MS. POWELL:  No.

 8              MR. GERHARDSTEIN:  If they think that there was

 9    hearsay during Broach's testimony, they should have objected.

10    They didn't.  So, to just have this person start testifying as

11    if he's testifying from personal knowledge, which is exactly

12    what he was doing, I'm going to ask that the testimony be

13    stricken and this jury be instructed not to regard any of that

14    testimony.

15              THE COURT:  Okay.

16              MS. POWELL:  Can I ask him whether it was based on

17    personal knowledge or rumor?

18              MR. GERHARDSTEIN:  We're not here to hear rumor.

19              MS. POWELL:  But you guys opened the door to rumor.

20              MR. GERHARDSTEIN:  Take each piece at a time.

21              MS. POWELL:  I think that --

22              MR. GERHARDSTEIN:  But you should be objecting then;

23    not like piling on now.

24              MS. POWELL:  I'm just saying Lieutenant Broach's

25    testimony was ladened with comments about what rumors were

1  going around and what the rumors were, and he opened the door

2  as to a discussion of rumor.

3          MS. BRANCH:  No, he didn't.

4          MR. GERHARDSTEIN:  There is no evidence rule that

5  says when somebody for various reasons talks about rumor or

6  reputation that the trial turns into a bunch of clothesline

7  yakking, which is what we're getting to.

8          THE COURT:  Okay.  I'm going to strike his response;

9  order the jury to disregard it.

10     You can ask him if he has personal knowledge about any

11 attempts to have Captain Campbell removed.  If he does, we can

12 see where it goes.

13         MS. POWELL:  Okay.

14 <u>CONCLUSION OF SIDEBAR CONFERENCE</u>

15         THE COURT:  The witness' response to the question is

16 going to be stricken from the record and the jury is

17 instructed to disregard his response.

18 BY MS. POWELL:

19 Q.  Lieutenant Lemons, do you have any personal knowledge as

20 to whether there were any efforts to have Captain Campbell

21 removed from the 34's?

22 A.  No, I don't.  Just the --

23         THE COURT:  That's okay.

24 Q.  That's okay.

25     Did Lieutenant Broach ever object to your presence at any

1   of the EEO meetings?

2   A.  No, he did not.  And if he did, I would have left.

3   Q.  And do you remember whether you ever offered to leave any

4   of the meetings?

5   A.  Yes, I did.

6   Q.  Now, did you play any part in the recommendation for

7   Lieutenant Broach to be referred for a fitness-for-duty

8   evaluation?

9   A.  No, I did not.

10  Q.  And were you present at the 34's on October the 19th when

11  Lieutenant Broach was relieved from duty pending -- pending

12  his fitness-for-duty evaluation?

13  A.  Yes, I was.

14  Q.  Who were you there with?

15  A.  Myself, Assistant Chief Demasi, Assistant Chief Kuhn,

16  Chief Texter.  That's it.

17  Q.  And what was the reason for your being there?

18  A.  To explain to Lieutenant Broach that the -- the reason for

19  some of the statements he made at the meetings.

20  Q.  And just to make sure I understand completely what you're

21  saying, you were there to explain --

22      Could you say again what you were there for?

23  A.  I was there to explain to Lieutenant Broach that because

24  of his not taking responsibility for his company, a lot of the

25  statements he made during the meetings with Lisa, myself,

 1   Captain Campbell, that they wanted to have him evaluated.

 2   Q.  Did you know that the --

 3       Did you know whether or not any of the October -- any of

 4   the third or fourth meetings that you had with Lieutenant

 5   Broach were recorded?

 6   A.  No, I did not.

 7   Q.  Did you find out at some point that they were?

 8   A.  Yes, I did.

 9   Q.  And did you ever have an opportunity to listen to those

10   recordings?

11   A.  Yes, I did, at a later date, after Lieutenant Broach -- I

12   guess through his attorney.

13   Q.  Were you given any transcripts of those recordings?

14   A.  Yes, I was.

15   Q.  Okay.  I'm gonna have you start -- open your exhibit book

16   to Joint Exhibit V.

17       Have you seen this document before?

18   A.  Yes, ma'am.

19   Q.  Okay.  And what is it?

20   A.  Our sick leave policy.

21   Q.  Are you on the Joint Exhibit notebook?  There's three

22   notebooks.

23   A.  Okay.

24   Q.  Okay.  Have you seen --

25       You're looking at Joint Exhibit V?

1   A.  Yes, I am.

2   Q.  Okay.  And have you seen this document before?

3   A.  Yes, ma'am.

4   Q.  And what is it?

5   A.  It's the transcripts of -- transcript of Lieutenant

6   Broach's secret tapes.

7   Q.  And have you read through this?

8   A.  Yes, I have.

9   Q.  You said you also listened to those tapes?

10  A.  Yes, ma'am.

11  Q.  Okay.  And this JX V, what -- for what meeting does the

12  transcript reflect?

13  A.  Either the third or fourth meeting.

14  Q.  And that was the one on October the 6th?

15  A.  Yes, ma'am.

16  Q.  And when you went --

17      When you had the opportunity to listen to the recording of

18  the October 6th meeting and to read the transcript, were both

19  accurate representations of what had taken place at that

20  meeting?

21  A.  Pretty much, yes.

22  Q.  I'm gonna have you turn to Joint Exhibit VI.  Have you

23  seen this document before?

24  A.  Yes, ma'am.

25  Q.  And what is it?

1   A.  It's a transcript of the taped meeting by Lieutenant

2   Broach.

3   Q.  For which meeting?

4   A.  The last meeting.

5   Q.  And that would be dated October the 13th, 2010?

6   A.  Yes, ma'am.

7   Q.  Have you read this transcript?

8   A.  Yes, ma'am.

9   Q.  And did you also listen to the tape that -- that would

10  accompany this transcript?

11  A.  Yes, ma'am.

12  Q.  And were both the transcript and the tape or the recording

13  that you listened to, did they accurately represent the

14  conversation that took place during that meeting?

15  A.  Pretty much.

16  Q.  Do you remember whether performance evaluations were

17  discussed at any of the EEO meetings?

18  A.  Yes, they were.

19  Q.  Who brought -- who brought up the topic of performance

20  evaluations?

21  A.  Lieutenant Broach.

22  Q.  Do you remember what was discussed?

23  A.  I can't recall word for word.  In general, he had some

24  complaints about his -- his marks.

25  Q.  About -- I'm sorry.  His marks?

```
 1   A.  His review.

 2          MS. POWELL:  Your Honor, one minute to confer with

 3   counsel?

 4          THE COURT:  Sure.

 5      (Defense Counsel confer privately.)

 6          MS. POWELL:  Thank you, Lieutenant Broach.  I have no

 7   further questions.

 8          MR. GERHARDSTEIN:  Lieutenant Lemons.

 9          MS. POWELL:  So sorry.  Lieutenant Lemons.

10          MR. GERHARDSTEIN:  Thank you, Judge.

11                        CROSS-EXAMINATION

12   BY MR. GERHARDSTEIN:

13   Q.  Lieutenant Lemons --

14   A.  Yes, sir.

15   Q.  -- you were not involved in the decision to refer

16   Lieutenant Broach for a fitness for duty, right?

17   A.  That's correct.

18   Q.  And, yet, you're here today to tell us what bothered you

19   about what Lieutenant Broach said on the meeting of

20   October 6th and the meeting of October 13th, right?

21   A.  As a firefighter, yes.

22   Q.  Okay.  And, in fact, when you were asked whether you could

23   identify what Mark Broach did or said at those EEO sessions

24   that supported a fitness for duty and a removal from duty, you

25   said that would be speculation, right?
```

1    A.  No, I did not.

2    Q.  All right.  Take a look at your deposition.

3         THE COURT:  We will get it to you.

4    Q.  Ms. Branch took your deposition on January 13th -- 15th,

5    2013, right?

6    A.  Which page are we looking at?

7    Q.  She took your deposition on January 13th -- 15th, 2013,

8    right?

9    A.  That's correct.

10   Q.  And you were under oath at that time, right?

11   A.  Yes, I was.

12   Q.  Turn to page 111, please.

13   A.  I've got it.

14   Q.  Look at line 25, the very last line:

15        "Question:  Did anybody explain what he did or what

16     he said during those meetings that thought he needed to be

17     evaluated?"

18        "Answer:  I couldn't -- it would all be speculation.

19     I couldn't tell you."

20     Did I read that correctly?

21   A.  Did --

22   Q.  Did I read that correctly?

23   A.  Yes, you did.

24   Q.  Okay.  So you were not consulted by Lisa Berning, right?

25   A.  No, I wasn't.

1   Q.  And she wrote up her referral for a fitness for duty

2   without your input, according to the record to this date,

3   right?

4   A.  That's correct.

5   Q.  And you didn't see her draft before you went to the 34's

6   to be part of the team that told Lieutenant Broach that he was

7   to be removed from duty, right?

8   A.  That's correct.

9   Q.  So, you didn't really know anything about what he had said

10  or done that made Lisa Berning make a referral for a fitness

11  for duty, right, as of October 19th?

12  A.  I was included in the meetings.

13  Q.  That's correct.  But you thought --

14  A.  I sat through all the meetings.

15  Q.  Hold on.  Hold on.  One at a time.

16      You were included in the meetings --

17  A.  Yes.

18  Q.  -- but between the end of the meeting on October 13th and

19  your confronting Lieutenant Broach at the 34's on

20  October 19th, you hadn't even seen a draft of any referral,

21  right?

22  A.  That's correct.

23  Q.  And you didn't know anything about the referral, right?

24  A.  I knew of a referral, yes.

25  Q.  By the time you were going out to the 34's?

1   A.  That's correct.

2   Q.  Okay.  But you didn't know about it while it was being

3   drafted, right?

4   A.  Not while it was being drafted.

5   Q.  And you didn't know that she had turned to Captain

6   Campbell, the man who had been accused of discrimination, and

7   said, "Why don't you take a look at this and give me any ideas

8   or drafting ideas," right?  You didn't know that, right?

9   A.  I can't recall.

10  Q.  That would be pretty unusual, wouldn't it?

11  A.  I can't recall.

12  Q.  You sat through the whole meeting on October 6th and

13  October 13th, right?

14  A.  That's correct.

15  Q.  And you did a prior meeting, as you testified to

16  initially, with Lieutenant Broach and Lisa Berning, right?

17  A.  That is correct.

18  Q.  And at the end of the meeting on October 13th, you saw

19  Lieutenant Broach sign an agreement that was handwritten by

20  Lisa Berning, right?

21  A.  That's correct.

22  Q.  And you saw Captain Campbell sign an agreement that was

23  handwritten by Lisa Berning, right?

24  A.  That is correct.

25  Q.  And you assumed they were going to implement this

1  agreement, go back to work, and talk to each other about

2  discipline and try to work it out, right?

3  A.  Lieutenant Broach --

4  Q.  First answer the question, then you can explain.

5      You assumed that they were going to work it out by

6  implementing this agreement, right?

7  A.  No, I didn't.

8  Q.  Okay.  So, you thought the agreement was a sham?

9  A.  I didn't think Lieutenant Broach meant what he was doing.

10  Q.  Did you tell him that?

11  A.  He knew that.

12  Q.  You're in his head now?

13  A.  I was there to give -- help Lisa with the terminology.  I

14  wasn't there to explain anything to Lieutenant Broach.  Lisa

15  Berning handled the whole meeting.

16  Q.  Okay.  But now you're here to tell the jury that somehow,

17  even though you thought it was speculation to figure out a

18  basis for fitness for duty, that today, now that he's filed a

19  lawsuit, you have all these reasons --

20      MS. POWELL:  Objection.

21  Q.  -- that would support a fitness-for-duty referral, right?

22  A.  Lieutenant Broach --

23      THE COURT:  Hold on one second.  Please don't --

24      MR. GERHARDSTEIN:  Hold on.  There's an objection.

25      THE COURT:  Objection?

1          MS. POWELL:  Yes.

2          THE COURT:  Sidebar, please.

3   SIDEBAR CONFERENCE:

4      (The Court requested the prior question to be read back,

5   as follows:

6          "Q.  Okay.  But now you're here to tell the jury that

7       somehow, even though you thought it was speculation to

8       figure out a basis for fitness for duty, that today, now

9       that he's filed a lawsuit, you have all these reasons --

10         "MS. POWELL:  Objection.

11         "Q.  -- that would support a fitness-for-duty

12      referral, right?")

13         MS. POWELL:  So the reason for the objection is that

14  it was a mischaracterization of --

15     The way that the question was characterized was Lieutenant

16  Broach --

17     (Defense Counsel confer privately.)

18         MR. GIGLIO:  If I may, Your Honor?

19         THE COURT:  Sure.

20         MR. GIGLIO:  The question that was quoted by

21  Mr. Gerhardstein is did anyone explain what he did or what he

22  said.  He said that was speculation.

23     It was a mischaracterization to say that he speculated it.

24     Did anyone explain it to him?  He said that was

25  speculation.  It's a mischaracterization of his testimony in

```
 1    the deposition.
 2              MR. GERHARDSTEIN:  Judge, that's redirect material.
 3    That's not -- it's not a fair basis for an objection.
 4              THE COURT:  Okay.  You can address it on redirect.
 5              MS. POWELL:  Okay.
 6              THE COURT:  Thank you.
 7    CONCLUSION OF SIDEBAR CONFERENCE.
 8              THE COURT:  Whenever you're ready.
 9              MR. GERHARDSTEIN:  Mary Ann, could you read back the
10    last question?
11         (Court reporter read back the pending question as follows:
12            "Q.  Okay.  But now you're here to tell the jury that
13         somehow, even though you thought it was speculation to
14         figure out a basis for fitness for duty, that today, now
15         that he's filed a lawsuit, you have all these reasons --
16            "MS. POWELL:  Objection.
17            "Q.  -- that would support a fitness-for-duty
18         referral, right?")
19    BY MR. GERHARDSTEIN:
20    Q.  You can answer.
21    A.  Lieutenant Broach entered the meetings with EEO.  He
22    brought up the incident where the firefighter ran away from
23    the fire.  He brought up the incident of him not reporting the
24    apparatus being damaged.  Those were incidents he brought up.
25    I never brought them up.  He brought them up.
```

1  Q.  Lieutenant, you said you were there to help Lisa Berning

2  with terminology and to help her understand the Fire

3  Department, right?

4  A.  Yes, sir.

5  Q.  You said that you were not there to bring charges or

6  enforce in your role as an investigator --

7  A.  I did not.

8  Q.  -- is that correct?

9  A.  I did not.

10  Q.  Am I right that you were not there to do that?

11  A.  That is correct.

12  Q.  Okay.  Did you tell Lieutenant Broach that you were not

13  there to do any investigation of the matters he brought up?

14  A.  Yes, I did.  I told him --

15  Q.  Okay.

16  A.  -- I would leave the room if he was uncomfortable with me

17  being there.

18  Q.  Okay.  Well, I understand that, but did you tell him you

19  were not there to investigate any matters that he brought up?

20  A.  No, I didn't --

21  Q.  Okay.

22  A.  -- tell him that.

23  Q.  So you were pretty shocked when you thought he said that

24  at the costume fire Firefighter Evans jumped off the equipment

25  and ran away from the fire; that was pretty shocking, right?

1  A.  As a firefighter, yes.

2  Q.  Okay.  And that's what you thought --

3  A.  That's not what I thought.  That's what I said.

4  Q.  -- Broach's explanation of that event was, right?

5  A.  That is not what I thought.  That's what he said.

6  Q.  And at that point did you tell him that his explanation is

7  so shocking that you are now going to have to consider that as

8  you -- in your role as a member of Internal Affairs?

9  A.  No, I did not.

10  Q.  Okay.  But, you now cite that report as one of the things

11  that in your mind should be considered on a fitness-for-duty

12  referral, right?

13  A.  Not just that incident.

14  Q.  Okay.  But that's one of them, right?

15  A.  Throughout the meeting there was several incidents.

16  Q.  Okay.  That's one of them, right?

17  A.  That is correct.

18  Q.  And Lieutenant Broach says that at the fire there was a

19  mayday, people did exit the interior, and Ron Evans did run in

20  further than anyone else.  Is that news to you?

21  A.  He never mentioned that.  Mayday was for everybody to get

22  out of the building.

23  Q.  Okay.

24  A.  There is a difference from running off an apparatus and a

25  mayday leaving the building that is structurally damaged where

```
 1   everyone has to exit the building.
 2   Q.  Right.
 3   A.  And I did ask him at that meeting "Did you report that to
 4   your -- your superior?"
 5   Q.  Right.  So -- so this is a really important thing, right?
 6   A.  Yes, it is.
 7   Q.  Okay.  So it would be good if there was a thorough
 8   investigation of the costume fire, right?
 9   A.  Well, that was before my time in Internal.
10   Q.  Right.  It was actually from 2008, right?
11   A.  Correct.
12   Q.  And the incident involving the truck damage was from 2009,
13   right?
14   A.  Correct.
15   Q.  And the costume fire, if you wanted to get to the bottom
16   of what really happened in a reliable way, you would
17   investigate it the way you investigated the Potter charges,
18   right?  You talked to the last responding fire company first
19   and then you talked to the first responding fire company last,
20   and you'd look at all the run sheets and you'd look at all the
21   information to make sure that you had an accurate picture of
22   what really happened, right?
23   A.  The problem is Lieutenant --
24   Q.  Well, first answer my question, sir.
25       If you wanted to know what happened, you'd do a thorough
```

 1  investigation, right?

 2  A.  It's hard to do a thorough investigation with five --

 3  Q.  Hold on.  Answer the question first and then you can

 4  explain.

 5  A.  I'm trying to answer your question, sir.

 6  Q.  Okay.  If you wanted to know what happened, you would do a

 7  thorough investigation, isn't that right, sir?  Yes or no.

 8  A.  If I had knowledge that --

 9  Q.  Hold on.  Hold on.  We have to get along here.  All right?

10  A.  I'm trying to get along.

11      Yes, you would have to do a thorough investigation.

12  Q.  Okay.  And a thorough investigation, as we've seen because

13  you do those --

14  A.  Right.

15  Q.  -- includes getting all the documents, right?

16  A.  Right.

17  Q.  And interviewing the firefighters at the scene, right?

18  A.  That's correct.

19  Q.  And when you were in those sessions with Lisa Berning, did

20  you think you were investigating his charges of

21  discrimination?

22  A.  We thought we were, yes.

23  Q.  Okay.  And if you thought you were investigating his

24  charges of discrimination, at any point did Lisa Berning ask

25  the Fire Department for any pattern information, like what is

1  the record of fires/discipline against black officers versus

2  white officers?  Did she ask for that?

3  A.  I can't recall.

4  Q.  If your -- Internal is part of Human -- Fire Human

5  Resources, right?

6  A.  Correct.

7  Q.  So, if she had asked to look at the big picture of

8  fire/discipline by race, you could have answered that

9  question, right?

10  A.  If I had done research, yes, I could.

11  Q.  Yeah.  You had that information available to you in the

12  Human Resources Department at the Fire Department, right?

13  A.  We could put the data together to get that information.

14  Q.  In fact, every year you put data like that together for

15  the annual Affirmative Action Report for the city, right?

16  A.  Correct.

17      (Messrs. Gerhardstein and Giglio confer privately.)

18          MR. GERHARDSTEIN:  We're up to 38?

19          THE COURT:  39, I believe.

20          MR. GERHARDSTEIN:  39?

21          MR. GIGLIO:  May we approach?

22          THE COURT:  You may.

23  SIDEBAR CONFERENCE:

24          THE COURT:  Okay.

25          MR. GERHARDSTEIN:  This is discipline by race.  First

```
 1   we have --

 2       These are the full reports, if they want to check it.  But

 3   for 2009, this is 2010, we have Protective Services Sworn,

 4   23.8 percent of the Protected Services, black males.

 5           THE COURT:  We went through this report.

 6           MR. GERHARDSTEIN:  With Berning.

 7           THE COURT:  Okay.

 8           MR. GERHARDSTEIN:  Actually, I went through other

 9   years, but since then I've been able to get '9, '10 and '11.

10           MS. POWELL:  Okay.

11           MR. GERHARDSTEIN:  And in this year they reported

12   fires separately.  And, so, 53 percent of the discipline is

13   against black males in the Fire Department.  But black males

14   only make up 23 percent of the Protected Service Sworn.

15           THE COURT:  Okay.  And the objection?

16           MS. POWELL:  I guess it's not clear to me what it's

17   going to be used for.  If it's going to be used for

18   impeachment purposes, he hasn't denied --

19           MR. GERHARDSTEIN:  No, I just laid a foundation that

20   said he could have gotten the information.  I did.  And I want

21   to show that had he gotten it, it's relevant to the issue

22   whether all those disciplines Lieutenant Broach was

23   complaining about were fair.

24           MS. POWELL:  He's not the --

25       There's no indication he's the one doing the
```

1  investigation.  These are documents we haven't seen.  This

2  isn't a disparate impact case.  This is a --

3       MR. GERHARDSTEIN:  Actually, every individual case

4  starts with this.  You know, what is the pattern of discipline

5  by the employer against the person in the protected class?

6    He just agreed he could have answered a question like

7  that.  Lisa agreed she could have asked for it, and the City

8  reports it everybody year.

9       THE COURT:  We talked about the reports before, so he

10  can ask the question and you can develop on redirect.

11       MS. POWELL:  Okay.

12       MR. GIGLIO:  Just note our objection.  This is

13  improper.  It's not a disparate impact case.  The exhibits

14  were never provided and it should not be admitted.  Thank you.

15       MS. POWELL:  Thanks.

16       THE COURT:  Thank you.

17  CONCLUSION OF SIDEBAR CONFERENCE

18       MR. GERHARDSTEIN:  May I approach just to leave them

19  with the witness?

20       THE COURT:  Yes.

21       MR. GERHARDSTEIN:  I've made a set for you, Judge.

22       THE COURT:  Thank you.

23       MR. GERHARDSTEIN:  So 2009 is 39; 2010 is 40; and

24  2011 is 41.

25       THE COURT:  Thank you.

1          MR. GERHARDSTEIN:  Thank you.

2   BY MR. GERHARDSTEIN:

3   Q.  So, you agreed that if Lisa Berning had asked you about

4   the discipline of white versus black in the Fire Department,

5   you could have answered that question, right?  Or you could

6   have provided data that relates to that question, right?

7   A.  Probably.

8   Q.  So take a look at Exhibit 39.  These are two pages from

9   the City's affirmative action program from 2009.  And the one

10  page that was excerpted is page 19 and it's called Utilization

11  Analysis.  Do you see that?

12  A.  Yes.

13  Q.  Now, they don't break out Fire separately, but they have

14  Protected Service Sworn, which we learned from earlier

15  testimony means Fire and Police.  Do you agree with that?

16  A.  Yes.

17  Q.  And this document indicates that of all the employees in

18  the Protected Service Sworn category, 24.4 percent are black

19  males, right?

20  A.  That's correct.

21  Q.  Is that about -- based on your what, 27 years --

22  A.  Yes.

23  Q.  -- in the Fire Department, is that about right for Fire,

24  or is it slightly more or less if you tried to tease out Fire?

25  A.  I can't speak to that.

1   Q.  Okay.

2   A.  I'm an internal investigation lieutenant.  I take my cases

3   on a case-by-case basis.  I couldn't tell you how many blacks

4   or whites that I disciplined.  I don't look at the numbers.  I

5   look at the case.

6   Q.  Uh-huh.

7   A.  I'm a black officer myself and I want to treat everyone

8   fair and equal.  I couldn't tell you -- I couldn't give you

9   the breakdown of this year how many blacks or whites I

10  interviewed or looked into their cases.  That doesn't matter

11  to me.

12  Q.  Well, that's very helpful to know.  You're saying that you

13  never look at whether there's more discipline against blacks

14  than whites?  You don't look at the numbers?

15  A.  That's correct.

16  Q.  Have you gone through EEO training?

17  A.  Yes, I have.

18  Q.  Have you been advised by the City in your EEO training

19  that it is helpful to track a comparison between the group

20  upon which discipline is visited to the number, the percentage

21  of that group, in the labor force?  Has that ever been

22  suggested to you?

23  A.  It's been suggested, but when you deal with lives of the

24  public, everyday lives of firefighters every day, you look at

25  incidents, and that's what I look at.  I look at the safety of

1   the firefighters and the safety of the public.

2   Q.  Right.

3   A.  I don't have time to look at numbers and should I go here

4   or there with my number.  I don't work like that.

5   Q.  So, are you saying that the City has advised you to at

6   least track whether African-Americans or women are disciplined

7   more than whites or males but you just don't do it?  Is that

8   what you're saying?

9   A.  I'm not saying that.

10  Q.  Okay.

11  A.  I'm saying I look at each incident as it comes up and I

12  investigate that incident that's before me.

13  Q.  And you don't look at --

14  A.  Race.

15  Q.  -- the numbers, right?

16  A.  I don't look at race.

17  Q.  All right.  But you don't look at the numbers either,

18  right?

19  A.  Maybe the number of cases I have, but not the numbers as

20  far as -- as far as percentage of --

21  Q.  Okay.

22  A.  -- who's gotten in trouble over the last year.  No, I

23  don't.

24  Q.  Okay.  So, this has about 24 percent black males here in

25  the Protected Sworn Service.  Do you see that?

6-47

1   A.  Yes, I do.

2   Q.  All right.  And for the year 2009 -- whoops -- Fire had 21

3   incidents of discipline against black males, right?

4   A.  If you say so.

5   Q.  Well, according to the report that was filed?

6   A.  Okay.

7   Q.  It's part of the City's EEO report.

8       And that represented 45.7 percent of all the discipline in

9   the Fire Department, right?

10  A.  That's correct, but a lot of data is misleading because

11  that's small violations also --

12  Q.  All right.

13  A.  -- and we can't control if a guy gets a DUI.

14  Q.  Right.  I understand that there could be an explanation.

15      My question is, really do you even look at it?

16  A.  No, I don't.

17  Q.  Okay.

18  A.  I haven't looked at it, no.

19  Q.  And when Lieutenant Broach was raising questions about his

20  prior discipline, he was suggesting that he was being

21  disciplined for things that white firefighters weren't being

22  disciplined for, it was unfair.  Right?

23  A.  I never heard that come up, no.

24  Q.  And then in 2010, we have 24.1 percent again of the

25  Protected Service as black males, right?

1  A.  Correct.

2  Q.  And, actually, we're not going to see much variation,

3  because the City hasn't been doing much hiring, right?

4  A.  Right.

5  Q.  But in the discipline for 2010, it was -- 50 percent of

6  the discipline was visited on that 24 percent of the

7  Protective Service labor force, right?  Is that correct?

8  A.  That's correct.

9  Q.  And then in 2011 -- and these Affirmative Action Reports

10 come at the end of the year, right?

11 A.  Correct.

12 Q.  So, the 2011 report would be April 1, 2011, is that right?

13 A.  Correct.

14 Q.  And the report for 2011 is actually for -- through

15 December 31, 2010, right?  The data?

16 A.  Right.  The data is for 2010.

17 Q.  All right.  So, for 2011, the 2010 data, we have black

18 males at 23.8 percent of the Sworn Protective Service, right?

19 A.  Correct.

20 Q.  And we have Fire with 53.7 percent of the discipline

21 hitting those -- that 23.8 percent of the labor force, right?

22 A.  Correct.

23 Q.  And, as you say, if you were to look at numbers, you would

24 be able to figure out whether every one of those incidents was

25 justified or whether it reflected a pattern of being more

1  harsh on blacks than whites, right?

2  A.  I can't speak for that.

3  Q.  Well, but, that would be the next step when you have data

4  like this that suggests that blacks are getting more

5  discipline, right?  You'd want to know whether it's because of

6  discrimination, right?

7  A.  I can't speak to that.  I couldn't -- I'd be speculating.

8  Q.  Well, you're an investigator, right?

9  A.  That's correct.

10 Q.  So you'd know how to look at those incidents and satisfy

11 yourself that each one individually was justified.  And if it

12 falls more heavily on blacks, that's just the way your fair

13 system operates, right?

14 A.  We have 750 firemen and 16 of them were disciplined and --

15 23 blacks were disciplined and 16 whites were disciplined.

16 You know, it's just on a case-by-case basis to me.  I don't

17 look at it who's coming in my office, what's their color.  If

18 I find the case frivolous, you know, it won't get by me.

19        MR. GERHARDSTEIN:  Would you read the question back?

20    (At which time the court reporter read back the following

21    question:

22        "Q.  So you'd know how to look at those incidents and

23    satisfy yourself that each one individually was justified.

24    And if it falls more heavily on blacks, that's just the

25    way your fair system operates, right?")

1  Q.  Can you answer that yes or no?

2  A.  I can't answer that.  That's -- I'd be speculating.

3  Q.  So, you don't even know whether you could look at the data

4  we just talked about and figure out if the higher level of

5  discipline against blacks was a reflection of discrimination

6  or not?  You think that's speculation?

7  A.  There's a lot of variables.

8  Q.  First answer the question.  Do you think that's

9  speculation?

10  A.  I'd be speculating, yes.

11  Q.  In your years in Internal, have you ever been asked to

12  explain the higher incidence of discipline against blacks in

13  the Fire Department?

14  A.  No, I have not.

15  Q.  Okay.  You were talking about your investigation of the

16  Potter charges at the beginning of your testimony.  Do you

17  recall that?

18  A.  Yes, sir.

19  Q.  And you looked at Defense Exhibit 4.  I'm sorry.  We're

20  gonna have to build bigger witness boxes or go totally

21  electronic.

22  A.  Okay.

23  Q.  And Defense Exhibit 4 is your entire investigative file

24  for your investigation of the Potter fire, right?  I'm sorry,

25  the Potter charges?

1   A.  My summary.

2   Q.  Right.  But all the pages behind it, is that your whole

3   file?

4   A.  There's three pages to my summary.

5   Q.  Right.  But aren't there a lot of other pages in the

6   exhibit?

7   A.  Those are the charges --

8          MR. GERHARDSTEIN:  May I approach, Your Honor?

9          THE COURT:  You may.

10     (Mr. Gerhardstein assisting the witness.)

11         THE WITNESS:  Yes.

12         MR. GERHARDSTEIN:  Thank you, Judge.

13         THE COURT:  Sure.

14  Q.  So, taking that fistful of documents, and take your time,

15  can you tell me whether that's your whole file?

16  A.  I couldn't tell you.  I'd be speculating if it's the whole

17  file.

18  Q.  Okay.  So --

19  A.  I don't memorize every file.

20  Q.  I only ask because you testified that you interviewed a

21  lot of people.

22  A.  Yes.

23  Q.  But there are no summaries of your witness interviews in

24  that --

25  A.  Transcript.

1  Q.  -- collection of documents?

2  A.  (Nodding head affirmatively.)

3  Q.  Would you normally have witness interviews?

4  A.  Yes, we would.

5  Q.  Okay.

6  A.  Probably have them on the internal hard drive.  They

7  probably didn't transcribe them because they didn't go through

8  a hearing.

9  Q.  Okay.

10  A.  Normally if they go to a hearing, they're transcribed.

11  Q.  You said in there in your testimony that you didn't

12  interview Ron Evans, right?

13  A.  No.  Ron Evans hadn't been to work for two years.

14  Q.  And you say you didn't interview Lieutenant Broach?

15  A.  That's correct.

16  Q.  But you also said that Lieutenant Broach called you and

17  gave you some information about --

18  A.  Early on.

19  Q.  -- the fire, right?

20  A.  Early on.

21  Q.  So that was after you had the case, right?

22  A.  Correct.

23  Q.  'Cause he wouldn't have known to call you, right?

24  A.  Right.

25  Q.  But before you had done -- before you had completed the

1  case, right?

2  A.  Before I started the case, yes.

3  Q.  Well, by him calling you and offering information about

4  the fire, it was clear that he wanted to tell you what

5  happened, right?

6  A.  Well --

7  Q.  Is that true or not?  First -- first, just say yes or no,

8  and then you can explain.

9  A.  Yes.

10  Q.  Okay.

11  A.  It's true.

12  Q.  Okay.

13  A.  Can I explain?

14  Q.  Yes.

15  A.  You said you'd give me the opportunity to explain it.

16  Q.  Yes.  Please do.

17  A.  While the incident is being investigated, I won't talk to

18  any of the -- the -- the people involved in the investigation

19  until I'm ready to talk to them.

20  Q.  So, did you give him a date to call back on?

21  A.  No, I didn't give him a date to call back.  I didn't know

22  when --

23  Q.  Did you explain to him that you wanted to talk to him and

24  that he was just calling in too early?

25  A.  No, I didn't explain that to him.  I don't have to explain

1  that to him.

2  Q.  Did you want to know what he had to say?

3  A.  At some point, yes.

4  Q.  Weren't you curious about his name and Ron Evans' name

5  were matched together so many times in those Potter charges?

6  A.  No.  It didn't occur to me.

7  Q.  That didn't raise any --

8  A.  No.

9  Q.  -- questions for you?

10 A.  No, it did not.

11 Q.  And you explained to the jury some of the things he said

12 in that phone call, right?

13 A.  That is correct.

14 Q.  But there's no record of that phone call in the file in

15 Exhibit 4, is there?

16 A.  Because I told him I could not talk with him at the time.

17 Q.  So, you're just remembering now three years later what he

18 said in the phone call and you didn't write down, is that

19 correct?

20 A.  I remembered it because he wanted to file charges against

21 his own company members.

22 Q.  So, you're remembering something that you think is wrong,

23 but you didn't write anything down from that phone call,

24 right?

25 A.  I did not expect him to go off on stress leave and stay

1  off for five months.  I had no --

2  Q.  Okay, sir.

3  A.  I didn't have any idea that was going to happen.

4  Q.  My question was, you didn't write anything down, right?

5  A.  Correct.

6  Q.  Okay.  Lieutenant Broach and you have been with the Fire

7  Department about the same length of time, right?  You have a

8  couple years more, I think?

9  A.  That's correct.

10  Q.  All right.  And Lieutenant Broach had never filed a

11  discrimination case prior to 2010, had he?

12  A.  I can't recall.  I started in 2009.

13  Q.  And you never investigated Lieutenant Broach for anything

14  prior to the Potter charge, right?

15  A.  I can't recall.

16  Q.  When you started working with Lisa Berning on her

17  processing of Broach's EEO complaint, did she share with you

18  her policy book on how she operated?

19  A.  I never worked with her.  I helped her.

20  Q.  Okay.  Did she share with you her policy book?

21  A.  No, she did not.

22  Q.  So, did you ever see Chapter 3 of her policy book which

23  details all the things that an EEO person should do to

24  investigate a claim of discrimination?

25  A.  No, I never saw Chapter 3.

1  Q.  Apparently, Lisa Berning told you that she had made a

2  finding of Unfounded with respect to Broach's EEO charge, is

3  that right?

4  A.  Something to that effect.

5  Q.  She never should --

6       Go ahead.

7  A.  I can't remember what she said.  I think she pointed it

8  out somehow with -- with not finding anything.

9  Q.  So your understanding --

10  A.  I can't remember the exact words.

11  Q.  Your understanding, in your parlance, is Unfounded or

12  Unproven, correct?

13  A.  That is correct.

14  Q.  And she never showed you any written findings, right?

15  A.  She didn't have to show it to me.  She would share that

16  with Administration.

17  Q.  My question was, she never showed you any written

18  findings, right?  Is that correct?

19  A.  That's --

20  Q.  Yes or no, please.

21  A.  No.

22  Q.  She didn't, right?

23  A.  No, she didn't.

24  Q.  Okay.  You understood that Lieutenant Broach was accusing

25  Campbell of race discrimination, right?

1   A.  That's correct.

2   Q.  And as an African-American lieutenant yourself, you agreed

3   that if your captain was a racist, you couldn't work for him,

4   right?

5   A.  I probably have worked for racist captains in my career.

6   Q.  I'm sorry, sir.  I am actually asking you about the

7   dialogue during the EEO meetings.

8       And my question is, as an African-American lieutenant

9   yourself, you agreed when you talked to Lieutenant Broach that

10  if your captain was a racist, you couldn't work for him.  Is

11  that right?

12  A.  That's correct.

13  Q.  And Lieutenant Broach asked you if you believed that there

14  were any people working for the City who were racists and your

15  response was, "I'm sure there's quite a few."  Isn't that

16  right?

17  A.  That's correct.

18  Q.  And you still believe that, right?

19  A.  That's correct.

20  Q.  So it's important to thoroughly investigate claims of

21  discrimination in order that people not act on that racism,

22  right?

23  A.  If you're going to comment on the meetings, can I make a

24  statement on the meetings?

25  Q.  No.  I'm sorry.  You know, we have a system --

1  A.  Okay.

2  Q.  -- and I get to ask questions, and you know this because

3  you're an investigator and you usually get to ask the

4  questions.  And I know this is frustrating --

5  A.  Yeah, it is.

6  Q.  -- but please work with me.  Okay?

7  A.  I'm trying very hard.

8  Q.  Well, thank you.

9       MR. GERHARDSTEIN:  Can you read the question back?

10      THE WITNESS:  Read it back.

11   (At which time the court reporter read back the following

12   question:

13      "Q.  So it's important to thoroughly investigate

14   claims of discrimination in order that people not act on

15   that racism, right?")

16  A.  That's fair.

17  Q.  Okay.  And once you said in your meeting with Lieutenant

18  Broach on October 13th that you agreed that there were quite a

19  few racists working for the City, Berning said, "I'd like to

20  keep my rose-colored glasses on and believe that's not true."

21   Didn't she say that?

22  A.  That's correct.

23  Q.  So, if the person responsible for investigating Mark

24  Broach's discrimination claim admitted to having rose-colored

25  glasses on and didn't want to believe that there were racists

1    working for the City, didn't that raise any concerns for you?

2    A.  Are we talking about the meetings again?  I thought they

3    were stricken, we couldn't talk about the meetings.

4        You want to talk about the meetings?

5    Q.  Hold on.

6            MR. GERHARDSTEIN:  Just read the question back,

7    please.

8    A.  I would like to talk about the meetings.

9        (Laughter.)

10   Q.  You know what?  She's going to get up and ask more

11   questions and then you'll feel better.  Trust me.

12       (At which time the court reporter read back the question

13       as follows:

14           "Q. So, if the person responsible for investigating

15       Mark Broach's discrimination claim admitted to having

16       rose-colored glasses on and didn't want to believe that

17       there were racists working for the City, didn't that raise

18       any concerns for you?")

19   A.  No, it did not.

20   Q.  Now, did Lisa Berning talk to you about Chapter 2 of her

21   policies regarding mediation?

22   A.  No, she did not.  I was not there --

23       I was there to help with Fire Department policy and

24   procedures.

25   Q.  Did she explain to you that she was conducting a mediation

1    on October 6th and October 13th?

2    A.   With?  The scheduled meetings with Lieutenant Broach and

3    Captain Campbell?

4    Q.   Yes.

5    A.   Yes, I was involved in that.

6    Q.   And did she give you any instruction as to at what point

7    you could speak up and on what issues you could speak up?

8    A.   It was an informal meeting and there were no instructions.

9    Q.   Okay.  Were you one of the mediators?

10   A.   No, I was not.  I was there to assist Lisa with the

11   policies and procedures.

12   Q.   Would you agree that at times you were confrontational

13   with Lieutenant Broach?

14           THE COURT:  Yes or no.

15   A.   Yes.

16   Q.   And would you agree that at times Lisa Berning was

17   confrontational with Lieutenant Broach?

18   A.   I think it was the other way around:  Lieutenant Broach

19   being confrontational.

20   Q.   When you discussed the Potter charges in these meetings

21   with Lisa Berning and Lieutenant Broach, did you also discuss

22   the email that Captain Potter had sent out following the time

23   he fell through the floor of a burning building?

24   A.   Who brought this up?

25   Q.   It was attached to the March 2010 charge of discrimination

```
 1   filed by Lieutenant Broach.

 2   A.  I don't remember talking about that.

 3   Q.  Okay.  So, you're an investigator, right?

 4   A.  Yes, sir.

 5   Q.  Let's assume that a black person files a charge of

 6   discrimination.  Okay?

 7   A.  Yes, sir.

 8   Q.  That act by the African-American person of filing a charge

 9   of discrimination is a protected activity, right?

10   A.  Yes, sir.

11   Q.  And you know that the City can't retaliate against that

12   person simply because he filed a charge of discrimination,

13   right?

14   A.  Yes, sir.

15   Q.  And you know that the City can't retaliate against that

16   person simply because he would oppose discrimination, right?

17   A.  Yes, sir.

18   Q.  And the City also can't retaliate against that person for

19   participating in the EEO process, right?

20   A.  Correct.

21   Q.  Okay.  Do you think it's even possible for a black person

22   to retaliate against another black person?

23   A.  It's possible.

24   Q.  And do black -- do all black people treat all other black

25   people equally?
```

```
 1   A.  Probably not.
 2   Q.  Some blacks discriminate against other blacks with lighter
 3   skin, right?
 4   A.  If you say so.
 5   Q.  Well, you've seen that, right?
 6       I mean, have you ever gone down Gilbert and seen the
 7   beauty shop with all the light-skinned women and no
 8   black-skinned women?  Something's going on there, right?
 9   A.  I don't pay attention.  I can't speculate.
10   Q.  Would you agree that blacks can collaborate with others
11   who are engaging in race discrimination?
12   A.  They can --
13   Q.  Okay.
14   A.  -- I guess.
15   Q.  Take a look at Plaintiff's Exhibit 27.  You see that?
16   A.  Yes.
17   Q.  So, on January 18th, there is an anonymous email sent to
18   Chief Wright accusing Captain Campbell of creating a hostile
19   work environment and of racial intolerance.  Do you see that?
20   A.  Yes, sir.
21   Q.  Was this complaint ever referred to you for investigation?
22   A.  No, sir.
23   Q.  Have you ever seen this before?
24   A.  Never seen it before in my life.
25   Q.  Well, Chief Wright is black, right?
```

1   A.  Right.

2   Q.  And Chief Wright sends the email, forwards it to Chief

3   Rick Reed at AOL, his private email.

4       And that's Howard Reed, right?

5   A.  I'd speculate.  I don't know Howard Reed's personal --

6   Q.  You know that Howard Reed's nickname is Rick, right?

7   A.  No, I don't.  It's the first I've heard of that.

8   Q.  You know that Howard Reed would sign his name Howard,

9   right?

10  A.  I don't -- I'd be speculating how Howard would sign his

11  name.  I have no idea.

12  Q.  You know that Howard Reed's been on the Fire Department

13  longer than you have, right?

14  A.  Yes.

15  Q.  And Howard Reed's been very active in the African-American

16  Firefighters Association, right?

17  A.  I'd be speculating.  I don't know his activities.

18  Q.  Your brother was an officer of the African-American

19  Firefighters Association, right?

20  A.  That is correct.

21  Q.  You're a member of the African-American Firefighters

22  Association, right?

23  A.  That's correct.

24  Q.  You went to a lot of their meetings, right?

25  A.  Not -- 20 years, probably.

1  Q.  You know who Howard Reed is, right?

2  A.  I know who Howard Reed is.

3  Q.  And he's a district chief, right?

4  A.  Retired.

5  Q.  Yeah.  And you know he's retired, right?

6  A.  Yes.

7  Q.  Okay.  So Robert Wright says to Howard Reed, "No name

8  complaint.  I can figure out if Ron sent this."

9      That's Ron Evans, right?

10 A.  I'd be speculating.  I don't know.

11 Q.  And then Chief Reed writes back saying, "No, I think it's

12 Lieutenant Broach.  He's the real snake here."

13     Did I read that correctly?

14 A.  Correct.

15 Q.  So, you know that Howard Reed and the Fire Chief were very

16 close friends, right?

17 A.  I couldn't -- I'd be speculating.

18 Q.  Your brother Henry was a --

19     What was he, secretary of the African-American

20 Firefighters?

21 A.  I don't know what his position --

22 Q.  He was on the Executive Board, right?

23 A.  Correct.

24 Q.  And you were a member for many years of the

25 African-American Firefighters, right?

1  A.  I've been nonactive for probably 20 years now.

2  Q.  Right.  But you're a member, right?

3  A.  Yes.

4  Q.  And you know that Lieutenant Mark Broach never joined the

5  African-American Firefighters, right?

6  A.  That's the first I've heard of that.

7  Q.  You weren't aware of that?

8  A.  No.

9  Q.  So tell me what the Cincinnati African-American

10  Firefighters Association is.

11  A.  I'm still trying to figure that out myself.  That's why I

12  haven't been an active member in it.

13  Q.  Your brother, who's on the Executive Board, never gave you

14  a clue?

15  A.  No, he didn't.  He didn't give me a clue.

16  Q.  Organization, trying to secure the rights of

17  African-Americans.  Right?

18  A.  I would like to think so.

19  Q.  And Robert Wright was appointed Police Chief in 1997?

20  A.  Fire Chief.

21  Q.  Sorry.  Thank you.  Fire Chief in 1997?

22  A.  Yes, sir.

23  Q.  And at that time it was an internal process, right?

24  Didn't hire from the outside?

25  A.  Right.

1   Q.  And he was a great test-taker, right?

2   A.  I'd be speculating.

3   Q.  I mean, over the years he did really well on the Civil

4   Service test, right?

5   A.  I assume.  I'm speculating.

6   Q.  He was the first African-American Fire Chief in the city?

7   A.  That's correct.

8   Q.  But after he became Fire Chief, EEO problems didn't stop,

9   right?

10  A.  I'd be speculating.  I worked in Internal for four years

11  and I've only seen a couple.

12  Q.  Well, you've already agreed that there are racists working

13  in the city, right?  Isn't that right?

14  A.  I never agreed to it.  I said I would guess so.  I don't

15  know for sure.  I can't pick out any, point you in their

16  direction, no.

17  Q.  In -- after Chief Reed -- I'm sorry.

18      After Chief Wright was appointed, there were some public

19  race issues that came up, including -- remember a column by

20  Peter Bronson that criticized the hiring standards that was

21  posted on a Fire Department bulletin board?

22  A.  I can't recall.

23  Q.  You don't recall the EEO investigation that followed that?

24  A.  No, I don't.

25  Q.  How about when Fire Chief Wright fired the chaplain who

 1  was white and who he thought was raising problems among the

 2  black firefighters:  Do you remember that?

 3  A.  I would be speculating on --

 4      That was all handled by Chief Wright's administration.  I

 5  was on Ladder 29 at the time.  I concentrated on my men,

 6  checking my men and the public.  I don't remember the

 7  incident, no.

 8  Q.  Well, you know the incident happened, right?

 9  A.  I know the chaplain was fired.

10  Q.  Okay.

11  A.  That's all I know about it.  I didn't investigate it.  I

12  wasn't part of Internal at the time.

13  Q.  And you know that in 2001 over a hundred black

14  firefighters walked out of the union, right?  That was a

15  really big deal right after the riots.  You remember that,

16  right?

17  A.  Vaguely.

18  Q.  Okay.  So, eventually the black firefighters resolved

19  their differences and came back into Local 48, right?

20  A.  I never left.

21  Q.  Okay.  But you know that suddenly a lot of the

22  firefighters who had walked out had rejoined, right?

23  A.  I'd be speculating.  I don't know how many rejoined.  I

24  don't know how many exited.  I can't answer that question for

25  you.

6-68

1   Q.  And you know that in the mid-2000s, the City Manager of

2   Cincinnati started publicly raising questions about firehouses

3   being segregated.  Do you remember that?

4   A.  I don't remember that.

5   Q.  Well --

6   A.  Firehouses --

7   Q.  Well, you'd agree that there's a racial imbalance in the

8   staffing of firehouses, right?

9           MS. POWELL:  Objection.

10          THE COURT:  Hold on.

11  A.  I worked at Engine --

12          MR. GERHARDSTEIN:  Hold on.

13  SIDEBAR CONFERENCE:

14          MS. POWELL:  The reason for my objection is that this

15  line of questioning is going way beyond the items I brought up

16  in direct examination with him.

17          THE COURT:  Okay.

18          MR. GERHARDSTEIN:  This line of questioning goes to

19  his conclusion that all the disciplines -- and in fact that's

20  what they have testified to.  And if there is a way to look at

21  the big picture and see that a person could legitimately feel

22  that he is the victim of discrimination because of disparate

23  discipline and that he's been targeted, then you can

24  understand the reasonableness of him questioning his own

25  discipline.

1          MS. POWELL:  And I understand the point you're trying

2    to make.  That's the point that should have been made in

3    plaintiff's case-in-chief, and it's beyond the items that I

4    raised with the lieutenant in his direct examination.

5        I just think we're way far afield the confines of what I

6    asked questions about.  If they had wanted to ask him these

7    kind of questions, quite frankly, bring the witness in to talk

8    about expert -- to talk about disparate impact and how this is

9    the big-picture discipline.  They could have done that in

10   their case and they're trying to blow up the narrow opening of

11   that and into a lengthy dissertation of race discipline

12   statistics and the history of civil rights in the fire fight

13   -- Fire Department, and it's just going way beyond what I

14   asked him.

15         THE COURT:  Okay.

16         MR. GERHARDSTEIN:  Directly suggested that because

17   he's black, he would be more fair.  That's why they have him

18   testifying about the meetings.  And I think it's important

19   that he be thoroughly cross-examined on these items.  And I'm

20   not belaboring it.  I'm simply raising some of the themes that

21   would assist the jury in evaluating his testimony.

22         THE COURT:  After the question about the segregation

23   of the stations, how many other examples would you want to

24   give?

25         MR. GERHARDSTEIN:  I think that's about it.

```
 1            THE COURT:  All right.  One more.
 2            MR. GIGLIO:  Note our objection.
 3            MS. POWELL:  Note our standing objection.
 4    CONCLUSION OF SIDEBAR CONFERENCE
 5    BY MR. GERHARDSTEIN:
 6    Q.  You'd agree that even today there are some all-white
 7    firehouses and some that are almost all black, right?
 8    A.  That is correct.
 9    Q.  And that's largely because the union contract has always
10    supported people being able to choose what firehouse they'd
11    work in by seniority, with some exceptions for the
12    administration to override that with administrative staff,
13    right?
14    A.  That's correct.
15    Q.  But that issue is one that the African-American
16    Firefighters' Association and Local 48 actually agreed on.
17    They didn't want to change it, right?
18    A.  It's up to the individual.  I worked in Ladder 29 for
19    15 years; all-white firehouse, I was the only black.
20    Q.  I'm sorry, sir.  Could you answer the question?
21    A.  What was your question again?
22            MR. GERHARDSTEIN:  Would you read it back, please?
23        (At which time the court reporter read back the following
24        question:
25            "Q.  But that issue is one that the African-American
```

1        Firefighters' Association and Local 48 actually agreed on.

2        They didn't want to change it, right?")

3  A.  I can't answer that.  I don't know of any agreement like

4  that.  I didn't pay attention to it.  I worked wherever I

5  wanted to work.  I didn't pay attention to what house is all

6  white and what house is all black.  It didn't matter to me.

7  Q.  Kevin Campbell was the Trustee of Local 48, right?

8  A.  I'd be speculating.  I don't know what he does.

9  Q.  This anonymous email to Chief Wright accusing Kevin

10  Campbell of discrimination, if this had been referred to you,

11  you could have investigated it at Internal, right?

12  A.  That is correct.

13  Q.  And you had the power to investigate everybody from the

14  chief on down, right?  You and your captain?

15  A.  That is correct.

16  Q.  And once you were involved in Lieutenant Broach's claim of

17  discrimination against Campbell --

18  A.  I was never involved in the claim.

19  Q.  Once you assisted Lisa Berning --

20  A.  Right.

21  Q.  -- in her work on Lieutenant Broach's claim of

22  discrimination, it would have been helpful for you to know

23  about this, right?

24  A.  No.

25  Q.  It would have been helpful for Lisa Berning to know about

1   it, wouldn't it?

2   A.  It's the chief's discretion, the Fire Chief.

3   Q.  So, the reason this would not have been sent to Internal

4   was that this Fire Chief didn't send it, right?

5   A.  That's correct.

6   Q.  And that's the same fire chief who's in dialogue on this

7   email with Rick Reed about whether the complaint came from Ron

8   or from Lieutenant Broach who's referred to as a snake, right?

9   A.  That's correct.

10  Q.  The EEO meetings that ended with the agreement on October

11  13th, would you agree that if Broach had simply declined --

12  let me back up.

13      Those EEO meetings were voluntary, right?

14  A.  That's correct.

15  Q.  So, would you agree that if Broach had declined to

16  participate in the EEO meetings between you and Captain

17  Campbell and Berning, that there never would have been a

18  referral for fitness for duty?

19  A.  That is correct.

20      (Counselors Gerhardstein and Branch confer privately.)

21          MR. GERHARDSTEIN:  I don't have any more questions.

22          THE COURT:  Thank you.

23      Ms. Powell?

24                      REDIRECT EXAMINATION

25  BY MR. POWELL:

1  Q.  Lieutenant Lemons --

2  A.  Yes.

3  Q.  -- in your opinion, was Lieutenant Broach referred out for

4  fitness for duty because of filing the EEO complaint, or was

5  it because of his failure to accept responsibility and

6  demonstrate his ability to accept responsibility for a unit of

7  firefighters?

8          MR. GERHARDSTEIN:  Objection, Your Honor.

9          THE COURT:  I'm sorry.  We completely went through

10  the morning break.  You guys want to take a break or wait till

11  lunch?  Keep going?  Is it okay to keep going?  Yeah?  Are you

12  sure?

13          JUROR NO. 2:  Yes.

14          THE COURT:  All right.  Let's have a sidebar on that

15  end.

16  SIDEBAR CONFERENCE:

17          THE COURT:  They looked so interested, I completely

18  forgot about the break.

19          MR. GERHARDSTEIN:  Her question goes to the ultimate

20  question, in his opinion, and then he's supposed to give an

21  answer, I guess.  And he's already testified that he wasn't

22  involved in the decision to do the fitness for duty.  And I

23  was careful in my questions to just talk about the sequence.

24  If he hadn't participated, then there'd be no fitness for

25  duty.

1      So I haven't tendered him as an expert on this.  And I

2   don't think it's an inappropriate question.  I think it goes

3   -- it's unfair.

4           MS. BRANCH:  And leading.

5           THE COURT:  And I was confused by it.

6           MS. POWELL:  I can rephrase the question, but

7   essentially the jury should be able to hear from him -- well,

8   first of all, let me start Mr. Gerhardstein finished his last

9   question, "But for the EEO complaint, would this

10  fitness-for-duty evaluation have occurred?"  And the City has

11  always maintained it's not the EEO complaint that resulted in

12  the fitness-for-duty evaluation.  It's the behavior and the

13  denial of responsibility during the meetings that resulted in

14  the fitness-for-duty evaluation.

15          MR. GERHARDSTEIN:  And what my question was, was but

16  for his participation in those meetings there wouldn't be a

17  fitness for duty, and he agreed to that.

18          MS. POWELL:  But for his being a firefighter, he

19  wouldn't have been.

20          MR. GERHARDSTEIN:  Well, you can ask him that.  I

21  mean, that's fine.  But --

22          MS. POWELL:  He was present at the meetings and he

23  should be able to testify as to what the behavior within the

24  meetings was that gave rise to the referral, in his opinion.

25          MR. GERHARDSTEIN:  He said he wasn't involved in the

1   referral.  He was making it up after the fact then.

2           THE COURT:  I agree.

3           MS. POWELL:  Okay.

4           THE COURT:  Move on.

5   CONCLUSION OF SIDEBAR CONFERENCE

6   BY MS. POWELL:

7   Q.  Lieutenant Lemons, is it part of your duty as an

8   investigator to analyze the statistics from your -- your

9   investigation outcomes?

10  A.  No.

11  Q.  Do you have any duties to analyze the racial makeup of the

12  Fire Department as it relates to firefighter discipline

13  statistics?

14  A.  No.

15  Q.  And in this case you did not uphold the February 2010

16  charges against Lieutenant Broach?

17  A.  I found them to be inconclusive.

18  Q.  You were asked about the statement that Lisa Berning made

19  in one of those October meetings.  And do you remember the

20  question about whether she made a statement about wearing

21  rose-colored glasses and she didn't want to believe that

22  racism existed?

23  A.  Yes.

24  Q.  What was your understanding of what she meant by that

25  statement?

6-76

1  A.  To me, it meant she would like to think that everyone

2  treated everyone fairly.

3  Q.  Did you get any sense -- strike that.

4         MS. POWELL:  One minute.

5     (Defense Counsel confer privately.)

6  Q.  I'm gonna have you turn to Defendant's Exhibit -- it's

7  Defendant's Exhibit 7.

8     I apologize, Lieutenant Lemons.  It's Joint Exhibit VI.

9  A.  VI.  Okay.  Okay.

10 Q.  I'm gonna have you turn to the bottom right.  It's going

11 to be page 000704.

12 A.  You said Exhibit VI, right?

13 Q.  Correct.

14        THE COURT:  It's this book on your right.

15        THE WITNESS:  Sorry.

16 A.  Which page again?

17 Q.  The bottom right, 000704.

18 A.  Okay.

19        MS. POWELL:  Permission to publish?

20        THE COURT:  Any objection?

21        MR. GERHARDSTEIN:  No.

22        THE COURT:  You may.

23 Q.  So, can you read for us what the conversation was when

24 there was a discussion about whether there were racists in the

25 city?

1  A.  "Do you think there's any people in the city that might be

2  racist?

3          Myself:  "I'm sure there's quite a few."

4          Ms. Berning:  "I'd like to keep my rose-colored

5      glasses on and believe that's not true."

6          Lieutenant Broach:  "I think that" -- "I think that

7      would be a fantasy; wouldn't it?"

8  At the bottom:

9          Ms. Berning:  "But I guarantee you that nobody better

10     do it in front of me."

11 Q.  So Ms. Berning says, "But I guarantee you that nobody

12 better do it in front of me"?

13 A.  That's correct.

14 Q.  What was your understanding of what she meant by that

15 statement?

16         MR. GERHARDSTEIN:  Objection, Your Honor.  Talk about

17 his impression; her being --

18         THE COURT:  Rephrase.

19 Q.  What was your --

20     What was your impression of what she meant when she said

21 that?

22 A.  That she would take action if that happened in front of

23 her.

24         MS. POWELL:  I don't have any further questions.

25         THE COURT:  Mr. Gerhardstein, do you have any

1    questions?

2            MR. GERHARDSTEIN:  One moment, Judge.

3        (Plaintiff's Counsel confer privately.)

4            MR. GERHARDSTEIN:  No further questions, Your Honor.

5            THE COURT:  Thank you.

6        At this time the jury may ask questions of this witness.

7    After the questions, we will take a very short morning break.

8        (Pause.)

9        (The Court reviewing the jurors' questions.)

10           THE COURT:  May I see counsel at sidebar, please?

11   SIDEBAR CONFERENCE:

12           THE COURT:  Okay.  The first question:

13        "Did you or Captain Campbell know the performance

14        ratings were in Lieutenant Broach's locker prior to the

15        search?  If so, how?"

16           MR. GERHARDSTEIN:  No objection.

17           MS. POWELL:  No objection.

18           THE COURT:  "Are events from years past, whether

19        unreported mistakes or closed cases of discipline, ground

20        for requesting a fitness-for-duty evaluation?"

21           MR. GIGLIO:  Could you repeat that?

22           THE COURT:  "Are events from years past, whether

23        reported mistakes or closed cases of discipline, ground

24        for requesting fitness-for-duty evaluations?"

25           MS. POWELL:  Well, I just was told I can't ask about

```
 1   fitness for duty.

 2            MR. GERHARDSTEIN:  Yeah.  It's not the --

 3            THE COURT:  "What would happen with Lieutenant

 4   Broach's EEO charge if he had not attended the meetings or

 5       at least --"

 6            "What would happen with Lieutenant Broach's EEO

 7       charge if he had not attended the meetings with Lisa

 8       Berning and you?"

 9            MR. GERHARDSTEIN:  I don't have any objection to

10   that.  I don't know what he's going to say.  He might say

11   "don't know."

12            THE COURT:  Second set of questions:

13            "Could someone other than a rep from Internal Affairs

14       have assisted Lisa Berning at the EEO meeting?  Like

15       someone else from the Fire Department?"

16            MR. GERHARDSTEIN:  No objection.

17            MS. POWELL:  No objection.

18            THE COURT:  "Is it policy to have a union rep present

19       whenever an Internal Affairs rep is in the room?"

20            MR. GERHARDSTEIN:  No objection.

21            MS. POWELL:  Okay.

22            THE COURT:  "If you felt as stated that you could

23       leave the room, why didn't you leave?"

24            MR. GERHARDSTEIN:  No objection.

25            MS. POWELL:  No objection.
```

1           THE COURT:  "Is the costume fire the same as the

2     McMicken fire?"

3           MS. POWELL:  No objection.

4           MR. GERHARDSTEIN:  No objection.

5           THE COURT:  No. 4:  "You say you spend time in your

6     role as internal investigator in training lieutenants.

7     Could you elaborate on what kind of training and duties

8     and responsibility of a lieutenant?"

9           MR. GERHARDSTEIN:  No objection.

10          MS. POWELL:  No objection.

11          THE COURT:  "What is sworn duty and what do

12    firefighters swear to?"

13          MS. POWELL:  No objection.

14          MR. GIGLIO:  No objection.

15          MR. GERHARDSTEIN:  No objection.

16          THE COURT:  No. 5:  "If you were only at the meetings

17    for terms and policies and procedures for Lisa, why were

18    you asking Lieutenant Broach questions, like did you

19    report firefighter for running from fire, et cetera?"

20          MR. GERHARDSTEIN:  No objection.

21          MS. POWELL:  No objection.

22          THE COURT:  Six has several regarding the Ludlow

23 fire.

24          "Where in the building was Mark Broach according to

25    witnesses?"

```
 1              MR. GERHARDSTEIN:  No objection.

 2              MR. GIGLIO:  No objection.

 3              THE COURT:  "Have you ever personally sensed any form

 4         of racial discrimination towards you or other

 5         African-Americans in any way while serving in the Fire

 6         Department?"

 7              MR. GERHARDSTEIN:  No objection.

 8              MS. POWELL:  No objection.

 9              THE COURT:  "Have you ever felt any sort of

10         retaliation was taking place after your investigation of

11         Mark Broach?"

12              MR. GIGLIO:  No objection.

13              MR. GERHARDSTEIN:  No objection.

14              THE COURT:  "How many EEO complaints do you

15         personally investigate each year?"

16              MR. GERHARDSTEIN:  No objection.

17              MR. GIGLIO:  No objection.

18              MS. POWELL:  EEO complaints?

19              THE COURT:  Yes.

20              MS. POWELL:  He doesn't investigate EEO complaints.

21              THE COURT:  That will be his answer.

22         "Did you feel Lisa Berning was ever upset with Mark Broach

23    for his lack of evidence?"

24              MR. GERHARDSTEIN:  No objection.

25              THE COURT:  Jessica?
```

1           MS. POWELL:  No objection.

2           THE COURT:  "To your knowledge, how many

3      African-Americans were in Engine 34 at the time of Mark

4      Broach's relief of duty?"

5           MR. GIGLIO:  No objection.

6           MR. GERHARDSTEIN:  No objection.

7           THE COURT:  "Had any of them expressed concern or

8      complained about race or retaliation issues?"

9           MR. GIGLIO:  No objection.

10          MS. POWELL:  No objection.

11          THE COURT:  And, finally, "Did you hear Captain

12     Campbell say anything negative or racially motivated about

13     Lieutenant Broach?"

14          MR. GERHARDSTEIN:  No objection.

15          MS. POWELL:  No --

16          THE COURT:  I'll ask the witness the question.

17          MS. POWELL:  No objection.

18          THE COURT:  Okay.

19  CONCLUSION OF SIDEBAR CONFERENCE

20          THE COURT:  Lieutenant Lemons, I'm now going to ask

21  you questions posed by the jury.  After I have asked you these

22  questions, each attorney will have an opportunity to follow up

23  with you based on these questions.  Okay?

24          THE WITNESS:  Okay.

25          THE COURT:  Did you or Captain Campbell know the

1    performance ratings were in Lieutenant Broach's locker prior

2    to the search?

3              THE WITNESS:  No, we did not.  No, we did not.

4              THE COURT:  Thank you.

5         What would happen with Lieutenant Broach's EEO charges if

6    he had not attended the meetings with Lisa Berning and

7    yourself?

8              THE WITNESS:  I'd be speculating.

9              THE COURT:  Okay.

10             THE WITNESS:  I couldn't answer that question.

11             THE COURT:  Could someone other than a rep from

12   Internal Affairs have assisted Lisa Berning at the EEO

13   meeting?  Like someone else from the Fire Department?

14             THE WITNESS:  There's only four people assigned to

15   Human Resources:  Myself, Captain Ransick, Chief Porter, and

16   Chief Winston.  I'm the lowest man on this totem pole, so I

17   got the duty.

18             THE COURT:  Is it policy to have a union

19   representative present whenever an Internal Affairs

20   representative is in the room?

21             THE WITNESS:  Normally, yes.  But an EEO complaint,

22   no.

23             THE COURT:  If you felt as stated that you could

24   leave the room, why didn't you leave?

25             THE WITNESS:  It was at Lieutenant Broach's request.

1   I asked him on several occasions "Did you want me to leave the

2   room?"  He indicated no.

3          THE COURT:  Is the costume fire the same as the

4   McMicken fire?

5          THE WITNESS:  Yes.

6          THE COURT:  You say you spend time in your role as

7   internal investigator in training lieutenants.  Could you

8   elaborate on what kind of training and duties and

9   responsibilities of a lieutenant?

10          THE WITNESS:  Just mentoring the lieutenants.  And,

11   basically, you're the lieutenant going over our policies and

12   procedures and letting them know what -- some of the traps

13   that new lieutenants fall into when they go out.

14          THE COURT:  What is the sworn duty and what do

15   firefighters swear to?

16          THE WITNESS:  To uphold the safety of the public.

17          THE COURT:  If you were only at the meetings for

18   terms and policies and procedures for Lisa, why were you

19   asking Lieutenant Broach questions like did you report the

20   firefighter for running from the fire?

21          THE WITNESS:  Because I'm a firefighter, and I assume

22   that part of me took over and I was upset that he would allow

23   a member from his fire company to run away from the fire and

24   not go and help with the extinguishment.

25          THE COURT:  Regarding the Ludlow fire, where in the

1  building was Mark Broach according to witnesses?

2       THE WITNESS:  He was kneeling at the doorway of the

3  apartment.  There was fire.

4       THE COURT:  Have you ever personally sensed any form

5  of racial discrimination towards you or other

6  African-Americans in any way while serving in the Fire

7  Department?

8       THE WITNESS:  Like I said before, I spent 15 years at

9  Ladder 29.  That's an all-white firehouse.  And it takes some

10 getting used to, but over time you learn to -- to work with

11 everybody.  I can't say I experienced any racism, but it just

12 took an adjustment to working with other people that you're

13 not comfortable with.

14      THE COURT:  Have you ever felt any sort of

15 retaliation was taking place after your investigation of Mark

16 Broach?

17      THE WITNESS:  No, I did not.

18      THE COURT:  How many EEO complaints do you personally

19 investigate each year?

20      THE WITNESS:  I don't personally investigate EEO

21 complaints.  It's handled at the City Human Resources.  If

22 they need me to assist with a case, then I'll assist.

23      THE COURT:  Did you feel Lisa Berning was ever upset

24 with Mark Broach or his lack of evidence?

25      THE WITNESS:  On several occasions she asked him for

 1   evidence to support his case and at no time did he present the

 2   evidence to support his case.

 3           THE COURT:  To your knowledge, how many

 4   African-Americans were in Engine 34 at the time of Mark

 5   Broach's relief of duty?

 6           THE WITNESS:  There were approximately 12 to 14

 7   members assigned to Engine 34.

 8           THE COURT:  Had any of them ever expressed concern or

 9   complained about race or retaliation issues?

10           THE WITNESS:  Only Ron Evans and Mark Broach.

11           THE COURT:  Did you hear Captain Campbell say

12   anything negative or racially motivated about Lieutenant

13   Broach?

14           THE WITNESS:  No, I have not.

15           THE COURT:  Thank you.

16       Based upon those questions and the responses, Ms. Powell,

17   do you have any followup?

18           MS. POWELL:  No further questions.

19           THE COURT:  Mr. Gerhardstein?

20           MR. GERHARDSTEIN:  Very briefly.

21                         FURTHER EXAMINATION

22   BY MR. GERHARDSTEIN:

23   Q.  Lieutenant, you're asked what are firefighters sworn to

24   uphold and you said public safety.

25       They are also sworn to uphold the law, right?

1    A.   The law?

2    Q.   Yeah.  The law with respect to EEO, the law with respect

3    to other matters that interact with your job on the fire

4    force, right?

5    A.   Yeah, that's correct.

6    Q.   Okay.  And you were asked by one of the jurors did you

7    feel Lisa Berning was ever upset with Mark Broach for his lack

8    of evidence, and I didn't hear an answer.

9    A.   Yes.

10   Q.   Did you feel she was upset?

11   A.   Yes.

12           MR. GERHARDSTEIN:  I don't have any other questions.

13           THE COURT:  All right.  Thank you.

14           THE COURT:  Okay.  Lieutenant Lemons, thank you very

15   much.  You may step down.

16           THE WITNESS:  Thank you.

17     (Witness excused.)

18           THE COURT:  At this time we're going to take our

19   morning recess.

20      Like all others, please do not discuss the case with

21   anyone, including your fellow jurors, members of your family,

22   anyone involved in the trial or anyone else.

23      Should anyone try to talk to you about the case, please

24   let myself or Ms. Lahley or the Court Security Officers know.

25      Do not read, watch or listen to any news reports

1    throughout this case.  Do not get on the Internet to do

2    research, use blogs, Internet chatrooms or any other social

3    media applications, do research or discuss the case.

4         Keep an open mind until all the evidence has been received

5    by you and you've heard the views of your fellow jurors during

6    deliberations.

7         It is now 11:06.  Let's take a break until about

8    11:15 A.M.  About a ten-minute break.

9         (At 11:06 a.m., the jury was in recess.)

10   BEFORE THE COURT:

11            THE COURT:  Captain Campbell's next?

12            MR. GIGLIO:  He is here.

13            THE COURT:  He's next and he's here.  Okay.  Thank

14   you.

15        (At which time a recess was taken.)

16                          *   *   *

17   BEFORE THE COURT:                          (11:24 A.M.)

18            THE COURT:  I would like to break for lunch as close

19   to 12:30 as we can.  So whoever is questioning, please be

20   aware of the time.  And if it's a little before or a little

21   after, I'm fine with that.

22        They have indicated they would like to take a shorter

23   lunch.  So 30 minutes or so.  Is that okay with all of you?

24            MS. BRANCH:  Sure.

25            THE COURT:  Okay.

1  BEFORE THE JURY:                              (11:24 A.M.)

2          THE COURT:  Defendants ready to call their next

3  witness?

4          MR. GIGLIO:  Yes, Your Honor.  We'll call Kevin

5  Campbell.  Captain Kevin Campbell.

6          THE COURT:  Thank you.

7      Sir, if you could please approach the witness stand and

8  raise your right hand to be sworn.

9      (Duly sworn by the Clerk.)

10         THE CLERK:  Please be seated.

11         THE COURT:  Thank you.

12     Please be seated and make sure you try and speak into the

13  microphone.

14         THE WITNESS:  Okay.

15                     CAPTAIN KEVIN A. CAMPBELL

16  a witness herein, having previously been sworn, testified as

17  follows:

18                     DIRECT EXAMINATION

19  BY MR. GIGLIO:

20  Q.  Good morning, Captain Campbell.

21  A.  Good morning.

22  Q.  Would you please state your full name for the record?

23  A.  Name is Kevin Albert Campbell.

24  Q.  And what is your present position with the City of

25  Cincinnati?

6-90

1    A.  Fire Captain, currently assigned to Emergency

2    Communications Section.

3    Q.  Are you from Cincinnati originally?

4    A.  Yes, sir.  Uh-huh.

5    Q.  Are you married?

6    A.  Yes.  Four children.

7    Q.  Four children?

8    A.  Uh-huh.

9    Q.  Before I get into your years of Cincinnati Fire

10   Department -- I should probably start with that.

11       How many years have you been with the Cincinnati Fire

12   Department?

13   A.  I'm in my thirty-third year.

14   Q.  Prior to joining the Cincinnati Fire Department, did you

15   have any other jobs or employment?

16   A.  Served in the United States Army.  Went to U.C.; graduated

17   from U.C.  I had a number of other small jobs.  Worked for

18   Cincinnati Police Division for a while and slowly migrated to

19   the Fire Division.

20   Q.  In your many jobs -- well, did you have many different

21   types of jobs while you were with the City Fire Department?

22   A.  In the Fire Division, served as a firefighter roughneck on

23   engine companies, ladder companies.  Was promoted to fire

24   apparatus operator.

25       Then in 1989, I was promoted to lieutenant.  I served ten

1  years with the Bomb Squad just shy of ten years and was

2  promoted Captain.  Spent a year or two Downtown, and I spent

3  the last ten years up in Engine 34, and transferred June of

4  this year to Communications Section.

5  Q.  You mentioned a bomb squad.  Is there any special training

6  that you would have for that type of position?

7  A.  Yes, sir.  All bomb technicians in the country are trained

8  at the same facility, which is Redstone Arsenal in Alabama.

9  You're selected for the process, background, screening through

10  Justice Department, then sent to Redstone, trained, and

11  hopefully complete your course work.  You're trained by United

12  States Army and civilian cadre.

13  Q.  Have you been commended [verbatim] for your actions

14  either in the Bomb Squad or just as a firefighter while you

15  were employed as a City firefighter?

16  A.  Yes, sir.

17  Q.  Would you say more than once?

18  A.  Oh, yes.  Uh-huh.  Ten, twelve, fifteen times.  I'm -- I

19  don't keep track.

20  Q.  I'm going to ask you to look at Defense Exhibit -- there's

21  some books in front of you.

22  A.  Okay.

23  Q.  There's a Plaintiff's Exhibit book, there's a Defense

24  Exhibit book, and there's a Joint Exhibit book.  I'd like you

25  to look at the Defense Exhibit book.

1  A.  Okay.  I hope I have the right one.

2          THE COURT:  That is.

3  A.  Okay.

4  Q.  And I'd like you to turn to Defense Exhibit 25.

5  A.  Okay.

6  Q.  Okay.  Can you identify that document?

7  A.  It's an organizational chart for the Fire Division.

8  Q.  Turn the page.  Is there an organizational structure

9  manual in that exhibit?

10  A.  Administration, I believe.  Yes.

11  Q.  Could you turn to page 7 of that organizational structure?

12  A.  The pages aren't numbered, but --

13  Q.  I believe if you look at the top of the printed manual, it

14  will give a page out of 12, 7 out of 12.

15  A.  Not on this one.

16          THE COURT:  Ours are not numbered.

17  A.  Okay.  What's the title?

18  Q.  It'd be --

19      (Counselors Giglio and Powell confer privately.)

20  Q.  I'm going to --

21  A.  Procedure manual, 7 out of 12.

22  Q.  I tend not to speak loud.  And if you don't tend to spoke

23  loud, we'll give the court reporter a hard time.  So --

24  A.  I'm there.

25  Q.  Good.

CAMPBELL  -  DIRECT                              6-93

1       Okay.  I'm going to put up on the screen here -- and

2   that's where I got the page number at the top.

3   A.  Okay.

4   Q.  Okay.  And this talks about the duties of fire captain.

5   A.  Yes, sir.

6   Q.  And without reading them, do you agree that --

7       Well, I should say without reading them, you don't have to

8   read them all, but do you know just off the top of your head

9   what your duties of a captain are?

10  A.  I do.  It basically follows this chart here.  I'm

11  commanded by procedures to follow this chart.  And you could

12  go right down the list.  I'm responsible for the actions and

13  disciplines of all members of the company.

14  Q.  Okay.

15  A.  We run a fire inspection program.  In the Fire Division,

16  we also maintain -- do all the maintenance on the fire

17  hydrants that are assigned to us.  We have close to 300 at

18  Engine 34, so we -- we have a maintenance program that I

19  direct the units.  I also guide them on what fire inspection

20  we should be doing.  I'm also to be familiar with, you know,

21  all the hazards in the area.  Any specific buildings that have

22  been condemned or bring the units up to date when things

23  change in the neighborhood.

24      I'm responsible for the general condition of the

25  firehouse.  The -- responsible for all reports, maintenance.

CAMPBELL - DIRECT

1  Responsible for the apparatus, the equipment, any reports

2  dealing with -- with that, those issues, and maintaining

3  records on the company, which include the fire inspection and

4  repair records, et cetera.

5  Q.  And part of your duty's to be responsible for the actions

6  and disciplines of your -- members of your house?

7  A.  That's correct, to a certain level.  After it goes to

8  Internal, something like that, then it's out of my hands.

9  Q.  Now, there are more than one unit in a house, am I right?

10  A.  That's correct.  We operate on a three-unit system.  Each

11  unit works 24 hours and then I oversee all three.  But each

12  one -- the other two units have a lieutenant assigned and

13  they're responsible for basically the same things, and then

14  following my lead on the inspection, hydrants and fire

15  responses also.

16  Q.  When we talk about the other units, when a lieutenant

17  doesn't appear, do you still -- are you still responsible for

18  all the units even though you're not on those units?

19  A.  Ultimately, I ensure that the reports are -- are

20  up-to-date, and they're responsible for certain things.  It's

21  kind of -- sometimes it's what -- they're responsible for all

22  reports, all run reports for their shift, if the equipment's

23  broken, properly reporting, and I follow up to make sure

24  that's being taken care of.

25  Q.  Okay.  Do you know the plaintiff, Mark Broach?

1  A.  Yes, I do.

2  Q.  Okay.  When did you first meet him?

3  A.  Oh, I met him years ago.  I was sent out to the house he

4  was working to relieve him.  I was on an overtime list.  I had

5  never met Mark before.  I spoke to him a little bit that day

6  and then in passing when he was assigned to Engine 34.

7  Q.  Do you know when he was assigned to Engine 34,

8  approximately?

9  A.  2007, I believe it was.  2006, somewhere around there.

10  2007, I believe.

11  Q.  Prior to his transfer, did you have any conflicts with

12  him?

13  A.  No, I did not know -- like I said, I ran into him.  But he

14  was cordial, polite.  There was nothing that I had issue on.

15  Q.  Do you know if you ran any fires with him before he came?

16  A.  No.

17  Q.  Now, you talked about your history at the 34's, Company

18  34, and I think you mention one part of that time you

19  transferred out.

20      Do you remember the dates that you -- proximate dates you

21  transferred from the 34's?

22  A.  I left -- it was during the winter.  I think 2009.  At the

23  end of 2009, 2010.  I left for a short while, went to Engine

24  46 in Hyde Park.

25  Q.  Okay.  And why did you do that?

1   A.  Two reasons.  One, my son --

2       In the Fire Division, you have a scheduled off day, a day

3   you never work.  It's a Kelly day.  And my son was --

4       (Court reporter requested the witness to speak louder.)

5   A.  My son plays -- he played football at Colerain.  And to

6   ensure I was off on Friday -- they have Friday Kelly days.  So

7   the troops called me, a group of guys I worked for before, and

8   asked me if I'd come out, and so I transferred there, based on

9   that and a few other factors in our house that I was little

10  frustrated with.  So I went to Engine 46.

11  Q.  Now, would you have been in Engine 46 in January and

12  February of 2010?

13  A.  Yes.  Yes.

14  Q.  You're aware that Mr. Broach brought a charge against you

15  in March of 2010?

16  A.  I'm aware?

17  Q.  That he brought an EEOC charge.

18  A.  Yes, right.

19  Q.  Okay.

20      MR. GIGLIO:  Publish?  Place this on here.

21  Q.  Is this the charge that you became aware of?  The date's

22  on the bottom.  I'll just slide it down.

23  A.  Yes.

24  Q.  All right.  And when did you become aware this charge was

25  filed against you?

 1  A.  It was after I put a transfer request to come back to

 2  Engine 34, then this -- then I heard about this.

 3  Q.  Did you see the facts that were listed on Mr. Broach's

 4  claim?

 5  A.  Yes.

 6  Q.  You've seen that before?

 7     And it says you spread negative information to surrounding

 8  fire companies.  I'll start with that.

 9     Do you recall any -- any basis for that complaint that you

10  spread negative information to surrounding companies?

11  A.  That is false.  Absolutely false.

12  Q.  All right.  It says, "Causing Greg Potter to initiate

13  racist charges."

14     Are you aware Mr. Broach was charged with discipline

15  approximately January 18th of 2010 for a fire in your Engine

16  34 jurisdiction?

17  A.  Not initially.  I was -- I was not in the district.  I was

18  in District 4, I was on Engine 46, and that all happened when

19  I was out there.  Very little knowledge of it.

20  Q.  Okay.  Did you know any knowledge of it before it was

21  filed or after?

22  A.  After what was filed?

23  Q.  The charge.  And I'll call it the Potter charge.

24  A.  Okay.

25  Q.  Did you know anything before it was filed?

1   A.  No.

2   Q.  I'm going to ask you the second part of it, the charges,

3   your negative information which you deny caused Greg Potter to

4   initiate the charges.

5       Is there any accuracy in that?

6   A.  Say it again.

7   Q.  Is there any truth in that?

8   A.  Absolutely not.  I've never spoken to Greg Potter about

9   these charges.  In fact, I never spoke to anyone about the

10  fire until I ran into Lieutenant Kathman just a while back.

11  Stupid.

12  Q.  Were you contacted -- were you involved in the

13  investigation?

14  A.  No.  No.

15  Q.  Why would you be involved?

16  A.  Number one, I wasn't there.  Two, I'm not the Captain of

17  Engine 34 at that time and I'm the Captain of Engine 46 and

18  another fire district.  There's no reason for him to contact

19  me.

20  Q.  Do you know now-District Chief Gregory Potter?

21  A.  Yes.

22  Q.  Okay.  Did you ever work at the same engine company with

23  him?

24  A.  No.

25  Q.  Are you friends with him outside of being -- professional

1  relationship at the firehouse?  Do you socialize with him?

2  A.  No, never.

3  Q.  You probably -- I think you volunteered an answer.  But

4  did you have any input whatsoever in the drafting, placing, or

5  comments made in the charges brought against Mark Broach by

6  Greg Potter on January 18th?

7  A.  I didn't know anything about it unless, like I said, down

8  the road sometime.

9  Q.  Uh-huh.  Before -- before the fire of February 10th and

10  more specifically before these charges were brought -- and

11  I'll give you the date of January 18, 2010 -- 46's

12  approximately?

13  A.  Yes.

14  Q.  Okay.  I'm going to ask you did you discuss any issues

15  that you had with either Mark Broach or Ron Evans with Gregory

16  Potter?

17  A.  No, not at all.

18  Q.  Did Greg Potter have any communications with you -- and

19  what I mean by that is emails, telephone, personal

20  conversations -- regarding the bringing of his charge of

21  February 18, 2010?

22  A.  No, not at all.

23  Q.  Now, I understand you eventually did return to Engine

24  Company 34?

25  A.  That's correct.  Members of my immediate crew were -- they

1    asked me to come back.  And each one of them, each one of

2    those members I served approximately ten years with and I felt

3    a loyalty to them.  Each one I hand picked to -- to -- from

4    the Downtown companies, and at one point in time as an opening

5    came up, asked each of them to come up and serve, and they

6    did.  We had a pretty good unit.  And they called me and they

7    weren't happy I left.  They understood the reasoning I left,

8    but they asked me to come back, and I felt obligated to them

9    because, you know, we believe in what we do and how we do it.

10   And they had -- left their positions.  And it is part of being

11   a -- teamwork and being a leader.

12   Q.  And talking about the members of your unit, what's the

13   racial makeup of that unit?

14   A.  They're all African-American.  I'm the only Caucasian in

15   my immediate group.

16   Q.  When you returned, were you aware that Lieutenant Broach

17   was off on stress or off of some leave?

18   A.  Well, at that point I did inquire because he was a

19   lieutenant assigned to the house and I obviously wanted to

20   know what was going on.

21   Q.  Did you have any conversations with Lieutenant Broach from

22   the time of the fire on February 10th, even if you were at the

23   46's, and at the time when you returned and he was out on

24   stress?

25   A.  No.  No.

1   Q.  Did you have any communications with him when he was out

2   on stress leave?

3   A.  No.

4   Q.  Going back to when Lieutenant Broach transferred into the

5   34's --

6   A.  Okay.

7   Q.  -- we talked about captain duties, people you supervise.

8       Would Mr. Broach be in charge of preparing annual

9   performance reviews for those subordinate to him?

10  A.  That's correct.

11  Q.  In 2007, did Mr. Broach come to you and ask for any

12  assistance in the completion of performance evaluations?

13  A.  That's correct.  There was -- he was fairly new in the

14  company and we were having a discussion out front and at that

15  point I kind of went over what I go over with all new members

16  what I expect out of them as far as how to make their

17  response.  It's critical to be first in your geographical

18  area; you know, be on time.  Just do the basics.  Lay off the

19  fire, which means you take a water source in with you.  And

20  then he asked me about Ron Evans.  He said he didn't know much

21  about him and asked how he should evaluate him, so I gave him

22  some input.  And --

23      (Counselors Giglio and Powell confer privately.)

24          MR. GIGLIO:  Defense Exhibit 1 and Defense Exhibit 2.

25      (Counsel confer privately.)

```
 1              MR. GERHARDSTEIN:  No objection.

 2              MR. GIGLIO:  Okay.  If I may, Your Honor?

 3              THE COURT:  You may.

 4   Q.  Going to show you what's been marked Defense Exhibit 1.

 5   Take a look at this document.  The number's upside down here.

 6       You see that document, Captain?

 7   A.  Yes.

 8   Q.  All right.  And it appears to be a memo from you.  Is that

 9   right?  An email from you?

10   A.  It's an email from me to Mark Broach sent in 2007.

11   Q.  Now, you said you sent it in 2007.  Could you explain

12   where on the document would help you know that you sent it in

13   2007?  And as you said, you forwarded the message 9/24?

14   A.  If you look to the left of the screen, that's the

15   timeline.

16   Q.  This timeline here?

17   A.  Yes, sir.  When my emails are sent.

18   Q.  You see references to Revised Performance there?

19   A.  Right there.

20   Q.  Do you know the date that you would have sent that?

21   A.  Within sometime after May.

22   Q.  All right.  And I noticed you also have copies on that.

23   At the time -- Stephen Kluesener, what was his position?

24   A.  Stephen Kluesener was the District Chief on that -- that

25   unit.  Each -- each of the three units have a district chief
```

1   assigned to it.  So the communication chain changes -- I'm

2   sorry.

3   Q.  Just take your time.

4   A.  All right.  The communication line goes from -- from Unit

5   1, 2 and 3.  But there's three distinct separate supervision

6   chains.

7       So, Stephen Kluesener would be Mark Broach's immediate

8   supervisor.  Steven Phillips is my supervisor, my district

9   chief.  And then Ronald Texter was a district chief in the

10  Safety Office who eventually would collect all the performance

11  reviews.

12      So when I sent this to Mark, this was based on the

13  conversation we had in 2007 about the 2006 performance report,

14  and I copied all those supervisors, and noted at the bottom of

15  that that the bottom line is he's responsible for it.  If he

16  wasn't comfortable with anything, he could -- he could change.

17      On the report itself, it does say you're the -- to put any

18  commendations on there that happened in the past year or any

19  discipline records for the past year.

20  Q.  I'm going to show you Defense Exhibit 2.  And this is a

21  2007 evaluation of Ron Evans.

22  A.  Okay.

23  Q.  Okay.  Let me show you all the way down so you can see the

24  date it was signed, '07.  You see that?

25  A.  Okay.

6-104

1   Q.  Do you know if that is Mr. Evans' signature to the right

2   of that?

3   A.  He kind of scribbled.

4   Q.  All right.  Now, you just mentioned about commendations

5   and disciplines.  Can you show me on the form where that

6   appears?

7   A.  Right there under Comments and Suggestions, it tells you

8   right there.

9   Q.  Includes disciplinary -- commendations, disciplinary

10  actions.  So all that stuff, you're supposed to put that in

11  there, right?

12  A.  Uh-huh.

13  Q.  Since it was signed by Mr. Evans, would this have been the

14  final one that was complete as far as you know?

15  A.  For him, yes.

16  Q.  All right.

17  A.  It would have been --

18  Q.  Okay.  I know we read your email before regarding --

19      If I may ask this first.  Was it regarding your -- his

20  2007 evaluation hearing?

21  A.  That's correct.

22  Q.  All right.  Did you order or tell Mr. Broach after he

23  looked at it and after he got your email to change any of the

24  X's on there?

25  A.  No.  No.  I made it very specific in the email.  I said it

1    in the last paragraph.  The bottom line is, it rests with you.

2    Your decision, your choice.  The only thing they had to put on

3    there is what it said up there as far as any disciplines or

4    commendations is required.

5        But as far as the rest of it, it's his observations.  He's

6    free to make any changes.  This is not about attacking

7    somebody.  This is about identifying a weakness and trying to

8    turn it into a strength.  You know, trying to get somebody to

9    do corrective behavior or to improve or to acknowledge the

10   good things they've done.  So, it's -- you can use this as a

11   tool-building, as a person-building and that's the way those

12   are designed.

13   Q.  Okay.  When you look at all those and you see -- for

14   instance, in this one, rules and regulations, he got a zero.

15   But on the right it says, "Received a written reprimand for

16   not following procedures and making appropriate payoffs."

17   A.  Uh-huh.

18   Q.  When you get a reprimand, does that directly affect your

19   rating in that -- in a specific category?

20   A.  It can.  You're supposed to note it.

21   Q.  Okay.  And if you get a commendation, you might be over in

22   the Outstanding column?

23   A.  Possibly.

24   Q.  Since we're on the subject, you've had an opportunity to

25   review your performance evaluations over the years?

```
 1  A.  Yes, sir.
 2  Q.  And where would they generally fall?
 3  A.  Outstanding.
 4  Q.  Okay.  Let me go back to Defense Exhibit 1 again, that
 5  email.  Slide it all the way down.
 6      You see -- and I apologize.  There's a half-printed
 7  statement on the bottom.  You see that?
 8  A.  Yes.
 9  Q.  Okay.  It looks like Cincinnati, then I see Mark Broach's
10  name on there.
11      What do you understand why that would be there?
12  A.  That was Mark Broach forwarding that email to somebody.
13  Q.  All right.  And would that be why on the top up here it
14  says you forwarded it on 9/24/09?
15  A.  That's exactly what that is.
16      Could we see the top of that?
17  Q.  Certainly.  To clarify an answer?
18  A.  All the way at the top.  Okay.
19  Q.  Okay.  Does that help you?  Okay.
20  A.  What's that little mark on the left?
21  Q.  I think -- if I can represent to you, I think it's the
22  holes from a binder.  I'm not representing it's accurate.
23  That's just my interpretation.
24      Would that be yours as well?  Is that what it looks like?
25  A.  That's what it looks like.
```

1   Q.  All right.

2           THE COURT:  If that helps you, you can also look at

3   the exhibit in your book.

4           THE WITNESS:  Okay.

5   Q.  You don't have to rely on the screen in front of you.

6   A.  What exhibit is that?

7   Q.  That was Exhibit 1.

8           THE COURT:  Defense Exhibit 1.

9   Q.  Defense Exhibit 1.  Okay.

10      In regard to that same -- same line of questioning, I'm

11  going to show you to -- look at Defense Exhibit 3, please.

12          MR. GERHARDSTEIN:  No objection.

13          MR. GIGLIO:  Thank you.  May I publish?

14          THE COURT:  You may.

15  Q.  Show you Defense Exhibit 3.  This looks to appear to be an

16  email you sent to Lieutenant Broach in September of '07.  Can

17  you explain why you sent this in September of '07?

18  A.  I believe this was a reprimand.

19  Q.  Okay.  Why did you feel it was necessary that he include a

20  reprimand on his review?

21  A.  Well, there was actually two.  Chief Texter and I were in

22  discussion about the actual dates of the evaluation from the

23  -- January to December or from April to April.  And he said

24  that we should go April to April.  And at that point there was

25  a -- a discipline rendered in -- I'm not sure; sometime

1   between January and April.  So that was to be included in the

2   '07 report.

3   Q.  Okay.  So you were -- it was important to advise

4   Lieutenant Broach that he needed to look at all the

5   commendations, reprimands, for the entire reporting period?

6   A.  That's correct.

7   Q.  And that's why you sent it to him?

8   A.  Right.

9   Q.  You made -- you see the reprimand to Mr. Evans?

10  A.  Uh-huh.

11  Q.  All right.  And do you know who gave him that reprimand?

12  A.  For the -- yeah.  That was for --

13      I actually gave that reprimand.  And how it works in the

14  Fire Division, to explain that, that we -- we pay for our own

15  food, we pay for our own TV.  Any -- any accessory we have,

16  the firefighters pay for it.  And we have -- we split the cost

17  between the three of us, of all three shifts.  And there's

18  also an organization if a firefighter is injured or killed,

19  then we all put up five dollars.  It is called -- so we give

20  that to the family.  This is called a payoff.  And each pay

21  period when -- you come up with -- with a base number, which

22  takes care of the fatalities; it takes care of all the house

23  expenses.

24      I had -- Ron was -- was the only member who would not pay

25  off.  And you have an option to either be a part of this or

1  you can option out.  Well, he optioned in and everybody

2  optioned in, in the houses, and this went on for three years.

3  And one year he paid off three times, another time he paid off

4  -- I don't recall; it was less than the pay -- and another

5  time, you know, five or six.  And I kept talking to him.  I

6  didn't want it to go this far as being actually written

7  discipline, but I never could get quite through to the guy.

8  Even his officers had trouble with him paying off.  And it's

9  not fair to the other people.  They're carrying his weight.

10      And, anyway, he was behind.  There's 26 payoffs a year.

11 You know, he was making three one year, five one year, six,

12 and maybe eight another.  And finally I said, "If you don't

13 take care of it" -- we even noted it on his performance report

14 so he'd correct it, but he was obstinate and actually refused

15 to pay, and that's when I gave him a reprimand.

16 Q.  Firefighters, are they -- can they be late on this?

17 A.  Yeah.  I think everyone's been late.  But nobody's

18 refused.

19 Q.  Looking at the bottom, it says -- I think it's the last

20 sentence -- "When asked in September by his immediate

21 supervisor," who would that have been?

22 A.  That should have been -- might have been Doug Rubin in

23 '06.

24 Q.  All right.  At least his immediate supervisor.  It wasn't

25 you, correct?

1  A.  No.  Oh, that was Doug Ober, because I think there was --

2  I think the City had taken some money out of his check, if

3  memory serves right, and he said he wasn't going to pay off

4  until the City paid him back, and really -- which isn't the

5  firefighters' issue.  It was just part of this continued

6  pattern of not paying.

7  Q.  And there's a quote in there where he allegedly stated he

8  doesn't care if he's reprimanded or not.  Do you see that?

9  A.  Yes.  I was more concerned about his attitude than his

10  performance.  So --

11  Q.  And, again, that still had to do with his 2007 evaluation,

12  right?

13  A.  That's correct.

14  Q.  All right.  Did you send any emails or talk to Lieutenant

15  Broach or direct him to change any other performance

16  evaluations for Ron Evans or anybody else you supervised after

17  that?

18  A.  No.  No.

19  Q.  Did he ever ask you again for any assistance?

20  A.  No, he didn't.

21  Q.  I'm going to show you what's been marked Defense

22  Exhibit 32.  Which may have already been published.

23          MR. GERHARDSTEIN:  No objection.

24          MR. GIGLIO:  May I, Your Honor?

25          THE COURT:  You may.

1   Q.  I'm going to show you what's been marked Defense

2   Exhibit 32.  You see this evaluation of Ron Evans in April 1

3   of '09?

4   A.  That's correct.

5   Q.  I'll skip around here.  But do you know when you first saw

6   this?

7   A.  Yes.

8   Q.  When was that?

9   A.  I received a call from Internal Investigations and they

10  said that Ron Evans had talked with HR, and it was the basis

11  of a complaint that he had not have received his '09

12  performance report.  Lieutenant Lemons asked me if I knew, and

13  I said I had never seen it.  I called Chief Kluesener and

14  asked him, and he said he remembered it because he had given

15  some negative -- some negative comments on it himself.

16  Q.  Okay.  So he recalled it?

17          MR. GERHARDSTEIN:  Objection, Your Honor.

18          MR. GIGLIO:  If I may.

19  Q.  You can't -- I understand what you're saying, but you

20  can't state what someone else said --

21  A.  Okay.  Okay.

22  Q.  -- as a general rule.

23          THE COURT:  For the record, the objection is

24  sustained.

25          THE WITNESS:  Okay.

1   A.  Well, I had discussion with Chief Kluesener.

2   Q.  Did he confirm that -- without going into what he actually

3   told you -- did he confirm that he recalled the --

4   A.  Yes.

5   Q.  All right.

6   A.  How this works is, on performance reports, my unit -- you

7   know, I would fill out my unit and then it would go to my

8   district chief for review and then come back for signatures.

9   Q.  In this particular case, I'll show you the bottom of it.

10  Is that Chief Kluesener's signature and his comments as far as

11  you know?

12  A.  That's correct.

13  Q.  First, I think I asked it, but I want to make sure I asked

14  it for the record:  Did you place any of the X's on this?

15  A.  No.  I didn't see this until after we had retrieved it.

16  Q.  Okay.  How did you retrieve it?

17  A.  Well, Lieutenant Lemons came up, I said I had a problem in

18  the past with Mark Broach, the lieutenant on that unit,

19  keeping some paperwork in his locker and not turning it in on

20  time.  I said I haven't seen this.  Chief Kluesener says he

21  knows it was completed because it went from Mark Broach to

22  Kluesener and back to Broach.

23          MR. GERHARDSTEIN:  Objection, Your Honor.  May we

24  approach?

25          THE COURT:  Yes.

1    SIDEBAR CONFERENCE:

2          MR. GERHARDSTEIN:  I actually let a lot go because I

3    just wanted to get this over with.  But he asks one question

4    and then we get a speech and the speech is a lot of hearsay.

5       And I think because these matters are contested in

6    particular, that he should direct his questions more narrowly

7    and the witness should answer without launching into these

8    long speeches or else it will disrupt -- I mean, we'll be here

9    too much.

10          MR. GIGLIO:  Okay.  As I attempted earlier, I'm going

11   to instruct the witness not to engage in hearsay.  I'll

12   continue to do that and try to limit his responses to my

13   questions.  I'll just go through line-by-line and we'll cover

14   the area.

15          MR. GERHARDSTEIN:  As long as you're not leading.

16          MR. GIGLIO:  Yeah, as long as I'm not leading.

17   That's true.  Is that okay?

18          MR. GERHARDSTEIN:  And I think the jury should be

19   instructed that something -- I mean, he's already just

20   launched into a long statement about what Kluesener said.  We

21   should start over.

22          MR. GIGLIO:  I don't think that's -- I'm sorry.  I

23   just don't think an instruction to the jury is necessary on

24   that type of objection.

25          THE COURT:  Are you asking to have this statement

1    stricken?

2           MR. GERHARDSTEIN:  Yes.  Yes, Judge.

3           THE COURT:  Okay.  Can you read back what his

4    response was.

5        (At which time the court reporter read back the requested

6    answer as follows:

7           "A.  Well, Lieutenant Lemons came up, I said I had a

8        problem in the past with Mark Broach, the lieutenant on

9        that unit, keeping some paperwork in his locker and not

10       turning it in on time.  I said I haven't seen this.  Chief

11       Kluesener says he knows it was completed because it went

12       from Mark Broach to Kluesener and back to Broach.")

13          THE COURT:  Okay.  All right.  There's a lot of

14   hearsay in that.

15       All right.  I will ask -- I will strike his response and

16   you can go over it again.

17          MR. GIGLIO:  Okay.  That would be fine.

18          MS. POWELL:  Can we go off the record a minute?

19       (Defense Counsel confer privately.)

20   CONCLUSION OF SIDEBAR CONFERENCE

21          THE COURT:  All right.  At this time I'm going to

22   strike the witness' response to the last question and instruct

23   the jury to disregard it.

24       Also, Captain Campbell, if you could -- in the back of the

25   courtroom it sounds like we're getting feedback from your

```
 1   microphone.  I think you're speaking too close to the
 2   microphone.  So if you could speak up --
 3            THE WITNESS:  How's that?  Is that better?
 4   Q.  I think --
 5            MR. GIGLIO:  If I may, Your Honor.
 6   Q.  -- I think it would be help if you weren't too close to
 7   the mike but spoke louder.
 8   A.  Spoke louder.
 9   Q.  That might eliminate the feedback we're sensing.
10       Can you try that and we'll see how that comes across?
11       Okay.  Going back to the exhibit again, did you -- did you
12   go to Lieutenant Broach's locker with Lieutenant Lemons?
13   A.  That's correct.  Lieutenant Lemons from Internal
14   Investigations, right.
15   Q.  And with him did you open his locker?
16   A.  That is correct.
17   Q.  All right.  When you opened his locker, what did you find?
18   A.  Found performance reports for Mr. Evans and I think three
19   others.
20   Q.  All right.  And when you found those reports, had all this
21   been included -- when I say "all this," I'm referring to the
22   comments that apparently are attributed to Chief Kluesener.
23       Was that already on there?
24   A.  Yes.
25   Q.  All right.  And would this have been a period when
```

6-116

1  Mr. Broach was out on leave in 2010?

2  A.  That's correct.

3  Q.  All right.  Now, based on the year of these -- just this

4  particular exhibit, I'm not talking about anything else you

5  found in there, just this exhibit.

6     Would this evaluation be delinquent as far as time should

7  this have been served on --

8     If you can see the date, the performance date was April

9  '09.  Would that still be in his locker after 2010?

10  A.  No.  No.  But he wasn't on duty.

11  Q.  Was Mr. Broach on duty --

12     When you say "he," are you referring to Mr. Evans or --

13  A.  I'm not -- I have to think.  Both --

14     So much time, I get confused.  At that point Lieutenant

15  Broach was not on duty.  I believe that's why we were in his

16  locker.

17  Q.  I just want to clarify.  When you say "at that point," are

18  we talking about 2009 or 2010?

19  A.  It would have been 2010.

20  Q.  All right.  Mr. Broach, as far as you know, was on duty in

21  2009?

22  A.  That's correct.

23  Q.  And if Mr. Evans was off, obviously it wasn't given to

24  him?

25  A.  That's correct.

1  Q.  But if Mr. Evans came back before the -- months before you

2  -- months Mr. Broach took off, he had an obligation to give it

3  to Mr. Broach?

4  A.  Yes, uh-huh.

5  Q.  I'm going to ask you to look at Plaintiff's Exhibit 18,

6  which I believe has previously been published.  Have you found

7  that?

8         MR. GERHARDSTEIN:  Which?

9         MR. GIGLIO:  Oh, I'm sorry.

10  Q.  And I'm specifically -- there's several pages here,

11  Captain.  I'm specifically referring to --

12  A.  Okay.

13  Q.  If you look at the bottom, there's stamped numbers that

14  start with five zeroes.  Do you see that?

15  A.  Five zeroes?

16  Q.  Yes.

17  A.  I'm sorry.

18  Q.  Okay.  Don't be sorry; it's a lot of pages.

19     I believe there's various people who did reviews, but I

20  want to ask you about reviews you did, and I believe we have

21  it here on page 17 and page 16; 16 and 17.

22         MR. GIGLIO:  I believe these have been previously

23  published?

24         MR. GERHARDSTEIN:  No.

25         MR. GIGLIO:  No?  I'll ask counsel if they object to

1   Bates-stamped 16 and 17 of Plaintiff's Exhibit 18.

2         MR. GERHARDSTEIN:  No.  No objection.

3         MR. GIGLIO:  If I may, Your Honor?

4         THE COURT:  You may.

5   Q.  Okay.  I'm going to show you page 16 of that exhibit,

6   Captain.  This appears to be a review you did of Mark Broach

7   on April the 1st, '07.  Is that correct?

8   A.  That's correct.

9   Q.  See where your signature --

10        That's your signature?

11  A.  Yes, sir.

12  Q.  Okay.  And you -- following what you just said, you put

13  the good things as well as the bad things on the right side

14  there?

15  A.  That's correct.

16  Q.  And you even gave him an Outstanding on his appearance and

17  condition?

18  A.  Yes.

19  Q.  And for the year that you appraised Mr. Broach, did he

20  have any reprimands?

21  A.  No, not that year.

22  Q.  And your overall appraisal was a 90?

23  A.  Correct, uh-huh.

24  Q.  Now, I don't see any comments.  I just see that's signed

25  by -- it appears to be Chief Kluesener.  Would you agree with

1   that?

2   A.  Yes.

3   Q.  Okay.  All right.  Now I'm going to show you page 17 and

4   this --

5       You see that one?

6   A.  Yes.

7   Q.  This appears to be your evaluation done in '09.  You

8   recall giving Mr. Broach an evaluation in '09?

9   A.  Yes.

10  Q.  All right.  That's again your signature on the bottom?

11  A.  That's correct.

12  Q.  Okay.  And this time you gave him an 80?

13  A.  Uh-huh.

14  Q.  I guess I should ask you first is an 80 a bad rating?

15  A.  No, it's passing.

16  Q.  Does it prevent anybody getting promoted?

17  A.  No, it doesn't stop you from being promoted.

18  Q.  Okay.  But this more recent one, you dropped him ten

19  points.

20      Can you explain why it went from 90 to 80?

21  A.  Well, in the Comments and Suggestions, I detailed it

22  there.

23  Q.  Did he receive a reprimand?

24  A.  Yes.  He caused some problems the previous year.

25  Q.  All right.  And we'll ask you about some of those.  But

```
 1   would the reprimands Quality of Work and reprimands on Rules

 2   and Regulations be sufficient to lower an earlier rating of 90

 3   to 80?

 4   A.  Yes.

 5   Q.  Just that alone?

 6   A.  Yes.

 7   Q.  All right.  Thank you.

 8       Talking about reprimands, so why don't I ask you a few

 9   questions.  I'll ask you to look at Defense Exhibit 7, please.

10           MR. GIGLIO:  I can't recall if these have been

11   previously published.

12       Does counsel have any objection?

13           MR. GERHARDSTEIN:  No objection.

14           MS. BRANCH:  Six and seven?

15           MR. GIGLIO:  May I publish, Your Honor?

16           MR. GERHARDSTEIN:  You've got seven.  What else have

17   you got?

18           MR. GIGLIO:  Six.  I'll start with seven.

19   Q.  Let me show you a reprimand that looks like October of

20   '08.  Do you see that?

21   A.  Yes.

22   Q.  Slide it down.  I'm sorry; I can't do it all at one time.

23       And that's one you gave Mr. Broach?

24   A.  That's correct.

25   Q.  Okay.  And what was the purpose of this reprimand that you
```

1    -- it's called Inefficiency, I believe, on the left.

2    A.  We're all sort of fire inspectors.  We have an inspection

3    program.  And a company commander assigns the inspection and

4    also has the liberty to -- if you see something that needs our

5    attention, we have permits for a typical occupancy that needs

6    to be updated, they need to be taken care of in a certain time

7    frame, and we had also transitioned to an automated system,

8    computerized inspection system.

9        Two things here.  There's a weekly checkoff.  So if you,

10   for instance, if you're working Monday, all you have to put is

11   how many inspections you did Monday and then you put a copy of

12   them in there.  And at the end of the week we would review and

13   see basically what everyone's doing for maintaining this

14   program.

15       Now, the -- as we transitioned in this new computerized

16   program, that was difficult for some people.  But I instructed

17   him to talk to the Inspection Bureau, which was Captains Long

18   and Coldiron, and they would come out if anyone was having

19   trouble and work with you and go through the system with

20   you -- again, we all had been trained -- but bring you up to

21   par if you were having -- if you needed attention with the new

22   system, and none of this was being done.  And I asked him a

23   couple of times and he just neglected it and eventually it

24   resulted in this documentation.

25   Q.  Did you -- before you -- the documentation, did you

1    counsel him and ask him?

2    A.  All year long.  Yeah.

3    Q.  And is this a reference of your prior -- what you

4    testified earlier about paperwork getting in on time?

5    A.  That's correct.

6    Q.  Now, when you gave this reprimand to Lieutenant Broach, I

7    assume you spoke to him?

8    A.  Yes, uh-huh.

9    Q.  Did you tell him you were giving this reprimand because he

10   wasn't doing his job with Ron Evans?

11   A.  Ron Evans, no.  I gave him the reprimand because he wasn't

12   filling out the inspection module --

13   Q.  Okay.

14   A.  -- weekly.

15   Q.  Thank you.

16       Do you know if this went to peer review, if you know?

17   A.  Yes, it did.  Uh-huh.

18   Q.  I'm going to show you what's been marked as Exhibit 6.

19            MR. GERHARDSTEIN:  No objection.

20            MR. GIGLIO:  No objection.  If I may, Your Honor?

21            THE COURT:  You may.

22   Q.  Show you another reprimand of Mr. Broach.  This one says

23   effective date January 9, '09.  Do you see it?

24   A.  What's the exhibit number?

25   Q.  I'm sorry.  Defense Exhibit 6 in the defense book.

1  A.  All right.  Do you have a question?

2  Q.  Yes, I do have a question.

3     Is that your signature?

4  A.  Yes, uh-huh.

5  Q.  And you gave Mr. Broach a reprimand regarding -- I'll pull

6  it down.

7     Someday I'll learn how to focus this, but right now I'm

8  going to slide it around.  I apologize.

9     It has Neglect of Duty.  Do you see Neglect of Duty?

10  A.  Yes.

11  Q.  Was this involving an accident with one of the fire

12  apparatus vehicles?

13  A.  It was our fire truck assigned to Engine 34.

14  Q.  And again I'll ask you the same question.  When you gave

15  him this reprimand, did you talk to Mr. Broach?

16  A.  Yes, uh-huh.

17  Q.  Did you tell him "I'm giving you this reprimand because

18  you're not doing your job with Ron Evans"?

19  A.  No.

20  Q.  Okay.  I have to ask the questions.

21  A.  Ridiculous.  No, because the front bumper was turned up.

22  He didn't report it, and he tried to -- basically was not --

23  he was just dishonest about the whole thing.  He didn't report

24  it.  And then he said he talked to one of the off-going

25  drivers, who wasn't even on duty.  So it was just ridiculous.

1   Damage was obvious.  The whole bumper was turned up.

2   Q.  Okay.  And was this also under peer review, if you know?

3   A.  Yes, uh-huh, and sustained.

4   Q.  I'm going to ask you to look at Defense Exhibit 31.

5          MR. GERHARDSTEIN:  No objection.

6          MR. GIGLIO:  May I, Your Honor?

7          THE COURT:  You may.

8   Q.  Show you a third reprimand.  Excuse me.  See this one,

9   Captain?

10  A.  Yes.

11  Q.  And this one says Effective Date May 12th, '09?

12  A.  Yes.

13  Q.  And I'm just looking --

14      It looks like it was served by you on May 12th, '09?

15  A.  That's correct.

16  Q.  And this one includes two blocks, marked 3 and 4,

17  Inefficiency, but you also included Dishonesty.  Okay?

18      Can you tell us why you included dishonesty on this?

19  A.  In the morning, I was placed on overtime.  We were short

20  throughout the Fire Division so the Captain stays in the

21  house.  Mark Broach's shift was coming on, so that means he'd

22  be displaced.  I received a call for him to go to Engine 51 in

23  College Hill.  Then I received a call that there was a City

24  Manager's meeting down at 9th and Broadway at the district

25  headquarters and that all District 1 company had to come down.

1    We had to be there by 8 o'clock.

2        So, we were in a rush to get out and make your -- your

3    normal checks in the day, checking your equipment, get

4    manpower established.  Told him about his detail, and then we

5    went on down and met with the city manager at 8000.  I got

6    down there about 7:45 or so.

7        In the meantime, Engine 20 from Northside had been backed

8    in.  Since we're a single engine house, we try to keep someone

9    staffed there at all times.  So while we were Downtown on the

10   detail, they backed in Engine 20.

11       When we got back that afternoon from the meeting, I got a

12   call from District 1 -- I'm sorry District 3, McWilliams, and

13   he said, "Where was Mark Broach?  He wasn't at his detail."  I

14   said, "I don't know.  I just assumed that he went up."

15       Well, when he had -- when Engine 20 had backed in, they

16   told me he was sitting at the table, was doing something, and

17   they said they thought he was supposed to be -- I'm sorry,

18   Mark Broach was supposed to be with his company down at the

19   City Manager's meeting, not knowing I was there.  So these

20   guys coming in, they were a little confused.  They said, "Hey,

21   what are you doing here?"  He said, "I'm waiting on the call."

22       At that point, they told me he was there at the house at

23   quarter of eight or so, that he left the building.

24       When I approached Mark about this, I said, "District 3

25   wants to know where you were."  He said, "You had me blocked

1    in.  I couldn't go."  I said, "That's outrageous, and I didn't

2    have you blocked in."  And we had this -- this -- I said,

3    "Just put your comments on the sheet and if that's what you

4    think happened, just put it on and it will run the course."

5        So he writes out a report I had him blocked in, submitted

6    it, which was outrageous because my car was parked inside the

7    building.

8        What we do in the mornings, nobody parks out back, so the

9    oncoming shift has -- has a place to park.  So there were no

10   cars parked out back.  No one had blocked him in.  I mean, it

11   was disturbing actually you would put something like that on a

12   report.  And at that point, you know, I gave him the reprimand

13   for, number one, not showing up on time to College Hill, not

14   being there, because it was a limited duty guy up there

15   because District Chief McWilliams had called letting me know

16   where the replacement was.  And Lieutenant Broach just said,

17   "I don't understand."  And that's when he called me later on

18   in the afternoon and said, "Where was this guy?"

19   Q.   Okay.  You said -- why wouldn't McWilliams sign this

20   reprimand?  Why wouldn't he give the reprimand?

21   A.   Well, he didn't lie to McWilliams.  He lied to me.

22   Q.   But as far as not being there on time, why wouldn't he

23   sign the reprimand?

24   A.   He would have the option of doing that, but I was more

25   concerned about the lack of integrity.  I think that needed to

 1  be corrected.

 2  Q.  Okay.  This went to peer review as well?

 3  A.  Oh, yeah.  Yeah.  Yes.

 4  Q.  I have to ask the same question.  You spoke to him about

 5  this?

 6  A.  Oh, yes.  Uh-huh.

 7  Q.  And when you spoke to him, did you tell him "You're

 8  getting this reprimand because you're not doing your job with

 9  Evans when I told you" --

10  A.  "You're getting this reprimand because you're lying to

11  me."  Had nothing to do with Ron Evans.

12  Q.  Thank you.

13  A.  It was ridiculous.

14          MR. GIGLIO:  I could do another five minutes if you

15  wish, Your Honor.

16          THE COURT:  Will that conclude?

17          MR. GIGLIO:  No, it wouldn't conclude.

18          THE COURT:  Then you have five more minutes.

19          MR. GIGLIO:  All right.

20  Q.  Did you ever threaten or state to Mark Broach that "I'll

21  destroy your career"?

22  A.  No.  That's ridiculous.

23  Q.  Okay.  Did --

24  A.  I don't even know what that means.  I mean, how do you

25  destroy someone's career?  Firefighters know good

1   firefighters.  You know, your reputation is established by the

2   guy or the girl standing to the left and right of you inside a

3   burning building.  That's where your reputation is

4   established.  It's not established by me or you or the next

5   guy saying anything about that person.

6       If you're getting down and dirty and getting after it,

7   which is what this job is all about, that's where your

8   reputation's established.

9       I could say anything about anybody and it's not going to

10  mean nothing.  What matters is, is the person standing on the

11  left and right of you that's putting themselves in harms way.

12  That's what matters.  They're the ones that decide what kind

13  of person you are.

14  Q.  Did Mark Broach ever tell you he didn't want to discipline

15  Ron Evans because he thought it was discriminatory?

16  A.  No.

17  Q.  Did you ever tell Mark Broach "You need to get rid of Ron

18  Evans because he has filed a discrimination claim against you

19  in the past"?

20  A.  That's absolutely ridiculous.

21  Q.  All right.  Has any other members of your company

22  complained to the chief that you were racially intolerant or

23  told racially-charged jokes?

24  A.  My whole company is African-American.  I have in my house

25  my -- under my immediate supervision --

```
 1              MR. GERHARDSTEIN:  Objection, Your Honor.
 2              MR. GIGLIO:  Well --
 3              THE COURT:  If you don't want a sidebar, that's fine.
 4    I'll sustain the objection and you can rephrase.
 5              MR. GIGLIO:  I won't ask for a sidebar.
 6    Q.  Without going into your reasonings, and I can ask you
 7    about that, I'll limit my question to you.
 8        Did any of those other African-Americans who work with
 9    you, did any of those ever comment to some higher authority in
10    the Fire Department, the chief or someone else, that you were
11    racially intolerant or engaged in racially-charged jokes?
12              MR. GERHARDSTEIN:  Objection, Your Honor.
13              THE COURT:  Sustained.
14    Q.  Did you ever become aware of any complaints made by any of
15    your firefighters that work with you that you were either
16    racially intolerant or told racially-charged jokes?
17    A.  No.
18    Q.  Did you ever become aware of that?
19    A.  No.
20              MR. GIGLIO:  I'm going back to the --
21        I'm going to start a new area, Your Honor.
22              THE COURT:  Sure.  We can take a break now.  Sure.
23        We're going to take our lunch recess.  I understand you
24    are willing to take a shorter lunch.  Is that correct?
25              JUROR NO. 4:  (Nods head affirmatively.)
```

1          THE COURT:  Okay.  All right.

2      We're about to take a recess.  I'm going to again remind

3  you of our same instruction.

4      During this recess or any other, you must not discuss the

5  case with anyone, including your fellow jurors, members of

6  your family, anyone involved in this case or anyone else.

7      Should anyone try to contact you and try to talk to you

8  about the case, you must immediately notify me, Ms. Lahley, or

9  the Court Security.

10      Now, you're not to read, watch or listen to any news

11  reports about this case.  Do not get on the Internet to

12  research the case or talk about the case through blogs or

13  chatrooms or any other social media applications.

14      And, finally, keep an open mind until you receive all the

15  evidence and listen to the views of your fellow jurors.  It's

16  about 12:30.  Let's take a half hour lunch break, and I'll

17  have Jan check in with you at one.  If you're done eating, if

18  you guys need a few more minutes, that's fine, but try to keep

19  it around a half hour.  Thank you.

20      All right.  You may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23  (Witness temporarily excused.)

24          MR. GIGLIO:  Thank you, Your Honor.

25  (At 12:30 p.m., the luncheon recess was taken.)

**I N D E X**

- - -

MORNING SESSION CONCLUDED

- - -


I N D E X


| PLAINTIFF'S WITNESS: | D | C | RD | Questions | Furt. Exam |
|---|---|---|---|---|---|
| **LT. DAVID A. LEMONS(cont'd.)** | 2 | 30 | 72 | 78 | 86 |
| **CAPT. KEVIN A. CAMPBELL** | | 89 | (continued to the afternoon) | | |

E X H I B I T S

|  | Identified |
|---|---|
| DX 4 | 2 |
| JX V | 27 |
| JX VI | 28 |
| PX 39 | 43 |
| PX 40 | 43 |
| PX 41 | 43 |
| DX 4 | 50 |
| PX 27 | 62 |
| DX 25 | 92 |
| DX 7 | 103 |
| DX 2 | 102 |
| DX 3 | 107 |
| DX 32 | 110 |
| PX 18 | 117 |

**C E R T I F I C A T E**

DX 7                                                           120

DX 6                                                           122

DX 31                                                          124

\*   \*   \*

C E R T I F I C A T E

     I, Mary Ann Ranz, the undersigned, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


s/Mary Ann Ranz
Official Court Reporter