```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION

 3                            - - -

 4   MARK BROACH,              .  CASE NO. 1:12-cv-066
                               .
 5            Plaintiff,       .  Day 6 of Jury Trial
                               .  Afternoon Session
 6        - v -                .
                               .  Wednesday, August 28, 2013
 7   CITY OF CINCINNATI,       .  1:10 p.m.
                               .
 8            Defendant.       .  Cincinnati, Ohio
     . . . . . . . . . . . . . .

 9

10                    TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE STEPHANIE K. BOWMAN, MAGISTRATE JUDGE
11                        AND JURY

12

13   For Plaintiff:         ALPHONSE A. GERHARDSTEIN, ESQ.
                            JENNIFER L. BRANCH, ESQ.
14                          Gerhardstein & Branch Co., LPA
                            432 Walnut Street, Suite 400
15                          Cincinnati, Ohio  45202

16   For the Defendant:     AUGUSTINE GIGLIO, ESQ.
                            JESSICA L. POWELL, ESQ.
17                          Assistant City Solicitors
                            Room 214 City Hall
18                          801 Plum Street
                            Cincinnati, Ohio  45202
19

20   Also Present:          Mark Broach
                            Roy E. Winston, Assistant Fire Chief
21

22   Law Clerks:            Joan P. Brady, Esq.

23

24   Courtroom Deputy:      Jan S. Lahley

25   Court Reporter:        Maryann T. Maffia, RDR
```

1              P R O C E E D I N G S

2    BEFORE THE JURY

3         COURTROOM DEPUTY:  Court is back in session.  Please

4    be seated.

5         THE COURT:  Mr. Giglio, whenever you are ready.

6         MR. GIGLIO:  Thank you, Your Honor.

7    DEFENDANT'S EVIDENCE

8      CONTINUED DIRECT EXAMINATION OF KEVIN CAMPBELL

9    BY MR. GIGLIO:

10   Q.  Captain Campbell, I want to ask you, were you aware of

11   Firefighter Ron Evans filing an EEO charge, internal charge,

12   on or about February the 11th, 2010?  Did you ever become

13   aware of that?

14   A.  Yes.

15   Q.  When did you first become aware of that?

16   A.  It was after I had put a transfer request to come back to

17   Engine 34.  Sometime after that is when I was contacted by --

18   I'm not sure.  I have to think about that.  I'm not sure of

19   the contact.

20   Q.  Okay.

21   A.  Someone from Administration.

22   Q.  Okay.  Regarding Mr. Evans' previous -- there was some

23   discussion earlier about previous discipline -- not

24   discipline, previous charges of discrimination against you.

25   Do you remember that discussion?  I thought we discussed that.

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1   If not -- has there been?

2   A.  Yes.  He -- when -- I gave him a reprimand for not paying

3   off, and then following that he claimed an EEO, an EEOC, one

4   of those.  I'm not sure which complaint, but that was race

5   based.

6   Q.  All right.  And do you know what happened with that

7   charge?

8   A.  It was dismissed.

9   Q.  Was that internal or was that external?

10  A.  That was external.

11  Q.  All right.  I'm going to go back and direct yourself back

12  to the charge that we talked about earlier this morning from

13  Mr. Broach, the one in March 18, 2010, just to reorient.

14  A.  Okay.

15  Q.  When did you first become aware of that charge, if you can

16  recall?

17  A.  I -- it was down the road a bit.  I guess -- when I came

18  back to Engine 34, I transferred back, is when I kind of heard

19  some of the story of what happened.  But the actual charges,

20  I'd never really -- I still to this day don't know exactly

21  what he was charged with.

22  Q.  If I confused you, it's my fault.

23  A.  Okay.

24  Q.  I'm not talking about charges against Mr. Broach on the

25  Potter fire.  I'm asking -- let me back up a second.

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1    A.   I'm confused.

2    Q.   That's all right.  I thought you were.

3         Mr. Broach, we talked about this morning -- show you

4    again.  He brought an internal complaint naming you and others

5    under the institutionalized racism, negative comments by you.

6    Do you remember that document?

7    A.   Okay.

8    Q.   Do you need to see it again?

9    A.   Yeah, I'd like to.

10   Q.   Okay.

11        MR. GIGLIO:  It's been previously published.  I know

12   the camera is the other way.

13   Q.   I'm talking about this document.  Do you remember --

14        MR. GERHARDSTEIN:  What exhibit are we on?

15        MR. GIGLIO:  JX-1, Joint 1.

16   Q.   This is the one I'm talking about.

17   A.   Okay.

18   Q.   When did you first become aware of this charge?  It's

19   dated March 18, so my first question is:  Was it after March

20   18th that you knew about this charge?

21   A.   Absolutely.

22   Q.   Did you know about this charge before it was filed?

23   A.   No.

24   Q.   All right.  Can you tell -- could you tell anybody -- can

25   you tell us approximately --

1      If you know.  If you don't remember.  We're over three

2  years ago.

3      -- when you first got notice of this charge?

4  A.  I don't recall the actual date.

5  Q.  Okay.  That's fine.  Were you ever contacted by HR

6  regarding that charge?

7  A.  That's when I heard about the charge.

8  Q.  Do you remember who contacted you?

9  A.  First -- the only person from HR I talked to was Lisa

10  Berning.

11  Q.  When did you first talk to Lisa Berning regarding the Mark

12  Broach, March 18, 2010 charge?

13  A.  Mark had been off on leave, on some sort of leave, and

14  this was filed prior to that.  It was not addressed until he

15  came back from leave, so there was an extended time period

16  there.

17  Q.  If you remember the time period, that's -- do you remember

18  the month?

19  A.  It was months later.

20  Q.  All right.  When you were contacted, were you asked to

21  come in and be interviewed by Lisa Berning?

22  A.  That's correct, Lisa Berning.  And Dave Lemons from

23  Internal was there also.

24  Q.  Just the three of you?

25  A.  That's correct.

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1    Q.  And were you asked questions regarding the charge?

2    A.  Yes.

3    Q.  And did you respond to Miss Berning's questions?

4    A.  Yes.

5    Q.  Did she inquire of you whether any of these were true,

6    wanted your side of the story?

7    A.  Yes, absolutely.

8    Q.  All right.  After that meeting, do you recall having two

9    additional meetings with Lisa Berning, David Lemons, Mark

10   Broach and yourself?

11   A.  That's correct.

12   Q.  Is that shortly after this?

13   A.  Oh, it seems like it was -- it was a week or so, a couple

14   of weeks maybe.

15   Q.  Did you know at the time that those were being obviously

16   -- did the two meetings that you had later with everybody

17   there, did you know at the time that those were being secretly

18   recorded?

19   A.  No.  I didn't have a clue.

20   Q.  When did you first learn that they were secretly recorded?

21   A.  From you, I believe.

22   Q.  What's that?

23   A.  I believe from you.

24   Q.  Okay.  Was it after the litigation started?

25   A.  Yes.  Oh, yes.  Mm-hmm.

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1   Q.  All right.  Did you have an opportunity to listen to the

2   audio portions of both of those meetings?

3   A.  Yes, I did.

4   Q.  Did you also have the opportunity to read the transcript

5   that was prepared regarding those two audio --

6   A.  Yes, I did.

7   Q.  Okay.  Do they accurately reflect, both the audio and the

8   transcript --

9   A.  Yes.

10  Q.  Let me finish my question first.

11      Did it accurately reflect the conversation that was held

12  at those times?

13  A.  Yes.

14  Q.  All right.  I'm going to ask you to look at Joint

15  Exhibits, if you look at the book, 5 through 9.  Do you see

16  those?

17  A.  Yes, sir.

18  Q.  Okay.  Joint Exhibit 5, is that the transcript of the

19  October 6 meeting?

20  A.  Yes, it is.

21  Q.  All right.  And Joint Exhibit 6, is that the transcript of

22  the October 13th meeting?

23  A.  That's correct.  Yes, it is.

24  Q.  Okay.  Now, I can play them, but I'm not going to do that

25  right now.  The audio, the Exhibit 7 and 8, do you see those

1   in the book?

2   A.   Yes.

3   Q.   Okay.  Do they purport to be the audios of those two

4   meetings?

5   A.   That's correct.

6   Q.   Do you know why you met everybody -- after you met

7   individually regarding Mr. Broach's claim, do you know why you

8   had to come back?

9   A.   Yes.  The lady from HR who wanted to work out any

10  differences between Mark and I and establish a working

11  relationship.

12  Q.   Okay.  Going back to the lady from HR, is that Lisa

13  Berning?

14  A.   I'm sorry.  Yes, Lisa Berning.

15  Q.   Have you ever had any other contact with her prior to

16  these charges?

17  A.   No.  No.

18  Q.   And in the course of your duties you talked about this

19  morning as a captain, did you have any direct contact with HR

20  and her department?

21  A.   No.

22  Q.   All right.  At the meeting, did you recall if Mr. Broach

23  was asked by Lisa Berning what was the nature of his claims of

24  discrimination?

25  A.   Yes.

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1  Q.  All right.  Did she ask him more than once or just one

2  time?

3  A.  It was kind of the theme for the next two days, because he

4  really wouldn't give us anything solid.

5  Q.  Okay.  Did she ask Mr. Broach how you discriminated

6  against Mr. Broach?

7  A.  Yes.

8  Q.  Okay.  Did he ask -- she ask Mr. Broach how you harassed

9  Mr. Broach?

10  A.  Yes.

11  Q.  Did he give any explanations for those?

12  A.  He -- it was the reprimands, is what he wanted to rehash.

13  He disagreed with those.

14  Q.  Those are the reprimands we spoke about this morning?

15  A.  That's correct.

16  Q.  Who -- just so the record clear, did you bring up the

17  reprimands at those meetings or did Mr. Broach bring them up?

18  A.  I don't recall at this point.  It would be on the tapes.

19  Q.  Okay.  The transcripts will speak for themselves?

20  A.  Absolutely.

21  Q.  All right.  Did you -- were you present when Mr. Broach

22  gave his explanation of the vehicle reprimand?

23  A.  Yes, uh-huh.

24  Q.  Was it concise and clear and make sense?

25  A.  Not really.  Again, he didn't take responsibility for any

1   of his actions.  And that's kind of a common theme in this,

2   you know, no responsibility.  I mean, apparatus was wrecked.

3   The bumper was obviously twisted up.  He thought other people

4   should have been disciplined besides him, but he was in

5   charge.

6   Q.  Did he give any conflicting stories regarding that

7   accident, whether there was damage or wasn't damage?

8   A.  Oh, he said there was no damage.  That's what started the

9   whole thing.  When you have an accident with a vehicle,

10  there's a sequence of events.  You have to call your district

11  chief.  You have to call the police.  You do all the proper

12  reporting.  Then somebody comes out and investigates it.  You

13  know, it just follows the normal process.  Accidents happen.

14  Q.  Did he later say there was an accident and the driver was

15  responsible?

16  A.  Yes.

17  Q.  Did he state that he -- in his next tour, he then reported

18  it?

19  A.  Well, he did say that, but we had already started the

20  process.

21  Q.  So one day he said there was no accident, one day he said

22  there was?

23  A.  That's correct.

24      MR. GERHARDSTEIN:  Objection, Your Honor.  Leading.

25      THE COURT:  Sustained.

1      Rephrase.

2   Q.  Was there a difference in Mr. Broach's explanation of

3   whether there was an accident one day and a difference --

4   there wasn't an accident the next day?

5   A.  Originally the story was told to me that there was no

6   accident, nothing to report, and then it all changed, you

7   know.  Then there was an accident.  He had told an individual

8   by the name of Wendell Herm was the oncoming driver, and the

9   -- Wendell was on vacation.  He was on vacation, which was

10  what made it so outrageous.

11          MR. GERHARDSTEIN:  Objection, Your Honor.

12          THE COURT:  Sustained.

13  Q.  Are you saying he told some firefighter -- he alleges he

14  told some firefighter that was not present at the time of the

15  accident?

16  A.  He --

17          MR. GERHARDSTEIN:  Objection.

18          THE COURT:  Let's have a sidebar.

19  SIDEBAR CONFERENCE

20          MR. GERHARDSTEIN:  The basis for the objection is

21  that it's unclear whether the witness is giving us yet a new

22  version of his ideas about this vehicle accident or whether he

23  is responding to a question about the exchange at the October

24  EEO meeting.

25          MR. GIGLIO:  My question of the witness is what did

1   Mr. Broach say.  Did he -- if I didn't ask it artfully, I'll

2   ask it again.  Did he say it was some driver and --

3           MR. GERHARDSTEIN:  He is volunteering that it was

4   outrageous that this captain, that he was on vacation.  He is

5   going --

6           MR. GIGLIO:  I'll withdraw it.

7           THE COURT:  Let's try and control him a little

8   better.

9           MR. GIGLIO:  I'll do my best, Your Honor.  Thank you.

10          MR. GERHARDSTEIN:  You have a transcript.

11          MR. GIGLIO:  I do.

12          THE COURT:  All right.

13  CONCLUSION OF SIDEBAR CONFERENCE

14  BY MR. GIGLIO:

15  Q.  Do you recall Miss Berning asking Mr. Broach what did he

16  want from you?

17  A.  Yes.

18  Q.  Did that have to do with -- what did that have to do with?

19  A.  I recall him -- he said loyalty, which I, I don't even

20  quite figure out what he meant by that.

21  Q.  Did he bring up the circumstances of an anonymous phone

22  call regarding reporting someone suspiciously under the

23  influence of alcohol?

24  A.  It was discussed.

25  Q.  Did you bring it up or did he bring it up?

1    A.   I may have.  I don't recall.  It would be in the tapes.

2    Q.   It will be in the transcript?

3    A.   Yes.

4    Q.   All right.  Okay.  Is there anything wrong with an

5    anonymous complaint?

6    A.   Well, as -- first of all, in our administrative

7    regulations, it doesn't offer you that option.  If a -- if you

8    suspect that someone is under the influence, the rules say

9    that you observe, you take notes, and then you contact another

10   supervisor, they observe and take notes.  Then it goes up the

11   chain of command.  What -- and that didn't occur.  That did

12   not occur.

13   Q.   Could you look at the Defense Exhibit 24?  I'd like you to

14   turn --

15        First of all, are you a member of the Local --

16   International Firefighters Local 48?

17   A.   Yes.

18   Q.   Are all your members, including Mr. Broach as far as you

19   know, members of that union?

20   A.   Yes.

21   Q.   Are you governed by a collective bargaining agreement

22   between the City and that union?

23   A.   That's correct.

24   Q.   In that collective bargaining agreement, are certain

25   things negotiated?

1  A.  Yes.

2  Q.  One of the things negotiated, does it have anything to do

3  with drug and alcohol testing?

4  A.  Yes.

5  Q.  I'd ask you to point to page 107, please.

6        MR. GERHARDSTEIN:  107?

7        MR. GIGLIO:  I believe this was previously published.

8        MR. GERHARDSTEIN:  Oh, I'm on the wrong thing.  I'm

9  sorry.  Yeah, okay.  Go ahead.

10        THE COURT:  You may.

11  Q.  I'm going to show you Section 4 on drug and alcohol

12  testing.  Okay?  I'm going to ask you to look at paragraph

13  (A).  It talks about reasonable suspicion.  This is different

14  than a random test or names drawn out of a hat?

15  A.  That's correct.

16  Q.  All right.  It states halfway down, "The supervisor shall

17  record, in writing."

18    Would that include someone like Lieutenant Broach?

19  A.  Absolutely, yes, it would.

20  Q.  All right.  And he will "immediately contact a second

21  supervisor."  Am I right?

22  A.  That's correct.

23  Q.  Okay.  And why did the union negotiate -- if you know.

24  If you don't know, you don't know.  But why is a member of the

25  union to have this policy?

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1  A.  Well, it's critical.  I mean, my goodness, you're in

2  charge of a 40,000-pound piece of equipment.  You're in charge

3  of four firefighters' lives.  You're in charge of the lives

4  that -- somebody puts a 911 call in, that's your

5  responsibility.  That's what we're all about.  That's what we

6  do.

7      And for someone to say, "Hey, this officer is under the

8  influence" or "He's intoxicated" or he's -- some sort of drug

9  involvement and walk away from that responsibility, you know,

10 is shameful, absolutely shameful.

11 Q.  I don't want you to mention the officer's name --

12 A.  Yes.

13 Q.  -- but give me his race.

14 A.  I'm sorry?

15 Q.  Can you give me the race of the individual that this

16 anonymous call was made about?

17 A.  That anonymous call was made -- I can't give his name, but

18 I worked with him for a good ten years.  He's African

19 American.  His whole unit is African American.  There was an

20 outstanding group of individuals.

21 Q.  Okay.

22 A.  It was nothing --

23 Q.  That's fine.  Just -- I understand.  Did it -- let me do a

24 little follow-up.  Did it disturb you that charges were

25 brought against this outstanding individual?

1   A.  Oh, it -- actually no charges were brought against him.

2   They came up and investigated and found this to be a big

3   nothing.  It was nothing more than harassment.

4   Q.  Is that what you interpreted it to be?

5   A.  Absolutely.  I mean, it's right there in -- you know,

6   again, it's in administrative regulations that a person's work

7   environment should be free from harassment.  That -- to walk

8   out of a firehouse when you believe that an officer was

9   intoxicated is --

10      You know, my question to you is:  Have you ever been in a

11  burning building?  You know?  And you ever listen to a mother

12  cry for my baby?

13          MR. GERHARDSTEIN:  Your Honor --

14  Q.  Please, just --

15          THE COURT:  Sustained.

16  Q.  And I know you get emotional on these --

17          MR. GERHARDSTEIN:  Objection.

18  A.  I believe in what we do.  And for somebody to --

19          THE COURT:  Hold on.  I need you to just respond to

20  the questions that are asked.

21  Q.  And I understand.  And you may be given more opportunity

22  to express yourself, but for purposes of this interchange here

23  --

24  A.  I'm sorry.

25  Q.  Okay.  I'm not cross-examining you, so you don't have to

1    answer yes or no.  You can explain.  But I -- I'm sure

2    Mr. Gerhardstein will have that opportunity.

3        So when we talk about -- this talks about a supervisor; am

4    I right?

5    A.   Yes.

6    Q.   Okay.  And did you talk to Lieutenant Broach about this?

7    A.   Yes, I did.  I asked him.

8    Q.   Was the conversation, the anonymous call recorded by

9    Internal at the time?

10   A.   Internal Investigations has a copy of that conversation.

11   Q.   And did you -- did Mr. Broach ever have an opportunity to

12   hear it?

13   A.   Yes, he did.

14   Q.   All right.  Did he admit, "That's me"?

15   A.   I'm sorry?

16   Q.   Did he admit it was him?

17   A.   Oh, no.  He went into this melodramatic -- said it wasn't

18   him.

19   Q.   All right.  Sometimes people make anonymous calls, don't

20   they?

21       Well, I'm not going to do that.

22       Were you -- do you have any reason to believe that by

23   making an anonymous call as opposed to reporting it as a

24   lieutenant he could be retaliated against for reporting that?

25   A.   Not by me.

 1  Q.  Okay.  It was -- was there quite a bit of discussion

 2  regarding this whole scenario at those meetings with

 3  Mrs. Berning?

 4  A.  It's detailed out.  He denied it.

 5  Q.  He denied it even at that meeting?

 6  A.  Yes.

 7  Q.  And this is after he brought charges against you?

 8  A.  Yes.

 9  Q.  After the meetings were over, did you stay and talk to

10  Lisa Berning about preparing and working on a referral for any

11  fitness-for-duty?

12  A.  What -- no, I did not stay and do what you're saying, no.

13  Q.  All right.  Subsequent to those meetings, did you get an

14  e-mail from her regarding that she was going to do this?

15  A.  Miss Berning said at the end of the meeting that she would

16  contact me with her thoughts, and she said she was going to go

17  to Bo.  And I said, "Well, who is Bo?"  That was Hilary

18  Bohannon, head of personnel for the City of Cincinnati, which

19  -- that's completely out of my realm.  And she would send me a

20  copy of an e-mail and asked for my input.

21  Q.  Did you know at that time at the last minute she was going

22  to refer him for a fitness-for-duty?

23  A.  I had a suspicion.  I don't think --

24  Q.  Did she tell you that?

25  A.  I don't recall if it was said there.  I don't know.

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1    Q.  All right.  Did you actually have an opportunity after --

2    or before Mr. Broach was sent out to see the draft report that

3    she was going to use?

4    A.  Before he was sent out?

5    Q.  Before Mr. Broach was advised that he was going to be sent

6    out for a fitness-for-duty.

7    A.  I don't know when he was ever advised, but I did receive

8    an e-mail from her, and I expressed my concerns on that

9    e-mail.

10   Q.  Do you know if her draft was changed at all based on your

11   e-mail?

12   A.  I never spoke with her again after that, never saw her

13   again after that.  I did see her in City Hall six, nine months

14   ago just in passing, but I've never spoken or seen the woman

15   since.

16   Q.  Were you involved in the Fire Department agreeing with her

17   recommendation that Mr. Broach would be sent out for a

18   fitness-for-duty?

19   A.  I responded to her e-mail.

20   Q.  Right.  My question, did you -- were you involved in the

21   Fire Department's decision --

22   A.  No.  No.  I would have no -- as a captain, you have no

23   input.

24   Q.  You have no input?  No one asked you from the Fire

25   Department?

CAMPBELL - DIRECT EXAMINATION BY MR. GIGLIO

1   A.  No.

2   Q.  Were you involved in what type of releases he should sign

3   or not sign for such an exam?

4   A.  I don't -- no.  I have nothing to do with that.

5   Q.  Were you involved at all in his return to work after he

6   eventually had such an exam?

7   A.  No.

8   Q.  And were you involved in -- well, strike that.

9       Do you recall, if you recall, any other basis given by

10  Mr. Broach --

11      Other than ones you talked about, the reprimands, the

12  disloyalty issue, the performance evaluations we've talked

13  about this morning, can you give any other reasons why his

14  charge of racial discrimination and retaliation against you

15  should be brought?  Did he give any other explanation?

16  A.  No.  I -- what's on the tapes.  That's about it.  Never

17  quite figured it out.

18          MR. GIGLIO:  If I can just have one moment, Your

19  Honor?

20          THE COURT:  Sure.

21      (Mr. Giglio and Ms. Powell confer privately.)

22          MR. GIGLIO:  I have no more questions, Your Honor.

23  Thank you.

24          THE COURT:  All right.  Thank you.

25      Mr. Gerhardstein, whenever you're ready.

1           MR. GERHARDSTEIN:  Thank you, Judge.

2                   CROSS-EXAMINATION

3   BY MR. GERHARDSTEIN:

4   Q.  Good afternoon.

5   A.  Good afternoon.

6   Q.  You were the captain for Ron Evans and Mark Broach; right?

7   A.  That's correct.

8   Q.  And you were having lots of trouble with Ron Evans; right?

9   A.  I had limited trouble with him.

10  Q.  And he filed a discrimination charge against you in 2005;

11  right?

12  A.  That's correct.

13  Q.  You must have been upset by that.

14  A.  A racial charge?  Absolutely, yeah.

15  Q.  And then he filed another one against you in February of

16  2010; right?

17  A.  That's correct.

18  Q.  Lisa Berning investigated that charge; right?

19  A.  That's correct.

20  Q.  And she would have talked to you at some point before

21  October about Ron Evans' discrimination charge; right?

22  A.  Well, Ron was on extended leave, and they don't --

23  Q.  You know what?  My question was she would have talked to

24  you.  If she didn't, the answer is no.

25  A.  Okay.  Ask me again, because there's so much confusion

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1   here with time.

2   Q.   Slow down.  We'll be fine.

3   A.   All right.

4   Q.   She would have talked to you before September of 2010

5   about Ron Evans' charge, wouldn't she?

6   A.   I don't -- I don't recall when we spoke.

7   Q.   Okay.  You were upset again when you got hit with another

8   discrimination charge; right?

9   A.   Sure, because everyone in my house is African American.

10  Q.   And then -- your firehouse; right?

11  A.   Yes.  Yes.

12  Q.   And then that one turned into a federal lawsuit that's

13  pending in this building; right?

14  A.   That's correct.

15  Q.   And your lawyer is sitting in the courtroom; right?

16  A.   That's correct.

17  Q.   So --

18  A.   So is his.

19  Q.   -- the --

20       So is his?  I'm sorry?

21  A.   His attorney.

22  Q.   Whose attorney?

23  A.   Mr. Evans.

24  Q.   Oh.  Ron Evans' attorney is sitting in the courtroom?

25  A.   Yes.

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1  Q.  All right.  So both of them are here?

2  A.  Yes, sir.

3  Q.  So I guess Ron Evans' case is being watched; right?

4  A.  Well, looks like it.

5  Q.  And that's upsetting to you, to have --

6  A.  To be watching?

7  Q.  -- another discrimination charge; right?

8  A.  Well, it's offensive.

9  Q.  You were named by Lieutenant Broach in a discrimination

10  charge, which you've looked at a couple of times in your

11  testimony, and he filed that on March 18th; right?

12  A.  Okay.

13  Q.  And you knew that Lieutenant Broach was going to be a

14  witness for Ron Evans in his charge; right?

15  A.  No, I didn't know that.

16  Q.  You didn't learn that in -- prior to your meetings with

17  Lisa Berning?

18  A.  Now you're confusing me.

19  Q.  Well, you had some meetings with Lisa Berning; right?

20  A.  Yes.

21  Q.  And prior to those meetings, you knew that Lieutenant

22  Broach was going to be a witness for Ron Evans; right?

23  A.  Possibly.  When you say "for Ron Evans," in what?

24  Q.  In Ron Evans' discrimination case.

25  A.  In a lawsuit?  There was no lawsuit filed.

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1    Q.  No, his EEO complaint.

2    A.  That would be okay.  Right.

3    Q.  Right.  I'm going to show you what's been previously

4    marked as Plaintiff's Exhibit 27.  This is an e-mail,

5    anonymous.  It just says, "Members of 34."

6    A.  What's the exhibit?  What is the number?

7    Q.  It's 27, Plaintiff's Exhibit 27.  It's an e-mail to the

8    chief dated January 18, 2010, and the subject is, "Kevin

9    Campbell, No Return."

10        Do you see that?

11   A.  Yes, I do.

12   Q.  And it complains about you creating a hostile work

13   environment and racial intolerance, which it says "is

14   inexcusable."

15        Have you seen this before?

16   A.  About a month or so ago, yes.

17   Q.  Okay.  So that was the first time?

18   A.  Yes, it is.

19   Q.  So were you ever interviewed about the allegations in this

20   complaint?

21   A.  Well, it looks like it -- if I'm looking at this

22   correctly, it says --

23   Q.  No.  Sir, my question was:  Were you ever interviewed

24   about the allegations --

25   A.  No, I wasn't.  No, nuh-uh.

1  Q.  Did Internal ever call you and say, "We have an anonymous

2  complaint about you.  I want to check it out"?

3  A.  This doesn't say Internal has a copy.

4  Q.  No.  My question was:  Did Internal call you?

5  A.  Okay.  No, they didn't.

6  Q.  Okay.  So if this complains about your return to the 34,

7  you would have wanted to know about that; right?

8  A.  Well, sure.

9  Q.  And yet all that happened with this was that the fire

10  chief sent it on to -- I'm sorry.  The fire chief sent it on

11  to District Chief Reed saying, "No name complaint.  I can

12  figure if Ron sent this."

13      Did you ever see that e-mail?

14  A.  This is the only thing I've seen, this whole document.

15  Q.  All right.  So you've not seen this before; right?

16  A.  Not until a month ago.

17  Q.  And "Ron" would be Ron Evans; right?

18  A.  You would have to ask the chief.

19  Q.  Okay.  And then Howard Reed sends a response saying, "No,

20  I think it's Broach.  He's the real snake there."

21      Did I read that correctly?

22  A.  Yes.

23  Q.  And did you talk to Howard Reed about this anonymous

24  complaint?

25  A.  No.

1   Q.   Did you talk to Chief Wright about this anonymous

2   complaint?

3   A.   No.

4   Q.   You would have expected Chief Wright to refer this to

5   Internal; right?

6   A.   I think if Chief Wright thought one-tenth of one percent

7   of that was true he would have went after me.

8   Q.   Okay.  So it's your expectation that you have such a good

9   relationship with Chief Wright that --

10  A.   No.

11  Q.   -- he'd know that this is all BS and we shouldn't even

12  investigate.

13  A.   I didn't say that.  I just --

14  Q.   Well, what did you mean?

15  A.   I said if Chief Wright, being an African American chief,

16  sent a note to Chief Howard Reed asking, "What's this all

17  about?" -- if either one of those individuals thought that

18  one-tenth of one percent of any of that was true, they would

19  have hammered me, and they should have.

20  Q.   And yet, nothing happened?

21  A.   That's right.

22  Q.   So you've been a trustee of Local 48; right?

23  A.   A trustee?

24  Q.   Yeah.

25  A.   Yes.

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1    Q.  And that's the fire union; right?

2    A.  That's correct.

3    Q.  And that's the bargaining unit that represents the people

4    in the Fire Division; right?

5    A.  Yes.

6    Q.  And there's something that's always been confusing to me.

7    The bargaining unit actually includes firefighters, their

8    lieutenants, their captains and their district chiefs; right?

9    A.  Yes.

10   Q.  So you have management and firefighters all in the same

11   bargaining unit; right?

12   A.  Yes.

13   Q.  And, in fact, the president of Local 48 has often been

14   just a roughneck; right?

15   A.  Yes, sometimes.

16   Q.  Okay.  Now, when you have management employees responsible

17   for discipline mixed with the lowest level employees, that

18   creates some unusual alliances, doesn't it?

19   A.  I don't know.

20   Q.  Well, let's take a look at Joint Exhibit 5.  Joint Exhibit

21   5 is the transcript of your meeting with Lisa Berning and

22   Lieutenant Broach and David Lemons on October 6, 2010; right?

23   A.  Okay.

24   Q.  And at page 68 -- and the page numbers are at the top.

25   Oops, this one has no 68.

1          MS. BRANCH:  Here (handing).

2   Q.  At page 68, there is a discussion with Mr. Lemons and Lisa

3   Berning about the peer review and the review of those

4   reprimands that you had been talking about in your testimony

5   earlier.

6          Do you see that, like around line nine, being written up

7   and there was no one from peer review board agreeing?  Do you

8   see that?

9   A.  Yes.

10  Q.  Okay.  And then after you hear this reference to peer

11  review, you say, "Well, Reggie Harper was his union rep.  I

12  would told you to talk to him, either one of you."

13         Did I read that correctly?

14  A.  That's correct, uh-huh.

15  Q.  So you have talked to the union rep who represented

16  Lieutenant Broach in his effort to challenge your discipline

17  of Lieutenant Broach.

18  A.  That's incorrect.

19  Q.  Well, you're referring them to Reggie Harper; right?

20  A.  Yes, I did.

21  Q.  Okay.  So does the fact that you have these management

22  employees mixed up with the regular workers in the union

23  trigger any situations where the fire chief gives breaks to

24  captains like you when problems come up?

25  A.  I don't recall ever receiving a break.

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1  Q.  Well, you didn't get any investigation of the complaint

2  about you returning to the 34s; right?

3  A.  Maybe he didn't believe it.

4  Q.  So that's a break; right?

5  A.  What's -- I don't follow your question.

6  Q.  So if there had been an investigation, at least it would

7  have cleared the air; right?

8  A.  Sure.

9  Q.  When you engaged in the --

10 A.  I just assumed that the two chiefs didn't believe the

11 e-mail, so there was no investigation --

12 Q.  And, therefore, there was no airing of any complaints;

13 right?  It was just buried.

14 A.  It was just an anonymous complaint.  I guess.

15 Q.  And it was just buried.

16 A.  I never saw it.

17 Q.  So you understood -- and, by the way, you're a manager;

18 right?  You're a captain; right?

19 A.  I'm a captain.

20 Q.  Wouldn't it bother you to see a lieutenant referred to as

21 a snake?

22 A.  Under my command, I wouldn't have appreciated it, no.

23 Q.  And Internal has the power to investigate everybody from

24 the chief down; right?

25 A.  That's correct.  And maybe you should bring Howard Reed in

1    here and ask him what he meant by that.

2    Q.   Maybe the City should.

3         So you understood --

4    A.   I mean, you can't put that on me.

5    Q.   -- when you were in engaged in EEO process with Mark

6    Broach and Lisa Berning that Ron Evans had filed a complaint

7    because he was upset with the level of discipline you gave

8    him; right?

9    A.   I'm sorry?  Say that again.

10   Q.   When you were engaged in this EEO process, you knew you

11   had complaints both by Ron Evans and Lieutenant Broach; right?

12   A.   That's correct.

13   Q.   And Broach was at least claiming that he thought you were

14   pressing hard on him, on Broach, because of his failure to be

15   aggressive with respect to Ron Evans; right?

16   A.   Generally, yes.

17   Q.   And you know as a supervisor that you're supposed to

18   discipline blacks and whites equally; right?

19   A.   Well, sure.

20   Q.   And you know as a supervisor that you actually have a lot

21   of discretion to use counseling or retraining or the stick if

22   you need it; right?

23   A.   Limited resources.

24   Q.   Is that correct, sir?

25   A.   It's somewhat correct.

 1   Q.   So --

 2   A.   I don't know what you mean by "the stick."  What's "the

 3   stick"?

 4   Q.   Reprimands?  Written reprimands?

 5   A.   Yes.

 6   Q.   Demotion?  Suspension?

 7   A.   No, no.  I don't have the power to do any of that.

 8   Q.   Well, you can recommend it; right?

 9   A.   No, I can't.  I can't recommend a demotion.

10   Q.   You can bring charges.

11   A.   I cannot recommend a demotion.  I cannot recommend

12   suspension.

13   Q.   Well, hold on.  You can bring charges; right?

14   A.   I can bring charges.

15   Q.   And you know by labeling in a certain way they can have

16   severe consequences like suspension.

17   A.   Well, give me an example of "labeling in a certain way."

18   Q.   Well, can you think of any, sir?

19   A.   No, I can't.  I want you to tell the truth.

20   Q.   All right.  So if you think --

21          THE COURT:  Mr. Campbell, hold on.  Just answer the

22   questions that are asked.

23          THE WITNESS:  All right.

24   Q.   So if you think that a firefighter has set a fire of a

25   citizen's building, you can write that up as a charge and it

1   will get them terminated and criminally prosecuted; right?

2   A.   I would call the police and pursue it.

3   Q.   Right.

4   A.   Yes.

5   Q.   Okay.  So you know though that short of firefighters

6   starting fires, there are errors that can be handled with

7   counseling and discussion; right?

8   A.   Absolutely.

9   Q.   And you know that one supervisor may choose to do more

10  counseling than another; right?

11  A.   I believe so.

12  Q.   And you're all supposed to use progressive discipline in

13  your approach to problems that can be remedied; right?

14  A.   Yes.

15  Q.   And you and Mark Broach disagreed on the way in which Ron

16  Evans should be supervised; right?

17  A.   No.   I never discussed it with Mark Broach on how Ron

18  Evans should be supervised --

19  Q.   Well --

20  A.   -- outside training.

21  Q.   Okay.  When the City called you in to begin its

22  investigation of Lieutenant Broach's discrimination complaint,

23  did they do any sort of study on your pattern of discipline

24  with respect to white firefighters versus black firefighters?

25  A.   No.

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1    Q.   Were you asked to produce any records that reflected your

2    pattern of discipline with respect to white and black

3    firefighters?

4    A.   No.

5    Q.   Did you see any --

6            MR. GIGLIO:   Objection, Your Honor.

7            THE COURT:   Let's have a sidebar.

8    SIDEBAR CONFERENCE

9            MR. GIGLIO:   Your Honor, I only wish to protect the

10   record.   We objected earlier to this whole intrusion line of

11   questioning on disparate treatment, which this case is not.   I

12   just want the record to reflect that we oppose any questions

13   regarding percentages, quotas, numbers.   It's not part of this

14   claim and shouldn't be asked of the witnesses, should not be

15   before the jury.

16      I understand, of course, Your Honor, with respect, but I

17   just wanted the record to reflect --

18           MR. GERHARDSTEIN:   Your Honor, we'll give him a

19   standing objection on all that.

20           THE COURT:   All right.   Thank you.

21   CONCLUSION OF SIDEBAR CONFERENCE

22   BY MR. GERHARDSTEIN:

23   Q.   Did Lisa Berning tell you the results of her investigation

24   of Lieutenant Broach's EEO complaint?

25   A.   She was frustrated by the --

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1    Q.   Sir --

2    A.   I don't know how to answer that.

3    Q.   Did she tell you the results, yes or no?

4    A.   No.

5    Q.   Did she make any findings?

6    A.   Well, she didn't discuss it with me.  She sent me an

7    e-mail.

8    Q.   Okay.  And in that e-mail, did she tell you whether she

9    had sustained the EEO complaint or not?

10   A.   I don't recall seeing that in the e-mail.  I received a --

11   Q.   That's because the e-mail you're talking about is the one

12   that she was sharing the draft of the fitness-for-duty; right?

13   A.   I don't know if it was a draft or fit-for-duty or what it

14   was.

15   Q.   But that was the document; right?

16   A.   She sent me -- I don't know.  I don't know what you're

17   referring to.

18   Q.   Well, let's get straight our e-mails then.

19   A.   Okay.

20   Q.   Did she send you more than one e-mail?

21   A.   I don't believe so.

22   Q.   And the e-mail you've testified to was one where she

23   shared with you her recommendations about the fitness-for-duty

24   evaluation; right?

25   A.   I don't know if it was fitness-for-duty, but I responded

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1   to it.  There should be a record of it.

2   Q.  Okay.  And we'll get to that.

3   A.  Okay.

4   Q.  In -- do you have any recollection at all of seeing any

5   written findings from an investigation by Lisa Berning?

6   A.  By Lisa Berning?  I don't recall, no.

7   Q.  And as you sit here today, do you know whether there was a

8   determination one way or the other whether Mr. Broach's EEO

9   complaint was sustained?

10  A.  I believe I got an e-mail from Internal saying it was

11  unfounded, I believe.

12  Q.  Oh.  An e-mail from Internal saying his EEO complaint was

13  unfounded.

14  A.  Well --

15  Q.  Is that right?

16  A.  Or from the chief's office, somewhere from some

17  administrative point.  I think -- I recall, I'm pretty sure I

18  got an e-mail.

19  Q.  Was that before or after Mr. Broach was referred for

20  fit-for-duty?

21  A.  I truly don't recall.

22  Q.  And during the course of this litigation, have you been

23  asked to produce all the e-mails that you have received with

24  respect to Mark Broach?

25  A.  Yes.

1  Q.  And have you done that?

2  A.  I believe I have, yes.

3  Q.  And do you have any specific recollection of turning over

4  an e-mail with findings about this EEO complaint?

5  A.  You know, I may be confused with something else, but I

6  believe I turned over everything.

7  Q.  You've received EEO training through the course of your

8  work as a captain; right?

9  A.  If I did, it was quite a while back.

10  Q.  Well, you know not to discriminate based on race.

11  A.  I was raised that way.

12  Q.  And you also know it because you manage people consistent

13  with that principle; right?

14  A.  Absolutely.

15  Q.  And you know not to retaliate against an employee who

16  engages in protected activity; right?

17  A.  I do not retaliate.

18  Q.  My question was:  You know not to retaliate; right?

19  A.  Yes.

20  Q.  And you know that filing a charge is protected activity;

21  right?

22  A.  Explain yourself.

23  Q.  Well, when a man or a woman files a charge alleging that

24  Kevin Campbell has discriminated against me based on my race,

25  you know that just making that charge is protected activity;

1   right?

2   A.   Okay.  Sure.  Sure.  I see.

3   Q.   And even if you're really upset by that, it's still --

4   A.   Yes.  I understand that completely.

5   Q.   -- protected activity; right?

6   A.   Yes, absolutely.

7   Q.   All right.  And you know that when that charging party

8   cooperates in the processing of the charge by going to

9   meetings and talking with people about the charge, that's also

10  protected activity; right?

11  A.   Yes.

12  Q.   And you know that the City EEO process that Lisa Berning

13  was involved with and that you were involved with, that that's

14  all voluntary; right?

15  A.   I don't know if it's voluntary or not.  I truly don't.  I

16  don't know what -- that's my first involvement with them, and

17  I'm not sure how that all works.  I still don't.  I mean, to

18  be -- to answer your question correctly, I don't know.  I

19  don't know if it's voluntary or not.  I was told to go, so I

20  went.

21  Q.   Okay.  And so you really have no idea whether Lieutenant

22  Broach was there voluntarily or whether he had been ordered to

23  be there; right?

24  A.   Yeah.  I don't know, no.

25  Q.   Now, at the end of your session on October 13th you

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

 1    entered into an agreement, which is Joint Exhibit 12, with

 2    Mark Broach; right?

 3    A.  Yes.

 4    Q.  And that was written out by Lisa Berning; right?

 5    A.  That's correct.

 6    Q.  And the first paragraph basically says that Mark Broach

 7    will review with you any proposed discipline he has of Ron

 8    Evans; right?

 9    A.  Yes.

10    Q.  And the second paragraph says, that you, Captain Campbell,

11    when you become aware of problems with Ron Evans, that you'll

12    review those with Mark Broach so that you both have a chance

13    to be heard --

14    A.  Sure.

15    Q.  -- before you both proceed; right?

16    A.  That's correct.

17    Q.  And then the third paragraph, you're going to do this with

18    respect to other people as well; right?

19    A.  Yes.

20    Q.  And then you signed it, and that's your signature on the

21    left?

22    A.  That's correct.

23    Q.  And Mark Broach signed it, and that's his signature on the

24    right?

25    A.  That's correct.

1  Q.  And you signed it in good faith; right?

2  A.  Yes, sir.

3  Q.  And you were satisfied that at least you'd give this a

4  shot and implement this agreement when you ended the session

5  on October 13; right?

6  A.  I believe it's how it's always should have been.

7  Q.  Okay.  So when you finished, you thought you had

8  accomplished something; right?

9  A.  I thought Lieutenant Broach was going to run his unit and

10  take care of his business, absolutely.

11  Q.  And that you would cooperate with him as it says in the

12  agreement; right?

13  A.  That's correct.

14  Q.  Now, between October 13th and October 19th you didn't have

15  any problems with Lieutenant Broach; right?

16  A.  No.

17  Q.  There wasn't any crisis on his unit; right?

18  A.  Not that I recall.

19  Q.  There wasn't any allegation of impropriety or bizarre

20  behavior; right?

21  A.  No.

22  Q.  And there wasn't even anything that happened that caused

23  you two to consult pursuant to the terms of the agreement;

24  right?

25  A.  I'm sorry?  Say again?

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1  Q.  I mean, there wasn't even any event that triggered a

2  consultation under this agreement; right?

3  A.  Well, the event was --

4  Q.  Between October 13th when you signed it and October 19.

5  A.  Well, we were supposed to -- the whole idea of the meeting

6  was to work out a working environment between the two of us.

7  Q.  Right.  But, I mean, nothing happened pursuant to that

8  agreement after October 13th and before October 19th; right?

9  A.  Not that -- I'm not quite following you, but --

10  Q.  You didn't have any new meetings?

11  A.  No.  No.

12  Q.  No consultations about Ron Evans?

13  A.  No.

14  Q.  He didn't bring you any problems?

15  A.  No.

16  Q.  You didn't bring him any problems?

17  A.  No.

18  Q.  Quiet; right?

19  A.  Yes, sir.

20  Q.  And then you get this e-mail, which is Plaintiff's Exhibit

21  33, from Lisa Berning saying, "Please look this over and

22  provide me with your comments and suggestions.  Once you have

23  had a chance to review, I will share this with the chief,"

24  meaning the fire chief; right?

25  A.  Say again?

1  Q.  You got this e-mail from Lisa Berning on Friday, October

2  15th; right?

3  A.  Yes.

4  Q.  And your response is at the top; right?

5  A.  That's correct.

6  Q.  And attached to the e-mail was this document about

7  Lieutenant Mark Broach; right?

8  A.  Okay.

9  Q.  Is that correct?

10  A.  I believe so.

11  Q.  Well, take a look.  Be sure.

12  A.  I'm looking right now.

13  Q.  All right.

14  A.  I believe that was attached.

15  Q.  All right.  So you understood that she was proposing that

16  Mark Broach be referred for fitness-for-duty.

17  A.  Okay.

18  Q.  Is that correct?

19  A.  Let's say yes at that point.

20  Q.  All right.  And so you responded talking about his

21  inability to take responsibility and lack of integrity, as it

22  says in your e-mail; right?

23  A.  That's correct.

24  Q.  And you also said that he lacked truthfulness, inability

25  to grasp reality, and that he had created a level of concern

1   for the potential for workplace violence; right?

2   A.   That's correct.

3   Q.   Now, is this the same guy that you signed this agreement

4   with six days earlier?

5   A.   Same guy I sat in those meetings with, absolutely.

6   Q.   Is it the same man you signed this agreement with

7   (indicating)?

8   A.   Yes, it is.

9   Q.   And nothing that had been done in any of his prior

10  discipline suggested workplace violence; right?

11  A.   In his prior discipline from me, that's correct.

12  Q.   All right.  And at the end of your session on the 13th,

13  you thought he was capable of being a partner with you in this

14  agreement, Joint Exhibit 12; right?

15  A.   Yes.

16  Q.   And yet when you had an opportunity from Lisa Berning to

17  attack Mark Broach and suggest that he's going to shoot up a

18  firehouse, you did it; right?

19  A.   I didn't say shoot up a firehouse.

20  Q.   You said workplace --

21  A.   What I said is what exactly happened.

22  Q.   You said "workplace violence" --

23  A.   I said exactly what happened.  I was very concerned about

24  that, absolutely.  And that's October 17th.  Wasn't the second

25  meeting on the 16th?

CAMPBELL - CROSS-EXAMINATION BY MR. GERHARDSTEIN

1   Q.   No.

2   A.   Well, I'm confused.  The 13th was --

3   Q.   But he had done --

4   A.   Let me clarify something.

5   Q.   Hold on.  Hold on.  He had done nothing between the 13th

6   and the 17th when you wrote this to suggest that he was going

7   to engage in workplace violence; right?

8   A.   Well, what concerned --

9   Q.   Is that true or not?

10   A.   Between --

11   Q.   Hold on.

12   A.   Okay.

13   Q.   Just say yes or no.  Had he done anything to suggest that

14   he was going to engage in workplace violence?

15   A.   No.

16   Q.   Okay.  There was testimony earlier --

17        (Mr. Gerhardstein and Mr. Giglio confer privately.)

18        MR. GERHARDSTEIN:  I'm sorry, Judge.

19        THE COURT:  That's okay.

20   Q.   You were asked questions about an e-mail earlier in your

21   testimony.  It's Defense Exhibit 1.  Do you remember that?

22   A.   Yes.

23   Q.   And I think we established that this e-mail was taken from

24   Mark Broach's e-mail mailbox; right?

25   A.   Yes.

1    Q.   Okay.  And this means, if I understand Outlook correctly,

2    or whatever version of software you have, that you sent this

3    e-mail to Mark Broach on June 13th, 2007; right?

4    A.   That's correct.  Uh-huh.  Right.

5    Q.   Okay.  So when you were testifying, you said that Defense

6    Exhibit 2 was attached because it says -- well, Defense

7    Exhibit 1 shows this paperclip icon; right?  Is that why you

8    thought Defense Exhibit 2 was attached?

9    A.   It just looked different from what I had seen before in

10   deposition.

11   Q.   And this is Defense Exhibit 2; right?

12   A.   I don't know.

13   Q.   I'm sorry.

14   A.   Okay.  Do I have it here to look at?

15   Q.   Yeah.  It's in the defense book.  It would be number two.

16        My question is very simple.

17   A.   Okay.

18   Q.   If the e-mail that you're talking about as Defense Exhibit

19   1 was sent on June 13, 2007 --

20   A.   Yes.

21   Q.   -- it wouldn't have attached a report, performance

22   evaluation signed by Ron Evans on April 1, 2007, would it?

23   A.   Surely, because they are all dated April 1.

24   Q.   Well, but if it's already signed, then this whole e-mail

25   about how he could change it wouldn't make any sense, would

1    it?

2    A.   Maybe in your eyes, but that's not what happened.

3    Q.   Okay.  So Ron Evans had already signed off?

4    A.   I assumed he had.

5    Q.   That's kind of unusual, though; right?

6    A.   No, not really.  I mean, they are supposed to go out on

7    the 1st of April, and that's -- you know, a lot of times they

8    are just dated April 1 because that's the cut-off date, I

9    believe.

10   Q.   So to get back to the joint agreement that you entered

11   into with Mr. Broach on October 13, 2010, did you ever talk to

12   Lisa Berning about whether you really would implement that

13   agreement?

14   A.   Well, sure.  That's what -- we both signed off on it and

15   --

16   Q.   Well, don't you think that you just signed the agreement

17   in order to buy a little time so that you could get Mark

18   Broach off the Fire Department?

19   A.   That's ridiculous, and I'll tell you why it's ridiculous.

20   I signed this agreement because I believed --

21   Q.   I'm sorry.  Tell your counsel.

22        MR. GERHARDSTEIN:  No further questions.

23        THE COURT:  Thank you.

24      Redirect?

25        MR. GIGLIO:  Thank you.

1                    **REDIRECT EXAMINATION**

2    **BY MR. GIGLIO:**

3    Q.  **A few questions raised on cross I think I would like to**

4    **have you explain.**

5         **First of all, you were asked about being upset about EEO**

6    **charges filed by Mr. Broach and Mr. Evans.  Do you remember**

7    **that question?**

8    A.  **Yes.**

9    Q.  **All right.  And the ones that you related to earlier by**

10   **Mr. Evans was back in 2005 or 2007; is that correct?**

11   A.  **2005, I believe, uh-huh.**

12   Q.  **All right.  Was either Mark Broach or Ron Evans under your**

13   **command in February of '10 or March of '10 from then on?  In**

14   **other words, were you their commander in February of '10 for**

15   **Ron Evans?**

16   A.  **Was I their commander?**

17   Q.  **Were you at 34s --**

18   A.  **No.  No.  I didn't come back to 34s until March.**

19   Q.  **Okay.  When you came back in March, was Mr. Broach there?**

20   A.  **Well, he was assigned there, but I never really saw Mark**

21   **again.**

22   Q.  **Okay.  Did you have any contact with Mark Broach after you**

23   **came back to the 34s?**

24   A.  **We had the meetings with Lisa.  Am I getting confused on**

25   **times here?**

CAMPBELL - REDIRECT EXAMINATION BY MR. GIGLIO

1    Q.   Yeah.  Let me back you up.  There's a lot of dates here.

2    A.   Where --

3    Q.   Okay.  I'm going to give you 2010.  We'll start with the

4    year.  Okay?

5    A.   Okay.

6    Q.   You testified that you left the 34s, and you were gone at

7    least January, February, came back in March of '10; am I

8    right?

9    A.   That's correct.

10   Q.   All right.  So you got that time.

11   A.   Okay.

12   Q.   From the time you came back in March of '10, was either

13   Mr. Evans or Mr. Broach at the 34s?

14   A.   They were assigned there.

15   Q.   They were assigned there.  Were they there physically?

16   A.   Again, you'd have to check the -- they were gone so much,

17   I couldn't tell you when they were there and when they

18   weren't.

19   Q.   Well, if I represented to you that Mr. Broach took off for

20   stress on March 5, would you have any reason to doubt that?

21   A.   No.  I know he did take a stress leave.

22   Q.   So if he took -- if, in fact, that occurred, would he have

23   been there when you came back?

24   A.   When you say "been there," he would have been assigned

25   there.  You mean physically there?

CAMPBELL - REDIRECT EXAMINATION BY MR. GIGLIO

1  Q.  Yeah.

2  A.  No.  No.

3  Q.  Okay.  And if Mr. Evans was off for stress or off for

4  whatever reason and he wasn't working in February of '10 or

5  thereafter when you came back, would you be his commander?  He

6  might be assigned there, but if he's not there would it depend

7  on the records of the Fire Department if he was there or not,

8  physically?

9  A.  Yeah.  I don't recall seeing those guys.

10 Q.  All right.  I'm not trying to -- I don't want to confuse

11 you any more than you are.

12     You were asked about the anonymous e-mail to Chief Wright?

13 A.  Chief Wright, yes.

14 Q.  All right.  And does Chief Wright -- as fire chief, does

15 he have a lot of authority?

16 A.  He is -- yes.  He's the chief.  He is the ultimate.

17 Q.  Okay.  And can Chief Wright contact people to do what he

18 wants?  Does he have to go through Internal to investigate

19 anything?

20 A.  Not anything, but he has an option to use Internal.

21 Q.  He has an option.

22 A.  Yes.

23 Q.  Do you know what Chief Wright did when he received that

24 e-mail?

25 A.  Again, I didn't see that e-mail until, like, a month or

1   two ago.  And, obviously, according to that, which you

2   presented here, what was presented here, is that, you know, he

3   sent that to District Chief Howard Reed, who was a District 1

4   chief, and they had their own personal conversation about it.

5   That's it.  I mean, I don't know anything about that thing.

6   Q.  Okay.  Do you know if they did anything, if they called

7   anybody, or what --

8   A.  I have no clue.

9   Q.  Okay.  "Anonymous" is what it was worded; right?

10   A.  Yes.

11   Q.  Okay.  Anonymous.  I thought I had a question -- I'd

12   rather go on to the questions that Mr. Gerhardstein talked

13   about about the president of the Local 48.

14   A.  Okay.

15   Q.  Remember those questions?  There was a question that he --

16   there is a disparaging because of ranking, he is basically a

17   roughneck.  Do you remember that question?

18   A.  Yes.  And he made comment about I should ask Reggie

19   Harper, which was -- the name was Reggie Hocker, who was the

20   president of the Cincinnati African Firefighters Association

21   who was representing Mark at that hearing as a union rep.  I

22   said, "Just don't rely on what I'm saying.  Talk to him."

23   Q.  I want to go back to what Mr. Gerhardstein raised about is

24   there any favoritism because you're captain and there's a

25   district chief because the union -- the union president was a

1   low-ranking individual.  Do you remember those questions?

2   A.  Yes.

3   Q.  All right.  In 2010, who was the president of

4   International Firefighters Local 48?

5   A.  In 2010, it would have been -- let's see, Matt Alter --

6   Monahan, I believe.

7   Q.  Is that Marc Monahan?

8   A.  Yes.

9   Q.  What's his rank?

10  A.  He is a district chief.

11  Q.  What was his rank back then?

12  A.  Probably a captain.

13  Q.  So he wasn't a roughneck?

14  A.  No.  No.  I don't ever recall a roughneck ever being the

15  president, but I'm sure they could.

16  Q.  Well, you talked about entering into the agreement that

17  was shown that you signed with Mr. Broach?

18  A.  Yes.

19  Q.  After that, you received the e-mail from Lisa Berning?

20  A.  That's correct.

21  Q.  Okay.  I'm going to show that you e-mail again.  It's

22  Exhibit 33, Plaintiff Exhibit 33.  I'll -- when you got this

23  -- are you responding to her draft referral that she felt that

24  somebody --

25  A.  No.  These were my concerns.

CAMPBELL - REDIRECT EXAMINATION BY MR. GIGLIO

1   Q.  No, no.  I understand they were your concerns.

2   A.  Okay.

3   Q.  But did she ask you to look at her -- let's just see what

4   it says.  "Please look this over."  What is she talking about?

5   A.  She's talking about that draft.

6   Q.  Okay.  And that draft is a referral to PEAP?

7   A.  I don't know.  I don't know what she does.  I don't know

8   what that all entails.  I just stressed my concerns there.

9   Q.  Okay.  This has been previously published.  This is the

10  document -- is that the document that you understand was being

11  attached for you to look at?

12  A.  Yes.

13  Q.  All right.  She is issuing a mandatory PEAP.  Do you see

14  that?

15  A.  Okay.

16          THE COURT:  Can you state the exhibit number for

17  that, please?

18          MR. GIGLIO:  Which one is that?  I believe it's all

19  part of Plaintiff's 33.

20          MR. GERHARDSTEIN:  Plaintiff's 33.

21          MR. GIGLIO:  I'm sorry, Your Honor.

22          THE COURT:  That's all right.

23  A.  Again, this is her recommendations.  I have nothing

24  outside my two observations.

25  Q.  Okay.

1  A.  It came out of those meetings.

2  Q.  Okay.  All right.  And you were asked about an e-mail,

3  which I'm going to show you, PX-33, that you sent back.

4  A.  Yes.

5  Q.  And this was your input?

6  A.  Yes.

7  Q.  All right.  Is there anywhere in there that says I'm not

8  going to go along with the agreement to try to work with him?

9  A.  No.

10 Q.  Is this a distinct situation?  Are you giving her any

11 information regarding your comments about what occurred?

12 A.  It's my concern, is what's detailed there:  things we had

13 discussed on the tapes; his inability to take responsibility

14 for his own action; his lack of integrity.

15     And, I mean, the thing with Jeff Harris, I don't recall

16 when that information was brought to me.  It may have been

17 brought to me during that week, but it was recent.  It was

18 within the last --

19          MR. GERHARDSTEIN:  Objection, Your Honor.

20          THE WITNESS:  Okay.

21          THE COURT:  Do you want a sidebar?

22          MR. GIGLIO:  I'm not going to go there.

23          THE COURT:  For the record, the objection is

24 sustained.

25 Q.  Just try to -- I know you want to explain a little bit

CAMPBELL - REDIRECT EXAMINATION BY MR. GIGLIO

1   more, but we'll let you -- for purposes of our interchange --

2   A.  Okay.

3   Q.  Take a breath.

4   A.  Got you.  All right.

5        THE COURT:  There's water if you want.

6        THE WITNESS:  I'm fine.

7   Q.  My question is, despite your comments which you observed

8   that you were asked input on, did you intend not to honor the

9   agreement?

10  A.  No.  I would have loved for that to have been the

11  conclusion right there, that this -- we're going to follow

12  this.  And, you know --

13  Q.  So even though you made these comments --

14  A.  Uh-huh.

15  Q.  -- you believe you still could have --

16  A.  I would have tried.

17  Q.  You still would have talked to him about --

18  A.  I would have tried.  Absolutely.  I would have followed

19  that to a tee.  That's him running his unit.

20       MR. GIGLIO:  If I may I have one moment, Your Honor?

21   (Mr. Giglio and Ms. Powell confer privately.)

22       MR. GIGLIO:  I believe that's all the questions we

23  have, Your Honor.  Thank you.

24       THE COURT:  Thank you.

25   Mr. Gerhardstein, do you have any additional questions?

1                          **RECROSS-EXAMINATION**

2   BY MR. GERHARDSTEIN:

3   Q.  You said in response to counsel's question that you were

4   concerned about Lieutenant Broach's inability to take

5   responsibility.  Do you remember that?

6   A.  Yes, sir.

7   Q.  And your real problem is that on issues that have been

8   resolved, like those three reprimands, he was still saying

9   that he didn't think he was fairly treated; right?

10  A.  That's correct.  Yes, sir.

11  Q.  And you know that sometimes people go through due process,

12  get their sentence, get their judgment, and still disagree;

13  right?

14  A.  That's correct.

15  Q.  That doesn't mean they're unfit for duty.

16  A.  I never --

17  Q.  Right?

18  A.  That's not my conclusion.

19  Q.  Okay.

20  A.  I don't do that.  Lisa Berning does it.

21          MR. GERHARDSTEIN:  No further questions.

22          THE COURT:  Thank you.

23      All right.  At this time the jury may have the opportunity

24  to ask questions of this witness.  And if you could write down

25  questions that you have, we will review them.

JUROR QUESTIONS

1     The jury will ask questions, I will read them to you, and

2 then you'll answer them, and each attorney will have an

3 opportunity to follow up.

4         THE WITNESS:  Okay.

5         THE COURT:  All right.

6     Could I see counsel, please.

7 SIDEBAR CONFERENCE

8         MR. GIGLIO:  Can I -- one quick question?

9         THE COURT:  Yes.

10         MR. GIGLIO:  Can my client leave the room when we do

11 this to use the restroom?

12         THE COURT:  Yes.

13         MR. GIGLIO:  I'll tell him to start without me.

14         THE COURT:  Okay.  Number one --

15         MR. GIGLIO:  Back on the record.

16         MR. GERHARDSTEIN:  It's your witness.

17         THE COURT:  Okay.  "When you signed the agreement,

18 why, when you got the e-mail from Lisa Berning, why didn't you

19 suggest trying the agreement before going through with any

20 further steps if you believe what you signed?"

21         MR. GERHARDSTEIN:  This is why this so difficult for

22 trial attorneys.  These open-ended questions drive me crazy.

23 All right.

24         THE COURT:  Number two.  "Prior to becoming a

25 lieutenant, did you ever have any racial problems with your

1    peers?"

2            MR. GERHARDSTEIN:  No objection.

3            MR. GIGLIO:  No objection.

4            THE COURT:  "As a lieutenant and captain, have you

5    ever reported to an African American supervisor?"

6            MR. GERHARDSTEIN:  No objection.

7            MR. GIGLIO:  No.

8            THE COURT:  "How were you aware of performance

9    evaluations for Ron Evans would be in Lieutenant Broach's

10   locker?"

11           MR. GERHARDSTEIN:  No objection.

12           MR. GIGLIO:  No objection.

13           THE COURT:  The fourth set of questions.

14       "Why do you feel the African Americans at Engine 34 asked

15   you to come back to the unit?"

16           MR. GERHARDSTEIN:  This is a direct appeal to

17   hearsay.

18           MS. POWELL:  No objection.

19           MR. GERHARDSTEIN:  Well, we object, I mean, because

20   it's just going to be a speech about things people told him.

21   So we object.

22           MS. POWELL:  You could phrase it without giving his

23   direct quotes:  What is your understanding?

24           MR. GERHARDSTEIN:  Well, he's already volunteered

25   that anyway.  I just think that you can't do it without asking

```
 1    for hearsay.

 2           THE COURT:  Let's go back to number three and talk

 3    about that for a minute.  That's going to be our same problem.

 4      "How long were you aware the performance evaluations for

 5    Ron Evans were in Lieutenant Broach's locker?"

 6           MS. POWELL:  He already said --

 7           MR. GERHARDSTEIN:  No --

 8           MS. BRANCH:  He said that he found something in his

 9    locker before.  He already answered that --

10           MR. GERHARDSTEIN:  Right.  And these things were

11    overdue, so I mean --

12           THE COURT:  Okay.  Well, I'll ask him how he feels,

13    but if he starts to go into what other people told him, I will

14    stop him.  He could say, "I knew they liked me," but if he

15    gets into hearsay, I'll cut him off.

16      "Why would someone in your company ever claim race

17    discrimination before you asking them to motivate another team

18    member to be great?"

19           MR. GIGLIO:  I'm sorry, Your Honor, I missed that

20    one.

21           THE COURT:  "Why would someone in your company ever

22    claim race discrimination for you asking them to motivate

23    another team member to be great?"

24           MS. POWELL:  No objection.

25           MR. GERHARDSTEIN:  I think it's just asking for his
```

```
 1   speculation.  I think if counsel asked that question, it would
 2   be objectionable.  That is not appropriate.  I think it's just
 3   such an invitation to hearsay, and we object.
 4          THE COURT:  Okay.  And I'm not asking that because he
 5   can't testify to what other people in his company would let
 6   him do.
 7      "How many African American immediate supervisors have you
 8   ever had with the City?"
 9          MS. POWELL:  He kind of already --
10          THE COURT:  Which he asked that one already.  Okay.
11      "Has there ever been damage to a fire truck that went
12   initially unreported?  If so, when found, was that person
13   black or white?  And were they reprimanded?"
14          MR. GERHARDSTEIN:  No objection.
15          MS. POWELL:  No objection.
16          MS. BRANCH:  Can we go back?  You struck the prior
17   question about supervision --
18          THE COURT:  Yes.
19          MS. BRANCH:  -- but I think the earlier question was:
20   As a lieutenant or a captain, did you report to an African
21   American?
22      So maybe this makes it broader?
23          THE COURT:  Why don't I strike the number two and ask
24   this one instead?
25          MS. POWELL:  That makes sense.
```

```
 1          MS. BRANCH:  Okay.

 2          THE COURT:  So any objection to the fire truck

 3   damage?

 4          MR. GERHARDSTEIN:  No.

 5          MR. GIGLIO:  No.

 6          THE COURT:  "What was the ratio of black to white

 7   firefighters at Engine 34 in March of 2010?"

 8          MR. GIGLIO:  That's fine.

 9          MR. GERHARDSTEIN:  No objection.

10          THE COURT:  "Have any other African American

11   firefighters at Engine 34 ever expressed concerns about

12   working with Mark Broach?  If so, can you elaborate?"

13          MS. POWELL:  We don't object.

14          MR. GERHARDSTEIN:  That's hearsay.  That's just one

15   set of rules here.

16          THE COURT:  Okay.

17          MR. GIGLIO:  You could ask if he was aware of any

18   objections by anyone.

19          THE COURT:  I'm just going to ask it as a yes or no

20   question and not read the "elaborate" part.

21      And then the last question on this page, "Can the jury be

22   made aware of who brought up the reprimands in the four

23   meetings?"  Which we've gone over at least three times

24   already, but --

25          MR. GIGLIO:  Who brought up reprimands at the
```

1    meetings?  There has been prior testimony --

2         MR. GERHARDSTEIN:  Are you going to offer the

3    transcripts?

4         MR. GIGLIO:  Yes.  We're going to offer the

5    transcript and the audio.  We were going to play the audio,

6    Your Honor.  And, frankly, it's been a very good jury.  We

7    don't -- we're not here to punish anybody, but we want them to

8    have the opportunity to listen to it and certainly read the

9    transcript.

10        MR. GERHARDSTEIN:  We're not going to object to the

11   transcripts, so the answer to the question is you go check

12   that out in the transcripts.

13     We are going to object to the audio just because nobody

14   has used it and it's very hard to -- it could be very

15   confusing without some guidance.  He comes off booming because

16   his mike is right next to his body, but I think the transcript

17   solves the problems.

18        MR. GIGLIO:  If that's the case, then they may have

19   to play the transcripts.

20        MS. POWELL:  We will need -- maybe it's not for this

21   portion of the jury questions, but we will need to have a

22   discussion about that at some point.

23        MR. GIGLIO:  Well --

24        THE COURT:  Well, let's have it now because we're --

25        MR. GIGLIO:  I think we're certainly going to move

```
 1   them in, the audio as well as the -- we think the audio is
 2   very, very important here because both sides have argued how
 3   this whole -- how this thing came about.  Plaintiff has argued
 4   he didn't get his fair share, fair shake.  Defense has argued
 5   we are asking multiple times.  I think the jury should
 6   actually hear the voices of these people, the tone, their
 7   demeanor that goes -- it's the best evidence, frankly.
 8           MS. POWELL:  We could consider a stipulation about
 9   where the mike was.  I mean, that's fine.
10           MR. GIGLIO:  Yes.  There's nothing wrong with that.
11           MR. GERHARDSTEIN:  I just think you're inviting a
12   long period of deliberations about something they have no
13   guidance in.  The transcript is neutral.  It solves the
14   problem.  We've both used it.  No one has used the audio.  And
15   without that, I would object to the use of the audio.  I just
16   don't think there is any framework within which to, you know,
17   size it up.
18           MS. POWELL:  I would just add that, from our
19   perspective, it's kind of like when you hear about an e-mail
20   being used in the wrong tone in an e-mail, it's the same
21   thing.  The transcript doesn't convey the tone and the cadence
22   of the actual meeting and the pauses and the different
23   people's voices, and it is the best evidence.
24       There is no reason why we should be treating them
25   separately and only allowing the written document because it
```

 1    doesn't reflect all the things that I think we know impact how

 2    a conversation goes, which is how fast people are speaking,

 3    what level of pause and that kind of thing.

 4            THE COURT:  Okay.  I have only looked at the

 5    transcript.  I haven't listened to it, so I want to listen to

 6    it before I decide this.  Why don't we take a break, and I

 7    will do that depending on how the rest of the day goes.  But

 8    we need to address it before we lose the witness that we need

 9    to talk about because we won't be able to talk --

10            MR. GIGLIO:  No.  He wasn't there.  Campbell can talk

11    about it.  Of course, the plaintiff could -- what we did ask

12    specifically with Lieutenant Lemons and Captain Campbell,

13    accurately went through the whole foundation scenario.  We

14    would not dismiss him if we were going to play it.

15            THE COURT:  Okay.  So back to this question.  What do

16    we want to do about the question?

17            MR. GERHARDSTEIN:  I think you should just say that

18    they'll have the record of the conversation.  I think you can

19    just answer it for them.  They'll have the record of the

20    conversation, and they'll be able to address that in their

21    deliberations.

22            THE COURT:  Okay.

23       This one made me laugh.  "What is a roughneck?"

24            MS. POWELL:  No objection.

25            MR. GERHARDSTEIN:  No objection.

```
1            THE COURT:  And, "Did you ever complete a performance
2   evaluation for Lieutenant Broach or tell him how to score a
3   firefighter?"
4            MR. GERHARDSTEIN:  No objection.
5            MR. GIGLIO:  I'm sorry.  Try that again.
6            THE COURT:  "Did you ever complete a performance
7   evaluation for Lieutenant Broach or tell him how to score a
8   firefighter?"
9            MS. POWELL:  It's been asked and answered.
10           MR. GIGLIO:  I asked him.
11           MR. GERHARDSTEIN:  Right.
12           MS. POWELL:  And he provided testimony to --
13           MR. GERHARDSTEIN:  Well, they didn't get it.  I think
14  we should respect their --
15           THE COURT:  Okay.  As far as timing goes, it's 2:30.
16  I missed what you said about giving -- you need Campbell to
17  play the tape?
18           MR. GIGLIO:  We would be done other than awaiting
19  your ruling on the audio.
20           THE COURT:  Are you going to call Winston?
21           MR. GIGLIO:  We would call Winston next.
22           THE COURT:  Okay.  Do you have any rebuttal
23  witnesses?
24           MR. GERHARDSTEIN:  We have to decide it.
25           MS. BRANCH:  Well, we have to wait until their close.
```

1        THE COURT:  All right.  What are your thoughts on

2   them playing the tape without the witness if we finish with

3   Campbell and excuse him, or would you object and want Campbell

4   to be here?

5        MR. GERHARDSTEIN:  I think we should have a witness.

6        THE COURT:  Okay.  Then we're going to take a break

7   so we can listen to it.  I'll ask him these questions.  Before

8   you follow up, I'll take a break.

9   <u>CONCLUSION OF SIDEBAR CONFERENCE</u>

10       THE COURT:  Okay.  Captain Campbell, I have some

11  questions that I'm going to ask you.  Then after we conclude

12  with these questions, I need to take a short break, so I will

13  take that break.  After that, the attorneys will have an

14  opportunity to follow up with you.  Okay?

15       THE WITNESS:  Okay.

16       THE COURT:  When you signed the agreement, why, when

17  you got the e-mail from Lisa Berning, why didn't you suggest

18  trying the agreement before going through with any further

19  steps if you believed what you signed?

20       THE WITNESS:  The -- I have nothing to do with HR and

21  that process.  You know, as far as the agreement, yes.  If

22  Mark Broach would stay on the company, that's the agreement we

23  would have worked out.  But the HR -- my understanding, this

24  fit-for-duty and all that came out of the meetings that we had

25  that are on the tapes, and her conclusions came from that.  I

```
 1    have nothing to do with that.  I don't send somebody out for

 2    fitness-for-duty.  I don't have that responsibility.  That

 3    comes from HR.

 4            THE COURT:  Okay.

 5        Prior to becoming a lieutenant, did you ever have any

 6    racial problem with your peers?

 7            THE WITNESS:  No.  No.

 8            THE COURT:  How were you aware the performance

 9    evaluations for Ron Evans would be in Lieutenant Broach's

10    locker?

11            THE WITNESS:  I wasn't.  We were guessing.  The --

12    because I had had issues with him earlier in the course of his

13    assignment there at Engine 34, and we discussed that with

14    inspections, different forms and paperwork was left in his

15    locker.  I had numerous discussions with him.  I had no idea

16    they were in there.  It was just a guess.

17            THE COURT:  Without telling us what other people may

18    have told you, why do you feel the African Americans at Engine

19    34 asked you to come back?

20            THE WITNESS:  Because we were all brothers.

21            THE COURT:  How many African American immediate

22    supervisors have you had in your career with the City and the

23    Fire Department?

24            THE WITNESS:  As far as my immediate supervisors?

25    Um, well, we're talking 32 years.  I'm trying to remember back
```

```
 1    32 years.

 2        As my immediate supervisor was African American?  Well,

 3    the -- Bobby Wright, who eventually became the fire chief, was

 4    my immediate supervisor when I was with Ladder 19.  And then

 5    there were -- that was -- I think that was the only immediate

 6    supervisor that I had directly over me.

 7             THE COURT:  Has there ever been damage to a fire

 8    truck that went initially unreported?

 9             THE WITNESS:  Yes.  Yes.

10             THE COURT:  When that was found, was that person

11    black or white?

12             THE WITNESS:  Oh, I have no clue.  It's a procedure.

13    I mean, that apparatus, the bumper was twisted up and --

14             THE COURT:  I'm asking about just any --

15             THE WITNESS:  Oh, okay.

16             THE COURT:  -- other incident where a fire truck was

17    damaged and went unreported.

18             THE WITNESS:  I don't know, but it could have.  Not

19    in my house, though.

20             THE COURT:  What was the ratio of black to white

21    firefighters at Engine 34 in March of 2010?

22             THE WITNESS:  There would have been 15 total

23    firefighters and three paramedic supervisors.  Those are all

24    lieutenants.  Those three lieutenants were African American.

25    The five firefighters under my direct control were African
```

1   American.  On Unit One, until when Lieutenant Lopez was there,

2   that was all African American, all five.  And then under

3   Lieutenant Broach, he had some six men assigned, so one or two

4   Caucasians that were there.  There was a driver -- let me back

5   up.  There was one Caucasian on Unit One, one on Unit Two,

6   which was me, and then I think Lieutenant Broach had a couple

7   Caucasians.  Everyone else was African American.

8            THE COURT:  Have any other African American

9   firefighters at Engine 34 ever expressed concerns about

10  working with Mark Broach, yes or no?

11           THE WITNESS:  Oh, yes, absolutely.

12           THE COURT:  All right.

13      The jury had asked the question can they be made aware of

14  who brought up the reprimand in the four meetings.  I just

15  want to let you know that you will have a record of the

16  conversation in your deliberation.

17      The next question is:  What is a roughneck?

18           THE WITNESS:  Oh, I'm sorry.  A roughneck is a term

19  for a firefighter, and unpromoted firefighter in the Fire

20  Division.

21           THE COURT:  Did you ever complete a performance

22  evaluation for Lieutenant Broach or tell him how to score a

23  firefighter?

24           THE WITNESS:  Tell him how to score?  I mean, what

25  was presented up here is what happened.  I sent him an e-mail,

1   and in 2007 -- I remembered that.  You know, I was thinking

2   about that after the conversation, you know.

3      Ron Evans was on an extended leave when -- or when

4   Lieutenant Broach first came up to the house.  That was part

5   of the reason why he asked me.  He said, "I don't have much

6   background with this guy."

7      So I sent him the e-mail, which -- and I copied all the

8   district supervisors.  I expressly said at the end, you know,

9   "Bottom line, this rests with you.  If you're not comfortable

10   with it, change anything."

11      But I did send him that.  That was 2007 for the 2006

12   evaluation.

13         THE COURT:  Did you ever complete a performance

14   evaluation for Lieutenant Broach?

15         THE WITNESS:  Did I ever do one for him?  I did --

16         THE COURT:  Yeah, answer that question.  I'm not sure

17   that was the question the jury asked, but you can answer that.

18         THE WITNESS:  I was responsible for his performance

19   report and for the other African American officer on Unit One,

20   his performance report, and then, of course, everyone under my

21   immediate command.

22         THE COURT:  All right.

23      We're going to take a short recess.  I'm going to say 15

24   minutes.  I'll try to keep it to 15 minutes if I can.

25      The same instruction as I gave you previously.  Do not

1   discuss this case with anyone, including your fellow jurors,

2   members of your family, or people involved in the trial or

3   anyone else.  If anyone tries to contact you or talk to you

4   about this, please let us know immediately.  Do not watch,

5   listen or read any news reports of the trial.  Do not get on

6   the Internet or use blogs or chat rooms to research or discuss

7   the case or any other social media applications.  Finally, you

8   must keep an open mind until all the evidence has been

9   received and you have heard the views of your fellow jurors

10  during deliberations.

11      (Jury out at 2:45 p.m.)

12          THE COURT:  Okay.  We'll take a short recess, and I

13  will be right back.

14     (A recess was taken from 2:45 p.m. until 3:00 p.m.)

15  BEFORE THE COURT

16          THE COURT:  Okay.  So let's go on the record for a

17  minute before we bring the jury back.

18     Obviously I wasn't able to listen to the whole thing, but

19  I listened to parts of both seven and eight, beginning and

20  middle.

21     My view on the audio is that I think it should go back to

22  the jury.  Although plaintiff is closer to the microphone, the

23  jury has already been told he secretly made it, so I think --

24  if we can do a stipulation, they will know why that is.  It

25  does give the best evidence of what happened at those

```
 1    meetings.
 2        So they will be admitted.  I am fine with defendant's plan
 3    to just move to admit them at the end of their case and not
 4    play them at this time to the jury.
 5            MR. GIGLIO:  That would be fine, Your Honor.  In the
 6    interest of time economy, makes sense.
 7            THE COURT:  Okay.
 8        Mr. Gerhardstein, would you like to make any objections
 9    for the record?
10            MR. GERHARDSTEIN:  Well, we object, but that's okay.
11            THE COURT:  All right.  Are we ready to proceed then?
12    We'll just do follow-up with Captain Campbell?
13            MR. GERHARDSTEIN:  As far as a stipulation, let's
14    work that out as part of the charge.  You know, there's
15    another stipulation that you're going to get the audio tape,
16    the microphone was there.  We'll come up with some language.
17            THE COURT:  Okay.
18            MR. GERHARDSTEIN:  Thank you, Judge.
19            THE COURT:  All right.  And we'll do the follow-up to
20    my questions with Captain Campbell?  Do you have follow-up?
21            MR. GERHARDSTEIN:  No, I don't.
22            THE COURT:  Do you have follow-up?
23            MR. GIGLIO:  No, Your Honor.
24            THE COURT:  Oh, okay.  Well, then do you have any
25    objection to me releasing Captain Campbell now and just
```

1   informing the jury that there were no follow-up questions?

2         MR. GERHARDSTEIN:  No.

3         MR. GIGLIO:  No objection.

4         THE COURT:  Okay.  We'll do that.  Thank you.

5      Ms. Lahley, you can release Captain Campbell and we'll get

6   the jury.  Thank you.

7         COURTROOM DEPUTY:  Yes.

8      (Pause in proceedings.)

9      (Jury in at 3:07 p.m.)

10        THE COURT:  All right.  Counsel did not have any

11  follow-up questions for Captain Campbell.

12     So would defendants like to call their next witness,

13  please.

14        MS. POWELL:  Your Honor, the City calls Assistant

15  Chief Roy Winston.

16        THE COURT:  Thank you.

17     Mr. Winston, if you will please approach the stand and

18  raise your right hand to be sworn.

19     (The witness was duly sworn by the courtroom deputy.)

20        THE WITNESS:  I do.

21                    ROY WINSTON

22  a witness herein, testified as follows:

23               DIRECT EXAMINATION

24  BY MS. POWELL:

25  Q.  Chief Winston, would you state your full name for the

1    record.

2    A.    It's Roy Edward Winston the Second.

3    Q.    And your current position with the Fire Department?

4    A.    I'm the Assistant Chief of Human Resources, also referred

5    to at times as the Training and Personnel Bureau.

6    Q.    And how long have you been the assistant chief for the HR

7    Division?

8    A.    Just a little over two years.

9    Q.    Do you remember approximately when you started that

10   position?

11   A.    It was early August of 2011.

12   Q.    How long have you been employed with the Fire Department?

13   A.    Just a little over 25 years.

14   Q.    And can you walk us through your employment history at the

15   department in terms of different positions you've held and

16   roles that you've held at the Fire Department?

17   A.    Sure.  Came in the department in August of 1988.  After

18   graduating from drill school, went on to the west side of

19   town, was sent over to the 24s, the 35s and the 17s,

20   firehouses over Price Hill, Westwood and Lower Price Hill.

21   Then went up to -- spent some time in Corryville at Engine 19,

22   a couple of years there.  Then I was promoted to lieutenant

23   from there in 1993.  I served as a lieutenant for a few years,

24   finally got a regular position there at Engine 9, which is in

25   North Avondale.  I was promoted to captain I think sometime in

 1    '96, I think it was.  I started out down in Lower Price Hill

 2    and then eventually spent the rest of my time as a captain

 3    there in Carthage.

 4        In 1999, I was promoted to a district chief over to the

 5    east side of town there this District 4.  Approximately early

 6    2003, took the assignment of communications district chief

 7    which oversaw the Fire Department's 911 portion of the 911

 8    center, all the technology that's associated with the Fire

 9    Department.

10        Early 2011, went down to District 1 which is down at Ninth

11    and Broadway, spent those seven, eight months until I got

12    promoted to assistant chief in 2011.

13    Q.  And can you explain your general duties that you performed

14    as the assistant chief in the HR Division?

15    A.  I was -- Operations is really responsible for all the

16    people in the Fire Department.  Human Resources is just really

17    responsible for the actual processing of those individuals.

18    So we have --

19        Really, it's made up of two divisions, the Training side

20    as well as the Health, Safety and Risk Management side.  On

21    the Training side, we're ultimately responsible for all the

22    certifications that people have from the day that they come on

23    to the department up until they retire.  So whether it's your

24    CPR, EMT, firefighter, we're tasked with trying to make sure

25    that those are not only up to date but that people have the

1    training that, you know, if the state were to come in and look

2    at our records, that everyone would be up to par as far as

3    what the state requirements are.

4         So within the Training, we also have the Media Team, we

5    have our Recruiting, Background Investigations, which is all

6    the backgrounds that's done on new employees as well as -- I

7    spoke to the recruiting.  So those are the primary functions,

8    primary duties that Training has.

9         Then on the other side, we have the Health and Safety as

10   well as Risk Management, which is responsible for processing,

11   you know, all the Workmans' Comp claims, any injuries,

12   accidents, the investigation arm of that, the line of duty

13   deaths as well as the safety captains that perform -- on each

14   entity in the city, we send one Safety captain to those,

15   whether it be a fire, entrapment.  Any high risk type of

16   incident, those Safety captains actually respond to make sure

17   our members are doing what they should on an incident scene.

18        We also have Internal Investigations, which is also under

19   that, which is tasked with investigating certain complaints,

20   certain violations of procedure that, you know, that we as

21   Administration may give them or task them with.

22   Q.  Okay.  So we heard testimony earlier this morning from

23   Lieutenant Lemons, and he is in the Internal Investigations

24   section or subsection of your department; right?

25   A.  Yes.

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1  Q.  He did talk, if you remember, about training; is that

2  right?

3  A.  Yes.

4  Q.  So why -- if Lieutenant Lemons is in Investigations, why

5  is he doing certain training when you have the Training side

6  of your department?

7  A.  I think sometimes with Internal, we usually look at them

8  as people who walk around with trench coats, you know, peeking

9  around corners and so forth.  So one of the things I did when

10  I became the assistant chief was to try to maybe broaden the

11  scope of what they did, so we created this --

12      The chief wanted some kind of officer development program,

13  so we came up with this mentoring program.  We noticed that a

14  lot of the disciplinary actions that were being taken probably

15  weren't handled in the best way, so Internal was tasked to go

16  out and mentor the newer lieutenants, the newer captains,

17  really helping them appreciate not only what's in the

18  procedures manual but really how to make practical

19  application, when the time comes, within the firehouse

20  setting.

21  Q.  And were those efforts for mentoring and training, was

22  that at all in response to the city's affirmative action

23  numbers?

24  A.  No.  It didn't necessarily have anything to do with that,

25  but we just thought it would be an effective tool to really

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1  assist people to better handle interpersonal relations within

2  the firehouse and really, hopefully, ultimately cut down on

3  some of the disciplinary problems that we've seen in past

4  years.

5  Q.  And just to make sure that the jury is clear, who were

6  your predecessors in your role as assistant chief of HR?

7  A.  When I took over for Human Resources, I relieved Robert

8  Kuhn who -- and before him it had been Mose Demasi.

9  Q.  Okay.  Do you know the plaintiff, Lieutenant Broach?

10  A.  Yes.

11  Q.  And how do you know him?

12  A.  We actually -- 25 years ago, we actually came in the same

13  recruit class.

14  Q.  Do you ever make fires together?

15  A.  We made a few.  Sometimes memory gets foggy, but I think

16  when I was the captain out in Carthage, he was assigned to the

17  firehouse in North Avondale.  So we were, you might say,

18  neighbors, if you would.  So that was -- I do recall making

19  certainly incidents with him.  I can't remember how long of a

20  period it was, but it was for a couple of years.

21  Q.  And did you -- when you started as the assistant chief in

22  the HR Division, did Lieutenant Broach's name come to your

23  attention?

24  A.  Yes.  Probably maybe a month or maybe a little less into

25  the new assignment, Chief Burkert, who works under me there in

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1   Risk Management, Health and Safety, mentioned that -- I guess

2   we were reviewing the people who had been off the track for

3   six months or longer.  We were talking about creating an

4   options letter that would -- those individuals, whether they

5   be on limited duty, which is our light duty status that we

6   have, or if they were just off the track, period, we would

7   maybe reach out to send them these option letters.

8       Well, at that time he brought up the fact that Lieutenant

9   Broach had been off for -- maybe since early in 2011, and he

10  wasn't sure what he was supposed to do with that situation.

11  Q.  And so what did you do to address that?

12  A.  Well, I just asked him to, you know, see what had been

13  done in the past as far as dealing with it, you know.  So he

14  went back and tried to speak, I think, with EHS and Risk

15  Management just to see what the status of that was.

16      And I just -- at that time, I advised him "Hey, whatever

17  help you need" in terms of trying to work on that situation,

18  trying to see if he was willing to come back to work, to let's

19  make that happen.

20  Q.  Did you or Chief Burkert or anybody in your division take

21  any follow-up steps to address Lieutenant Broach's current

22  off-duty status?

23  A.  He had mentioned that he was, you know, in the process of

24  drafting a letter to try to send out to Lieutenant Broach or

25  had sent some correspondence to the address as well as the

1  phone number, maybe, that we had on file with Lieutenant

2  Broach.  So we had taken some steps to try to send that, but

3  it had come back as being undeliverable.  I think it was Chief

4  Demasi who actually approached me, I don't know, sometime

5  maybe in September, and he mentioned that he had run into

6  Lieutenant Broach at Winton Woods.  So I mentioned that to

7  Chief Burkert.  Chief Demasi had what he thought was a current

8  known phone number for Lieutenant Broach, and I asked Chief

9  Burkert to see if he could use that contact information to

10  reach him.

11  Q.  Do you know if he was successful with that, if Chief

12  Burkert was able to use that information to reach Lieutenant

13  Broach?

14  A.  I think so, only because I know when we finally drafted a

15  letter that actually had my signature on it, he utilized

16  Internal to actually deliver that ultimately to Lieutenant

17  Broach.

18  Q.  I'm going to have you turn to Joint Exhibit 18, Lieutenant

19  Broach.  Do you have that document in front of you?

20  A.  Yes, ma'am.

21  Q.  Do you recognize the document?

22  A.  Yes.

23  Q.  Is this a copy of the letter that your department sent out

24  to Lieutenant Broach?

25  A.  Yes, ma'am.

1  Q.  Is this your signature at the bottom of the letter?

2  A.  Yes, it is.

3  Q.  Did you write this letter?

4  A.  No.  Chief Burkert did.  He typed it, which happens from

5  time to time.  But at the same time -- but ultimately it's my

6  letter because yes, I signed it.

7  Q.  Did you review it before it went out?

8  A.  Yes.

9  Q.  Okay.  Did you discuss it with Chief Burkert?

10 A.  Yes, I did.  I also discussed it with Chief Braun, who is

11 our current fire chief.

12 Q.  And is Chief Braun the fire chief that has succeeded Chief

13 Wright?

14 A.  Yes.

15 Q.  What kind of things did you discuss with Chief Braun about

16 the letter?

17 A.  I just tried to give him an overview of what I knew at

18 this point concerning why Lieutenant Broach had been off duty

19 and, really, at the same time, what we were going to try to

20 do, to try to see if he would comply in order to try to get

21 him back to work.  He was definitely agreeing with that.

22 Q.  And what was your understanding of why Lieutenant Broach

23 was still off duty?

24 A.  The way it was explained to me was, there was an issue

25 with some releases in the past, but it was almost -- I almost

1  felt that he was objecting to who from the Fire Department,

2  the names on the Fire Department that were listed.  I think

3  originally at the time was our risk manager, which was -- had

4  to have been Ron Texter.  There have been other people who had

5  problems with risk managers actually seeing, you know, their

6  reports.  So that name sometimes.

7      You know, I could see that, first, why people would maybe

8  objected first or there would be some issues with that.  So I

9  thought it was maybe Ron Texter, or at least the way it was

10  explained to me was it was Ron Texter that he was objecting

11  to, not necessarily the Fire Department.

12  Q.  Do you have any reason to think that Ron Texter was

13  considered intimidating to fellow firefighters or people who

14  were working through him to do a fitness-for-duty evaluation

15  or people who were out on stress leave?

16  A.  No.  But I think the position itself, because that's when

17  we -- when we medically separate or we separate someone, it is

18  through that office that we do that.  So if your job is on the

19  line, so to speak, because you have some physical limitation,

20  some kind of physical impairment, it's going to come out of

21  that office.  So I think, to some degree, you know, that --

22  the office itself, just the name of the office could be

23  somewhat intimidating to people.

24  Q.  So you didn't have any concerns that Chief Texter was

25  problematic in terms of his presentation to people?

1   A.   No.   I just think he had been in the job so long that he

2   was just kind of known for that.   That's all.

3   Q.   Okay.   So going back to this letter -- which it's fair to

4   say you've seen it a little bit; right?

5   A.   Yes.

6   Q.   Okay.   And there is -- the letter is dated October the

7   18th, 2011.   But if you go to the bottom paragraph, it talks

8   about -- it indicates that unless Lieutenant Broach confirms

9   his compliance for all the releases and an examination within

10  three days, that it "will be cancelled and disciplinary action

11  will proceed."

12  A.   Yes.

13  Q.   And what did you mean by that?

14  A.   Well, I mean, I needed to get some movement on this

15  situation.   I think to some degree -- maybe my nature is I

16  don't necessarily like loose ends, and I think this was, in my

17  view, a loose end that was out there.   So we -- I felt that we

18  needed to get some movement, and we needed to have some

19  action, really, on this particular situation or this

20  particular matter.

21       I mentioned earlier, we send out options letters for

22  people who have been out for more than six months.   In that

23  letter, we give you three days to contact us and set up an

24  appointment to have a meeting for those five options that they

25  will be given.   And so -- but we do that to prevent, you know,

1   procrastination.  And here we are, we are a paramilitary

2   organization, and so -- and I think that's been discussed here

3   quite through the trial.  So when you get a direct order from

4   one of your superiors, you know, usually timeliness is

5   something that is of the essence.  So that was why the three

6   days was given in that case.

7   Q.  Okay.  In this case, did you get a signed release from

8   Lieutenant Broach on October 21st?

9   A.  I can't remember the exact date that we got the release,

10  but yes, we did get the release signed by Lieutenant Broach.

11  Q.  But you don't know if it met the deadline in your letter,

12  do you?

13  A.  No.  I'm not positive, no.

14  Q.  Okay.  If I were to represent to you that a release was

15  signed by Lieutenant Broach later in October, would you agree

16  that doesn't meet your October 21st deadline?

17  A.  I would agree.

18  Q.  You didn't end up taking any disciplinary action against

19  Lieutenant Broach as a result of this letter or what followed

20  from it, did you?

21  A.  No, ma'am, did not.

22  Q.  Now, you had talked about sending out letters to other

23  firefighters with a similar three-day deadline to bring them

24  back to work; is that right?

25  A.  Or at least to have a meeting to discuss their options on

1  them returning to work, yes.

2  Q.  And it sounded like -- you said that some of those

3  firefighters were given the possible option of limited duty;

4  is that right?

5  A.  No.  Some of them -- we give the same option to whether

6  you're off the track, which means you're at home somewhere; or

7  you could be on limited duty, which means you're working with

8  us, you're just not on full unrestricted duty.

9  Q.  Okay.  I misunderstood.  Since you've been in the HR

10  Division, who do you generally have listed on the medical

11  releases for a psychological examination?

12  A.  Under normal situations, it's usually our Health and

13  Safety District Chief, which is Chief Burkert.  Usually Local

14  48 is on those releases, and then I think Employee Health

15  Services, and then maybe the City's Risk Management Division,

16  someone from there.

17  Q.  Are you sometimes on the releases?

18  A.  No.  This was actually the first one that I was on.

19  Q.  Talking about at this time with Lieutenant Broach?

20  A.  Yes, ma'am.

21  Q.  Can you -- your position is normally you don't include

22  yourself on the releases; correct?

23  A.  No.  Only unless they need some assistance in trying to

24  maybe mediate, if you will, who actually is on the release

25  from the department.

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1  Q.  And why did you think or did you think having your name on

2  the release for Lieutenant Broach would assist anything?

3  A.  Well, as I mentioned, I thought maybe he was -- basically

4  going the way it was told to me, I thought he was objecting to

5  Chief Texter.  And now, in this case, he had retired, so now

6  Chief Burkert had actually assumed his assignment.  So I

7  thought it was the actual individual that he was objecting to.

8      So I thought, you know, based upon the history I had with

9  Lieutenant Broach, that maybe if he saw my name on the release

10 as the only person from the Fire Department that actually

11 would see that, then, you know, maybe we could, you know,

12 rectify the situation and actually have the evaluation done.

13 Q.  Okay.  And you said that usually you have the union on the

14 release; correct?

15 A.  Yes.

16 Q.  Why is that?

17 A.  Well, usually the union is the advocate, if you will, for

18 the employee.  So most people -- I mean, they are quick -- and

19 that's who they want representing them in anything.  So I

20 think from, you know, anytime they are being opposed, if you

21 will, by management, in every case that I've ever seen they

22 always want Local 48 to be involved or to actually represent

23 them in this process.

24 Q.  Does the HR Division require the union, though, to be on

25 any of these releases?

1   A.   No.   I think it became more just boilerplate just because

2   it had been done so many times historically.

3   Q.   Do you remember whether the union was listed on any of

4   Lieutenant Broach's releases?

5   A.   I think there became some issue that Chief Burkert

6   mentioned to me where his name, Captain Ransick and Local 48

7   was actually listed on one of the releases, yes.

8   Q.   Okay.

9           MS. POWELL:   Just one minute.

10      (Ms. Powell and Mr. Giglio confer privately.)

11  Q.   I'm going to have you turn to the plaintiff's exhibit

12  book.  Are you there?

13  A.   Yes, ma'am.

14  Q.   Okay.

15  A.   But I didn't see what exhibit you said.

16  Q.   I did not.  I'm sorry.  Can you turn to Plaintiff's

17  Exhibit 9?

18  A.   Yes.

19  Q.   Do you have that in front of you?

20  A.   Yes, ma'am.

21  Q.   So were you involved with -- this is the release that's

22  used for the fit-for-duty evaluations; is that correct?

23  A.   Yes.

24  Q.   And are they prepared within your division or somewhere

25  else?

1  A.  I probably learned more so -- they are prepared within

2  Risk Management for the City.  So I think Employee Health,

3  which is actually under that, I think they are prepared there.

4  Q.  Okay.  And were you involved at least in the information

5  that went on this release?

6  A.  Actually, Chief Burkert was handling the release at that

7  time.

8  Q.  And here it indicates that Local 48 was initially listed

9  on the release.  Do you know the circumstances of how that got

10  crossed out?

11  A.  At that time no, I did not.

12  Q.  Okay.  Why did you include all -- District Chief Burkert,

13  yourself and Captain Ransick?  Why did you put these three

14  individuals?

15  A.  Well, we all work in the same bureau.  The only reason I

16  could imagine that Chief Burkert actually included Captain

17  Ransick -- when Chief Burkert is off on any kind of leave,

18  Captain Ransick actually fills in his spot.  So his job is to

19  actually, you know, do the -- or the assigned duties of Chief

20  Burkert when he's off duty.  So maybe by including him there,

21  he might have thought, you know, it may be something that he

22  would have to handle possibly down the road.

23  Q.  Okay.  Since you've -- let me start by asking -- well,

24  before you came to the HR Division, did you have any role with

25  fit-for-duty evaluations?

1  A.  No, never did prior to coming to HR.

2  Q.  Since you've been in HR, you've learned a little bit more

3  about fitness-for-duty evaluations?

4  A.  Yes.

5  Q.  What is your understanding of why the department and your

6  division requires firefighters in certain instances to do a

7  fitness-for-duty evaluation?

8  A.  I think the root of it is really what we have been tasked

9  with as a department.  I mean, here we are entrusted with the

10  safety of the community, but before we can really keep anybody

11  else safe, I mean, we got to be safe ourselves.  And so with

12  that safety there comes a lot of split-second decision-making

13  that has to be done so people have to be -- whether it's

14  physically, emotionally, mentally, they have to be prepared to

15  make those decisions.

16      So I think fitness-for-duty is just a tool that's used to

17  make sure that individuals are really up to standard or up to

18  par in order to make sure that our mission as a department can

19  be carried out effectively.

20  Q.  Since you've been in the HR Division, how many

21  fitness-for-duty evaluation cases have you seen?

22  A.  I think I've -- probably three.  There's been three.

23  Q.  And have they all been for psychological evaluations or

24  for physical or for both?

25  A.  For both.  I think two were for physical, I believe, and

1    then one was for psychological.

2    Q.   And one of those was for Lieutenant Broach, or is this

3    separate --

4    A.   No.   This is separate from Lieutenant Broach.

5    Q.   Can you -- without stating any names, can you identify the

6    races of the three individuals referred through your

7    department for a fitness-for-duty?

8    A.   All three were Caucasian.

9    Q.   Okay.   And what is your position as the assistant chief of

10   the HR Division in terms of receiving the full

11   fitness-for-duty reports, evaluations?

12   A.   It's really my position that we should receive the full

13   report.   Oftentimes, one of the conflicts that we run into,

14   whether it be our own internal City doctor or any private

15   physician, is that ultimately oftentimes they don't

16   necessarily understand everything, the makeup of what we have

17   to do with our job assignment.   So my feeling is that, you

18   know, having those full reports, we can better make decisions

19   that other people can't.

20       Yes, they can let us know whether their physical ability

21   is there or if they are actually fit for duty, but there could

22   be some things in there that we might need to know that could

23   jeopardize what we do on an everyday basis when it comes to

24   operating safely in whatever environment that we're in.

25   Q.   Okay.   When you receive the physical fitness-for-duty

1    evaluations, how are they kept?

2    A.   You said the physical ones?

3    Q.   I'm sorry.   When you receive the hard copies of an

4    evaluation, whether it's for a physical or a psychological

5    fitness-for-duty exam, you receive those -- the hard copies,

6    the pages, what do you do with them?

7    A.   I guess it depends on who gets them.   If the release was

8    to Chief Burkert, they would go in what we call the medical

9    file.   He maintains the medical file that we have at

10   headquarters.   It's a separate room.   It's kept locked up.

11   All the files are locked.

12        If they were released to me, in my office I have what we

13   call the HR files.   So even though he actually maintains the

14   medical file, if the release was for me and me only, it would

15   stay within that HR file which is in my office, which is also

16   locked up in, and that file is locked as well.

17        So I guess the only access somebody could have is -- yeah,

18   there is probably a spare key somewhere on this key ring that

19   we have just in case I lock myself out of my office, which has

20   happened before, but when it comes to those actual files, they

21   are locked in there as well.

22   Q.   Does every individual employee in the HR Division have

23   access to that?

24   A.   No.   Just myself.

25   Q.   What about -- do you know, what about for Chief Burkert's

1   files?

2   A.   He is the only one that has access to that.

3   Q.   Okay.  Now, do you remember approximately when Lieutenant

4   Broach's fitness-for-duty evaluation was completed?

5   A.   I want to say it was late November, '11.

6   Q.   2011?

7   A.   Yes, ma'am.

8   Q.   Did you receive it in late November of 2011?

9   A.   Yes.

10  Q.   Okay.  And when did Lieutenant Broach return to work?

11  A.   Came back early February, like February 10 -- February

12  12th, I think, 2012.

13  Q.   Why did it take those months between November and

14  February, late November, early mid-February to get Lieutenant

15  Broach back to work?

16  A.   I think there was just a series of discussions and

17  meetings that needed to be had.  I think -- first of all, this

18  was the first time we had ever brought somebody back like

19  this.  Normally, when you come back to duty, it's -- Employee

20  Health or with their collaboration with PEAP or something

21  like, they are the ones that will clear someone.  Then they

22  present it to the Fire Department, and we work to bring them

23  back.

24       In this case, this was pretty much handled more so within

25  the department directly.  So I think my initial discussion

1  maybe end of November, first of December was with Gus because

2  I think at this point he was really -- Gus Giglio, which is

3  the City attorney, he had been having a lot of correspondence

4  with Lieutenant Broach's attorney and so I met with him --

5  Q.  I'm going to stop you real quick just to caution you that

6  anything that you discussed with Mr. Giglio is privileged, but

7  you can continue to explain.

8  A.  Okay.  So yeah, that was the end of that.  So we did talk,

9  and we just went over, you know, next steps, if you will.  So

10  I think after that, the chief and I had a meeting.  I

11  explained to him there in that meeting that the report had

12  come back, I had reviewed it, and that Lieutenant Broach was

13  fit to return to duty.  We kind of just discussed some of the

14  things that we as a department may need to do in facilitating

15  his return back to duty.

16      I think one of the suggestions that was put in there had

17  to do with some type of counseling or so forth.  So I asked

18  Chief Burkert to research within the region, you know, what

19  kind of counseling, interpersonal counseling was out there and

20  get back to me, you know, give me a list of things, you know,

21  and then at the same time cost and things that were associated

22  with that.

23      I think it probably took him a couple of weeks to try to

24  compile some of that.  He presented it to me.  Usually at the

25  end of the year -- our fiscal calendar ends in December 31st,

1    or it used to at that time, was December 31st.  And so usually

2    -- at that point, I think overtime, we probably were over

3    budget, if you will, so money is always an issue at the end of

4    the year.  So we had to take that into consideration as well.

5        I think around probably, I don't know, December,

6    mid-December, late December, I went on vacation.  I think

7    Chief Braun usually always takes two weeks' vacation around

8    that time.  I don't think we probably didn't do anything with

9    those options that Chief Burkert had given me.  He had given

10   me some for Xaiver.  There was some at UD and a few other

11   places.  But even in my own mind I thought that the cost may

12   be a little steep in terms of what they were providing us.

13       And so when I returned back from vacation early January, I

14   met with two of my lieutenants who are actually in the

15   Training Bureau.  How we were going to -- in the meeting, what

16   we discussed was treating Lieutenant Broach as someone that

17   maybe had been on a long-term military deployment.  Usually

18   when our members are deployed into the military, we have this

19   -- it's almost like some kind of checklist to make sure

20   everything they might have missed during that period that they

21   were out, they were tasked with the responsibility to figure

22   out what it was and, at the same time, make sure that those

23   things were gone over with him or he was allowed to review the

24   material before he actually came back to full duty.

25   Q.  Can you give some examples of everything that Lieutenant

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1  Broach or someone who was out for an extended period had

2  missed?  What would that be?

3  A.  I'm sure we had a lot of procedural changes during that

4  time.  I think -- if memory serves, they were actually out,

5  had been training on a new device called a safety pad, which

6  is a new electronic notebook that's used on medical runs.

7  Well, that would have been something brand-new to him.  You

8  know, those types of items, anything new -- I think we might

9  have had new masks at that point.  He needed to go over the

10  new self-contained breathing apparatus.  And they had to make

11  sure that he was proficient at being able to do that before he

12  actually returned to full duty.  We -- because when we brought

13  him back, we were going to bring him back in a limited

14  capacity so that he could review those items before returning

15  to a fire company.

16  Q.  Okay.  And did you end up ever sending -- you didn't send

17  Lieutenant Broach to counseling; correct?

18  A.  I talked to City HR, told them what my options were, how

19  much they cost, and I asked them did they have anything that

20  would correspond to what we were looking for.  A gentleman by

21  the name of Tom Seward, who -- I don't necessarily know his

22  title in HR.  He was some kind of analyst there.  He

23  recommended a leadership course that they had for -- it was --

24  I think it covered over four weeks.  It was one day a week,

25  and he thought that might meet some of the needs concerning

1   this interpersonal type of thing that we were looking for.

2       So that's what we -- the chief and I talked.  We decided

3   to send him to that instead of some outside agency or some

4   outside counseling.

5   Q.  Okay.  Now, you heard the testimony from Chief Texter;

6   right?

7   A.  Yes.

8   Q.  You've heard testimony from Chief Burkert?

9   A.  Yes.

10  Q.  And from Chief Demasi?

11  A.  Yes.

12  Q.  And possibly others.  You've heard -- is it fair to say

13  you've heard varying testimony about the HR Division's receipt

14  of the full psychological evaluation report?

15  A.  Yes.

16  Q.  Okay.  And your position is, though, that you need to

17  receive the full report; correct?

18  A.  Yes.

19  Q.  Is that your understanding that Chief Texter required that

20  as well?

21  A.  Yes.

22  Q.  Is it your understanding that Chief Burkert requires it?

23  A.  Yes.

24  Q.  Is it your understanding that Chief Kuhn required it?

25  A.  I'm not necessarily sure what his requirements were.

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1  Q.  If there were any differing practices as it relates to the

2  fitness-for-duty report, how would you explain that?

3  A.  I think we all have different management styles, probably

4  different philosophies.  I mean, we have a lot of procedures

5  and policies that are put in writing.  But, at the same time,

6  we don't have -- everything is not addressed in writing.  And

7  so there is some latitude from the management standpoint to

8  make decisions that we think would be in the best interests of

9  those management styles that we do have.

10     So I think with -- as it relates to seeing the full report

11  or not seeing it, I think what you see is a difference in

12  philosophy or a difference in management style.

13  Q.  Okay.  Have you ever handled or been asked to handle an

14  anonymous complaint about someone in your tenure at the HR

15  Division?

16  A.  Yes.  We got anonymous complaints all the time.

17  Q.  Who do you get them from?

18  A.  The majority of them -- let me back up.  The majority of

19  them appear to come from the public.  But since they are

20  anonymous, we don't necessarily know the actual source.

21  Q.  Do these anonymous complaints, do they come directly to

22  HR?

23  A.  I probably receive very few.  The majority of them usually

24  come to Operations, which -- through their staff, or they come

25  directly to Internal.  The City also has an anonymous hotline

1    that they've set up.  I don't really know how long it's been

2    in existence, but occasionally we'll get a few from that

3    hotline as well.

4    Q.   Have you ever discussed how to handle anonymous complaints

5    with your current chief, Chief Braun?

6    A.   The chief -- Chief Braun originally comes from Columbus,

7    Ohio, which is where he spent his entire career.  In Columbus,

8    it's part of their union contract that they don't investigate

9    anonymous complaints.  So, in essence, that's his culture.  So

10   no, he -- usually his direction, we'll explain to him what

11   those anonymous complaints are.  But since that's his culture,

12   normally we do not -- I do not, in fact, have Internal

13   investigate those anonymous complaints.

14   Q.   Do you know what Chief Wright's practice was when he was

15   in charge?

16   A.   I knew -- in all cases with anonymous complaints, it's the

17   chief's discretion how he wants to handle it.  I did not work

18   under Chief Wright in that capacity at that time, so how he

19   handled I'm not positive.

20   Q.   Okay.  You heard some questions earlier about the City's

21   and the Fire Department's discipline statistics; right?

22   A.   Yes.

23   Q.   And you heard testimony and saw documents relating to the

24   City's affirmative action statistics?

25   A.   Yes.

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1  Q.  Okay.  Were you familiar with those before today?

2  A.  Yes.

3  Q.  How did you become familiar with them?

4  A.  Part of -- one of my assignments within HR is to provide

5  the data that the HR Department utilizes to come up with that

6  report.  So I usually have what's called our HR liaison run

7  the statistics from the previous year and, in return, give it

8  to me and I, in turn, give to the person that's working on

9  that report for City HR.

10 Q.  Do you ever share that data within your department or your

11 division?

12 A.  We share -- at the end of the day, we share the final

13 report, yes.

14 Q.  Do you ever ask any of your subordinate officers to do

15 anything with that data?

16 A.  No.  Ultimately, I think that rests with me and maybe the

17 chief.  But no, we don't ask them to do anything with it.

18 Q.  Does Lieutenant Lemons have any requirement to assess the

19 department and citywide discipline numbers?

20 A.  No.  His job is in investigating, and that's pretty much

21 what it is.  But no, he has nothing to do with the statistical

22 data that's collected.

23 Q.  So you said that is -- you view that to be more of your

24 job; correct?

25 A.  Yes.

1   Q.   What types of things have you done in your -- during your

2   time at the HR Division to look at the City's and the Fire

3   Department's discipline statistics and to identify and to

4   decide what to do with that information?

5   A.   I mean, I think one of the things that we looked at, we

6   want to -- I mean, we are a diverse organization, but we want

7   to do our best to maintain consistency and fairness across

8   discipline.  We recognize that disparity exists, and so our

9   job is to try to make sure that we make that disparity

10  decrease as much as possible.

11       I know one example -- I think we've talked about AWOL

12  here, which is people who are late and they really don't have

13  a reason for being late.  That means they don't report -- they

14  didn't make it to work at seven o'clock in the morning,

15  usually, and they didn't call ahead.  And so one of the things

16  we found is that some individuals were giving people a verbal

17  counseling for that, but yet at another firehouse -- and in

18  particular, there was one firefighter who was African American

19  and, in fact, he was Chief Wright's son, he was given a

20  reprimand for that same incident.

21       And so one of the things that I did was mandated that all

22  AWOLs will be sent to us.  So, that way, a reprimand would be

23  given across to everyone regardless of, you know, how late

24  they were.  I mean, late is late.

25       And so that was just one example of one of the things that

WINSTON - DIRECT EXAMINATION BY MS. POWELL

1    we tried to do to maybe make sure that discipline is a little

2    more consistent, a little more fair.  Officers have

3    discretion, but at the same time, you know, if one person is

4    being adversely treated over here for the same infraction, you

5    know, it's our responsibility to make sure that discipline is

6    applied evenly across the board.

7            MS. POWELL:  Just one minute to confer with counsel?

8            THE COURT:  Sure.

9        (Ms. Powell and Mr. Giglio confer privately.)

10   Q.  Chief Winston, I'm going to have you go back to the Joint

11   exhibit notebook.  Do you have that in front of you?

12   A.  Yes, ma'am.

13   Q.  Can you look through this exhibit?

14           MS. BRANCH:  What number?

15           MS. POWELL:  I'm sorry.  I keep doing that.  Joint

16   Exhibit 14.

17   A.  Okay.

18           MS. BRANCH:  We've been using PX-9.

19           MS. POWELL:  One moment.

20       (All counsel confer privately.)

21           MS. BRANCH:  One, two, four, six.

22           MS. POWELL:  Okay.  Seven, as well; is that correct?

23   I have one, two, four, six, seven.

24           MS. BRANCH:  Yes, it's seven.

25           MR. GERHARDSTEIN:  Right.

 1          MS. BRANCH:  And not in evidence is page five.

 2  BY MS. POWELL:

 3  Q.  Can you -- looking at Joint Exhibit 14, can you identify

 4  all the documents in that exhibit?

 5  A.  They are all the various releases that were put forth.

 6  Q.  And are those part of plaintiff's record at your office,

 7  do you know?  Do you know whether these are Captain Lieutenant

 8  Broach's file at the HR Division?

 9  A.  No, they wouldn't be.

10  Q.  Okay.  To the best of your knowledge, are these releases

11  true and accurate copies of the releases that were exchanged

12  between the City and Lieutenant Broach?

13          MS. BRANCH:  Objection as to the ones that

14  pre-existed Chief Winston, his position.  He has no

15  foundation.

16          THE COURT:  Counsel, that will be sustained unless

17  you can lay the foundation.

18          MS. POWELL:  I have no further questions.

19          THE COURT:  Thank you.

20                  CROSS-EXAMINATION

21  BY MS. BRANCH:

22  Q.  Good afternoon, Chief Winston.

23  A.  Good afternoon.

24  Q.  You ended your testimony talking about the discipline

25  reviews -- the review you did of the discipline at the City

 1  based on data that you collected; is that right?

 2  A.  Yes.

 3  Q.  And one of the examples you used was different supervisors

 4  were using different standards and different types of

 5  discipline for the same offense, it being AWOL; is that right?

 6  A.  Yes.

 7  Q.  And the example you gave was that an African American was

 8  given a reprimand, and other firefighters were given simply

 9  verbal counseling, both of which committed the same offense,

10  AWOL; is that right?

11  A.  Yes.

12  Q.  And those -- the firefighters who were AWOL who only got

13  verbal counseling were some of those white firefighters?

14  A.  The one example was a white firefighter, yes.

15  Q.  Okay.  So in addition to finding that there was disparate

16  treatment of firefighters for the same offense, being AWOL,

17  did you also look at the data to look at the racial impact of

18  that?  For example, in this situation both firefighters were

19  AWOL, but the African Americans were given a written reprimand

20  and the white person was given counseling.

21  A.  You mean just in that example did I look at the racial

22  makeup?

23  Q.  Yes.

24  A.  No.  I mean, I just took one example; but, at the same

25  time, I think it did cause me to want to dig a little further

1  to see -- but no, we didn't find any evidence that, yeah, this

2  was a pervasive thing that was taking place.

3      But in this instance, yes, it was an African American that

4  was treated harsher than a Caucasian firefighter.

5  Q.  And I think you said when you started your testimony that

6  there were some changes made and you had training implemented

7  because discipline was not being handled the best way; is that

8  right?

9  A.  In some instances, yes.

10  Q.  And part of what you were talking about is that different

11  supervisors were using different standards for the same

12  offense; right?

13  A.  Yes.  Even though people were being disciplined, it was a

14  little less harsh or severe in certain cases, yes.

15  Q.  And you thought that was unfair?

16  A.  Yes.

17  Q.  And that should be changed?

18  A.  Absolutely.

19  Q.  And in doing this analysis, have you also analyzed how

20  that has impacted the firefighters based on race?

21  A.  We have looked at that because we recognize that the

22  numbers are disproportionate.

23  Q.  Sure.

24  A.  And so -- you know, we can't control all external

25  influences, but as it relates to the Internal discipline

1    that's given, the chief and I have definitely collaborated to

2    try to find ways in which we can just make sure that things

3    are equitable across the board.  I mean, we can't control

4    people's behavior, but we can control how the discipline is

5    measured out.

6    Q.   So you and the chief are working on fixing this problem of

7    racial disparity and discipline?

8    A.   Doing our best, yes.

9    Q.   Okay.  And the racial disparity and discipline, has that

10   existed for years before you even got into your position?

11   A.   Oh, I'm sure it has.

12   Q.   Have you ever been a victim of that yourself in the Fire

13   Department?

14   A.   No, not that I can -- not that I ever recall, no.

15   Q.   Some of the numbers we looked at this morning, the one

16   that stood out for me was 54 percent of the people receiving

17   discipline in the protective services were African American

18   males.  Do you remember that testimony in that document?

19   A.   Yes, ma'am.

20   Q.   Is that one of the things that alerted you that there is a

21   problem in the Fire Department about racial disparity and

22   discipline?

23   A.   I don't necessarily think it was that report because,

24   naturally, a report ever goes -- we have our own internal

25   systems that we run, and I think it was --

 1   Q.   So you were already aware of that data?

 2   A.   Yes, ma'am.

 3   Q.   Before that final report comes out from the City?

 4   A.   And the reason I don't think I looked at that is because

 5   that includes the Police Department as well.  We're together

 6   in that.  So I'm not going to say I don't care about the

 7   police, but when it comes to discipline I only really care

 8   about the Fire Department as far as that.

 9   Q.   And was that statistic, 54 percent of the discipline was

10   disproportionate on African American males, was that the same

11   percentage for Fire when you looked at --

12   A.   I don't recall the number being that high, no.  I don't

13   recall what the number was, but it wasn't that outstanding.

14   Q.   It was similar to -- the total number for all protective

15   services was similar to what it is for Fire?

16   A.   Well, I'm not absolutely sure, but it was higher than what

17   I thought it should have been.

18   Q.   So back when Mark Broach was being reprimanded, written

19   reprimands by Captain Campbell in 2007, 2008 and 2009, would

20   you agree that there was racial disparity in disciplining

21   black firefighters?

22   A.   I'm sure it's existed, yes.

23   Q.   Now, you know that there had been an EEO complaint filed

24   by Mark Broach in March of 2010; right?

25   A.   Yes.

1  Q.  And let me say -- when you took over your position two

2  years ago in August of '11, you knew at that point that Mark

3  Broach had filed an EEO charge against the City; right?

4  A.  When I took over, no, not initially, no.  But it was

5  probably a few months into my new assignment, yes, I probably

6  became aware.

7  Q.  In that two months between August and October when the

8  releases were getting signed, did you learn about it then?

9  A.  I can't exactly say, but it was sometime in the fall, yes.

10 Q.  All right.  And that was something known to you and to the

11 chief when you met with the chief to talk about these various

12 things regarding Mark Broach?

13 A.  Not that I'm aware of, no.

14 Q.  There was also an EEO complaint filed by Ron Evans.  You

15 knew about that in the same fall of --

16 A.  Yes.

17 Q.  -- 2011; is that right?

18 A.  Yes.

19 Q.  And did you know that Mark Broach had already filed his

20 EEOC charge in the fall of 2011?

21 A.  No, I don't think I knew that initially.

22 Q.  Were you aware of this lawsuit being filed in January of

23 2012?  That would be during that three-month period after he

24 was declared fit but before he came back to work in February.

25 A.  I think I did become aware sometime in January, yes.

WINSTON - CROSS-EXAMINATION BY MS. BRANCH

1   Q.  And when this lawsuit was filed, he was not yet back to

2   work and on payroll; right?

3   A.  No, not yet.

4   Q.  It took another month or so for that to happen?

5   A.  I think I met with him at the end of January, and we

6   brought him in the next pay period.

7   Q.  Now, you say that you met with Chief Braun to discuss the

8   termination letter that you sent; right?

9   A.  Yes, ma'am.

10  Q.  And he approved that; is that right?

11  A.  Yes.

12  Q.  And you met with the chief about what to do after the

13  fitness-for-duty was -- after Dr. Nelson found that Lieutenant

14  Broach was fit for duty?

15  A.  Yes, ma'am.

16  Q.  And you also talked to Chief Braun about transferring Mark

17  Broach out of Engine 34; right?

18  A.  Yes.

19  Q.  And --

20          MS. POWELL:  Objection.

21          THE COURT:  Sidebar.

22  SIDEBAR CONFERENCE

23          MS. POWELL:  The objection -- or the question brings

24  up the issue of transfer, which was ruled on by this Court as

25  an issue not to be raised as an adverse action suggesting that

 1    -- no reason to bring it -- to be talking about transferring

 2    when you ruled that it was a legitimate business decision.

 3            MS. BRANCH:  I need to get the basis for where that

 4    information came from about Captain Campbell and Mark Broach

 5    not getting along.

 6            MS. POWELL:  What information?

 7            MS. BRANCH:  That's in the transfer memo.

 8            MS. POWELL:  The transfer memo shouldn't be part of

 9    this either.  The --

10            MS. BRANCH:  It talks about the history of the

11    conflicts that they had in 2010, trying to find the course of

12    that.

13            MR. GIGLIO:  Did Chief Winston sign that?

14            MS. BRANCH:  Did he sign it?  No, but he talked about

15    it in his deposition.

16            MS. POWELL:  Since then the Court has ruled on the

17    issue of transfer and it's not part of this case --

18            MR. GERHARDSTEIN:  The Court didn't exclude it from

19    the case.  It just said we can't have it on the verdict form

20    as one of our adverse actions.  It's part of the story.  It's

21    part of --

22            THE COURT:  We talked about it; right?

23            MS. BRANCH:  Right.  And Burkert wrote it, and he

24    said that he -- he was not clear as to what the source of the

25    information came from, how he learned about the conflicts from

```
 1   2010.
 2             THE COURT:  Ask him that, and then you can use the --
 3   depending on his answer, you can use the exhibit.
 4             MS. BRANCH:  All right.  Okay.
 5   CONCLUSION OF SIDEBAR CONFERENCE
 6   Q.  I'm going to show you Plaintiff's Exhibit 17.  You're
 7   welcome to look at it in your book.
 8       This is a memo you received about an administrative
 9   transfer of Lieutenant Broach?
10   A.  You say I received it?  Is that what you said?
11   Q.  Well, it's got -- I'm assuming you received it.  It's got
12   your name on it?
13   A.  I actually typed it, so --
14   Q.  You did type it?
15   A.  I did type it, yes.
16   Q.  Okay.  And this is a -- this is the paragraph I talked
17   about with Chief Burkert yesterday in his testimony?
18   A.  Yes.
19   Q.  You've been sitting through the whole trial; right?
20   A.  Yes.
21   Q.  So you've heard it all; right?
22   A.  Yes.
23   Q.  This paragraph about "It's my opinion" -- I'm sorry.  I
24   guess it was Chief Potter that talked about it.  He says in
25   his opinion, "Broach and Campbell should not be assigned in
```

1    the same firehouse due to past strained relations.  The

2    conflict came to light in 2010."

3        You said you're one that typed this memo?

4    A.  Yes.

5    Q.  And what's the source of the information?  Is that Captain

6    Campbell?  Did you talk to him about the conflict and the

7    strained relations with Lieutenant Broach?

8    A.  No.  I think in -- in that Dr. Nelson's report, he talked

9    a little bit about some of the issues that Lieutenant Broach

10   and Captain Campbell had.

11   Q.  So you used the information that you received from the

12   psychological report to administratively transfer Lieutenant

13   Broach?

14          MS. POWELL:  Objection.

15          THE COURT:  I'm going to overrule unless you want a

16   sidebar to discuss it.

17   A.  He wasn't administratively transferred.

18   Q.  You -- well, he was recommended to be administratively

19   transferred; would you agree with that?

20   A.  I would have told him that was going to be one of his

21   options, but no, he was never administratively transferred.

22   Q.  Would you agree that the Fire Administration was

23   recommending that he be administratively transferred?

24   A.  Yes.

25   Q.  Okay.  So you used the information you got from the

1  psychological report to draft this recommendation for

2  administrative transfer.

3  A.  No.  I drafted the -- I mean, we do administrative

4  transfers all the time.  I don't need a report to tell me how

5  to do it.  But I'm just talking about the reasons they weren't

6  going to work together was based upon those strained relations

7  that appeared.

8  Q.  Did you talk to Captain Campbell?

9  A.  No.

10 Q.  Did you talk to Lieutenant Broach?

11 A.  No.

12 Q.  So this was your idea?

13 A.  The chief and I discussed it, yes.

14 Q.  And whose decision was it to issue this recommendation?

15 A.  I mean, ultimately the chief can overrule me, so it's

16 actually his.  But, as I mentioned before, I'm the one that

17 actually authored the report.

18 Q.  So the chief approved your recommendation?

19 A.  Yes.

20 Q.  Did you have any personal knowledge from your own eyes and

21 ears what happened in 2010 between Lieutenant Broach and

22 Captain Campbell?

23 A.  No, not just -- except what I heard around the department,

24 but no personal knowledge, no.

25 Q.  Did you know back in 2010 that there was a conflict

1    between Lieutenant Broach and Captain Campbell?

2    A.  No.  I didn't have personal knowledge, no.

3    Q.  Did you -- in 2010, remind me, what level position were

4    you?

5    A.  In 2010 I would have been a district chief assigned to

6    Dispatch, Fire Communications.

7    Q.  And did you know that there was racial animosity between

8    Ron Evans and Captain Campbell back in 2010?

9    A.  No, ma'am.

10   Q.  Did you hear that around the Fire Department?

11   A.  Yes.

12   Q.  And you heard that there was racial animosity between Ron

13   Evans and Captain Campbell back in the year 2010?

14          MS. POWELL:  Objection.

15          THE COURT:  Let's have a sidebar, please.

16   SIDEBAR CONFERENCE

17          MS. POWELL:  She is asking him to testify to hearsay.

18   I'm objecting on that basis.

19          MS. BRANCH:  I didn't ask him to tell me who he heard

20   it from or what they said.  I'm only asking if he had

21   knowledge.

22          MS. POWELL:  And I asked similar questions of

23   witnesses earlier today and was not allowed to ask that on the

24   basis of hearsay.

25          MS. BRANCH:  You were -- I don't know what you were

1  asking.  Those questions were not this question.

2         THE COURT:  He can answer yes or no, but if he starts

3  to --

4         MS. BRANCH:  Sure.  I wasn't going to go any further.

5  I know the limits.

6         MR. GIGLIO:  We would note our objection.  It still

7  calls for hearsay responses, and it's hearsay if he heard

8  rumors.  It would be admissible, just for --

9         THE COURT:  Okay.  Thank you.

10 CONCLUSION OF SIDEBAR CONFERENCE

11         MS. BRANCH:  Could you read the question back?

12     (The record was read by the reporter.)

13 A.  Well, I heard there was just problems.  They had issues at

14 the 34s, is what I heard.

15 Q.  Okay.  And did you believe those to be racially -- that

16 race was involved somehow?

17 A.  No, I didn't, no.

18         MS. BRANCH:  Does the witness have his deposition at

19 the stand?

20         THE COURT:  Can we get that, please?

21     (The courtroom deputy assisted the witness.)

22 Q.  Is that your deposition transcript from the deposition I

23 took of you January 28, 2013, at City Hall?

24 A.  Yes, ma'am.

25 Q.  And you were under oath at the time?

1    A.   Yes.

2    Q.   Did you get an opportunity to read your transcript after

3    it was typed up?

4    A.   I'm sure I did.

5    Q.   Did you make any changes to it?

6    A.   No.

7    Q.   If you could turn to page 18, line 17?  Just let me know

8    when you're there.

9    A.   You said page 18, line 17?

10   Q.   That's right.

11   A.   Yes, I got it.

12   Q.   Okay.

13       "Question:  Did you know there was racial animosity, at

14   least from the perspective of Ron Evans?

15       "Answer:  I heard that, yes, but --

16       "Question:  Before you got involved in the depositions in

17   this case, did you know that?

18       "Answer:  I'd have to say I probably heard it around the

19   Fire Department, but that was, that was the extent of it."

20       Did I read that correctly?

21   A.   Yes, you did.

22   Q.   Okay.  So does that clarify that what you were hearing

23   about the problems with Ron Evans involved race?

24   A.   Yeah.  That refreshes my memory, yes.

25   Q.   Okay.  Great.  Well, let me move on to the releases that

 1  you were involved with.

 2      If I understand the testimony that we've heard so far,

 3  Chief Burkert around August, around the time you became

 4  assistant chief, you both realized that Lieutenant Broach had

 5  been out for a while, and you wanted to get him back to work.

 6  Is that your testimony?

 7  A.  Yes.

 8  Q.  And to getting him back to work, he needed to sign a piece

 9  of paper so that Dr. Nelson's report would come to the City;

10  right?

11  A.  Yes.

12  Q.  And we heard from Chief Burkert from his -- one of his

13  e-mails that the report, the release for Lieutenant Broach and

14  the appointment with Dr. Nelson should be done as close to the

15  one-year anniversary in October.  Do you remember that?

16  A.  Yes.

17  Q.  So even though you two came to this decision in August,

18  the plan was -- the Broach plan was to bring him back to work

19  -- I'm sorry, bring him to Dr. Nelson as close to the October

20  one-year anniversary as possible; right?

21  A.  I wouldn't call it the plan, no.

22  Q.  Wasn't that the title of the e-mail?

23  A.  I don't recall a title of it.

24  Q.  And the release -- you learned about the dispute over the

25  releases; right?

1   A.   Yes, ma'am.

2   Q.   And in your termination letter to Lieutenant Broach, you

3   said the releases go to you and EHS, Risk Management; right?

4   A.   Yes.

5   Q.   But the release that Chief Burkert drafted, it was to you,

6   to him, to Captain Ransick and to Internal; right?

7   A.   One, I don't know who drafted it, but yes, that ended up

8   being that way, yes.

9   Q.   Well, I thought you testified just now in your direct that

10  it was Chief Burkert who was in charge of getting those

11  releases.

12  A.   Chief Burkert in conjunction with Employee Health, yes.

13  Q.   Okay.  And I also -- I actually thought I heard you say

14  that he was the one that had the forms prepared; is that

15  right?

16  A.   I know he worked with EHS, but no, I'm not positive that

17  he actually prepared it.

18  Q.   Nonetheless, you learned there was a disconnect between

19  the letter you sent and the release that Mark Broach was told

20  to sign; right?

21  A.   Yes, ma'am.

22  Q.   And the release that Lieutenant Lemons took to him to sign

23  had all the extra names on it; right?

24  A.   Yes.

25  Q.   Even though you knew that Lieutenant Broach had a concern

1  with his privacy rights; right?

2  A.  I found out about that letter being -- going with him

3  after the fact, yes.

4  Q.  Have you ever asked Chief Burkert why he added Ransick,

5  himself and the union?

6  A.  No, I never asked.

7  Q.  Even today, you don't know why he did that?

8  A.  No.

9  Q.  Did you ever ask him why he told Lieutenant Lemons it was

10  okay to cross off those names but don't encourage Mark Broach

11  to do it?

12  A.  No, ma'am.

13  Q.  Now, you also know that one of the issues in this case is

14  a delay in getting the Internal investigation result to Mark

15  Broach; right?

16  A.  Yes.

17  Q.  You've heard the testimony they were signed June 16th, he

18  didn't find out about them, didn't get a copy until that first

19  meeting with Lieutenant Lemons, Lisa Berning in September;

20  right?

21  A.  Yes, ma'am.

22  Q.  And, in fact, we've got two versions in the exhibit book,

23  the June 16th version and the version Lieutenant Lemons gave

24  him September 24th; right?

25  A.  Yes, ma'am.

1  Q.  And you would agree, now in your position in HR, which

2  includes Internal, that Internal Investigations should do the

3  best they can to notify the employee when the charges are

4  resolved; right?

5  A.  That may be my philosophy, yes, but I think our policy has

6  changed as to how we deal with people who are off on stress

7  leave as opposed to how it was some years ago.

8  Q.  And when you say policy, do you mean practice?

9  A.  Practice, yes.

10  Q.  There's nothing in writing about any of this, is there?

11  A.  No.

12  Q.  There's no written rule, "Don't contact somebody on stress

13  leave"; right?

14  A.  At that time, that was the fire chief's direction, so yes,

15  that was just his directive.  There was nothing in writing.

16  Q.  But you recognize that's unfair, right, so you've changed

17  the practice?

18  A.  I wouldn't say I thought it was unfair.  I just -- that's

19  not the way I would do business, no.  So I believe that

20  usually we can notify people, yes.

21  Q.  And you actually think that Internal should do due

22  diligence in order to find the person; right?

23  A.  Absolutely.

24  Q.  One place to look is the personnel file to see what their

25  home address is; right?

1   A.   That's where we start.

2   Q.   That's where you start.  And you know that not every

3   employee updates their personnel file in a timely manner;

4   right?

5   A.   I wish it wasn't the case, but yes, you're right.

6   Q.   And so that gives Internal investigators a little extra

7   work to do; right?

8   A.   Yes.

9   Q.   If the home address is no good, you look for a phone

10  number; right?

11  A.   Yes.

12  Q.   Or a private e-mail address; right?

13  A.   We'd look for any contact information we can.

14  Q.   Like we found an e-mail there from Rick Reed that had his

15  AOL address on it, for example.

16  A.   Yes.

17  Q.   And with Mark Broach, it was pretty easy to find his cell

18  phone number, right, because you said Chief Demasi gave it to

19  you.

20  A.   Yeah.  But, I mean, 2011, I guess he ran into him in the

21  park and, yes, he gave us his number.

22  Q.   Okay.  So one way is to ask people, "Do you have a number

23  for Mark Broach?"

24  A.   Yes.

25  Q.   Another is just to look at the City forms.  And we have

1    his EEO form; right?  I'm not going to post it for the jury to

2    read, but if you could turn to Plaintiff's Exhibit 4, that's

3    in the plaintiff's book.  Oh, yours is redacted.

4            MS. BRANCH:  May I approach?

5            THE COURT:  You may.

6    Q.  I'm going to give you an unredacted copy of Plaintiff's 4,

7    which has the phone numbers that -- you can read them.

8        Would you agree that Mark Broach's EEO form that he filled

9    out with the City March 18th, that had his work phone?  That's

10   the firehouse; right?

11   A.  Yes.

12   Q.  And he had his cell phone underneath it.  That's this

13   second blacked-out line?

14   A.  Okay.

15   Q.  It's a phone number; right?

16   A.  Yes, it's a number, yes.

17   Q.  And do you know that to be his cell phone number?

18   A.  I don't.

19   Q.  But Internal could have found that, right, if they were

20   looking for him in March or June of 2010?  This EEO form is

21   public record; right?

22   A.  Yes.

23   Q.  So they could have easily called up EEO, asked them if

24   they got a phone number for him and see if it worked; right?

25   A.  You're talking about 2010 or are you talking about today?

1  Are you going back to 2010?

2  Q.  Oh, I'm talking about if somebody -- if Internal was

3  trying to look for him in back in 2010, they could --

4  A.  I don't think they were looking for him.  I think they --

5  Q.  No, I don't think they were either.

6  A.  He was on stress at that point.

7  Q.  Right.  I don't think they were looking for him.  My

8  question is, could they have found him if they tried?

9  A.  Yes.

10  Q.  Okay.  So the due diligence wouldn't really take much

11  work.

12  A.  No.  Correct.

13  Q.  Now, you've changed the practice because you recognized

14  that some people, like Mark Broach, go out on stress leave

15  when they've got those charges pending; right?

16  A.  I've changed the practice because I think -- normally,

17  what's customary is people are falling all over themselves to

18  get back to work.  So normally that's not even an issue.  I

19  mean, they're looking for us to come back.

20      But, at the same time, when things are accomplished or

21  when changes are made in their situation, I feel it's

22  important that they get notified of that.  But, granted,

23  that's just my particular policy -- or practice that we

24  utilize.

25  Q.  Is Mark Broach the only person that you know that was on

1    stress leave waiting for charges to be pending?

2    A.  During my time frame?

3    Q.  During your career.

4    A.  I don't know about my whole career, but I -- just during

5    my time frame, there has been other people to go out -- I've

6    had -- within my two years, I've had people to go out on

7    stress leave, yes.

8    Q.  Are you aware that Mark Broach's purpose for going on

9    stress leave was he was removed from the front seat in

10   addition to having the charges pending against him?

11   A.  I learned that from here, yes.

12   Q.  Okay.  And you also learned that Mark Broach was suffering

13   stress during that time that he was waiting to hear the

14   results of the charges; are you aware of that?

15   A.  Just from here, yes.

16   Q.  Do you have any reason to disagree with that?

17   A.  I really -- I didn't -- I had no idea at the time what he

18   was off for.

19   Q.  Right.  But now that you've heard about it, do you have

20   any reason to disagree that --

21   A.  I'm sure that can be a stressful situation.

22   Q.  Okay.  It's obvious that it would be stressful if somebody

23   felt that they were unfairly charged, they're charged, they're

24   removed from the front seat, and now they are waiting around

25   to find out the results.  During that period of time, it would

1    be stressful to that firefighter.

2    A.   Definitely not an easy situation, sure.

3    Q.   Okay.  And during that time you know that Lieutenant

4    Broach was on some sort of leave, in order for him to be paid

5    he had to use comp time, vacation time, holiday pay, those

6    things in order to still get a paycheck while he was on leave;

7    right?

8    A.   Yes.

9    Q.   And he depleted all of those hundreds of hours of leave

10   time that he had accumulated over his career; are you aware of

11   that?

12   A.   Yes.

13   Q.   And I think we've had an agreement with the City that he

14   had almost completely depleted it by September, but when he

15   was sent for the fitness-for-duty it was all depleted by the

16   end of October, October 30th, 2010; is that right?

17   A.   Yes, ma'am.

18   Q.   So during the time that he is out on that stress leave,

19   which was about six and a half months, March 5th to September

20   22nd, he used up all of his accrued benefits and he was not

21   eligible for earning overtime or comp time; is that right?

22   A.   If there was overtime during that period.  I would have to

23   look at the records to show -- back in 2010 we were browning

24   out like we are at now.  But during Chief Wright's tenure,

25   there was a long period where there wasn't any overtime.  I

1    would have to check the records to see.

2    Q.  Okay.  So if overtime was allowed by anybody, he would

3    have lost that as a benefit during that six and a half months?

4    A.  Yes.

5    Q.  Now, I think we're going to have an agreement by the

6    parties about back pay and lost wages, so I will not ask you

7    those questions, except let me just ask you one.

8        You've done some calculations of Mark Broach's income

9    during 2010, 2011 and 2012; is that right?

10   A.  Yes.

11   Q.  And when you add it all up and average it out for a

12   monthly number, that comes up to about $6,175 a month; is that

13   right?

14   A.  I can't be positive, but it sounds what I added up.

15   Q.  Within a few dollars?

16   A.  Yes.

17   Q.  Okay.  Now, when the report from Dr. Nelson came out, it

18   was sent to Employee Health Services and then sent to you; is

19   that right?

20   A.  Yes.  I don't know if it was sent to Risk Management as

21   well.

22   Q.  Oh, I'm sorry.  I think you're right.  I think it was Risk

23   Management and then to you.

24   A.  Yes, ma'am.

25   Q.  And, if you want, it's Joint Exhibit 20.  I'll just use

1   the top page here.  It's got -- I don't understand your time

2   stamps, but "Finance Received, November 21st, Risk Management

3   Department," does that mean Risk Management got it?

4   A.  I would assume so, yes.

5   Q.  And you got it from them, and you read the conclusion that

6   he was fit for duty?

7   A.  Yes, I would have, yes.

8   Q.  Did you get that sometime around November 21st?

9   A.  No.  I think it was probably more towards the end of

10  November.

11  Q.  And did you know that Mark Broach was asking for a copy of

12  the report?

13  A.  I did not.

14  Q.  He couldn't get one from Dr. Nelson; right?

15  A.  I didn't know.

16  Q.  Did you know I was asking for a copy of the report?

17  A.  I knew that through my attorney, yes.

18  Q.  Okay.  And did you fax me a copy of this report?

19  A.  I think I did, yes.

20  Q.  Just checking any dates.  January 6, 2012 sound about

21  right when you faxed me a copy of Dr. Nelson's report?

22  A.  It sounds okay.  So many days, but it sounds good.

23  Q.  And you wouldn't give it to me without a release; right?

24  A.  You're right.

25  Q.  Right.  So Mark Broach had to sign a release allowing you

1  to give it to me?

2  A.  Yes.

3  Q.  Now, he didn't come back to work at the end of November

4  when you found out he was fit for duty; right?

5  A.  No.

6  Q.  And he didn't come back to work after he filed the lawsuit

7  in January; right?

8  A.  I think he came back a little bit after that.

9  Q.  He came back on a Sunday because that's the start of your

10  pay periods?

11  A.  Yeah.  He came back on the payroll on the Sunday.  I don't

12  know if that was his first day or not.

13  Q.  And that was February 12, 2012?

14  A.  Yes, ma'am.

15  Q.  So for those three months while you were deciding about

16  counseling, talking to Chief Braun, going on your holiday

17  vacation at the end of the year, Mark Broach was without pay;

18  right?

19  A.  Yes.

20  Q.  Chief Winston, have you ever felt discriminated against

21  based on your race?

22  A.  No.

23  Q.  And --

24  A.  What do you mean, in my whole life?

25  Q.  Yeah.  I had already asked you at the City, and I think

 1    you already said no.

 2    A.   Okay.

 3    Q.   But I'm asking --

 4    A.   I'm sure probably in my lifetime, yes.

 5    Q.   And were any of those incidents where you felt

 6    discriminated against make you feel uncomfortable or upset?

 7    A.   Yes.

 8    Q.   And were any of those instances public, in other words,

 9    done to you a public way?

10    A.   Yes.

11    Q.   Where other people witnessed the fact that you were being

12    discriminated against?

13    A.   It was in public, but I don't necessarily know if other

14    people -- I don't really know what the setting as far as what

15    they acknowledged or what they witnessed.

16    Q.   And how did you feel about that?

17    A.   I mean, I didn't like it.

18    Q.   Were you upset?

19    A.   Yeah, I'm sure I was, yes.

20    Q.   And were you embarrassed?

21    A.   I don't know about embarrassed.  I mean, I was upset

22    though.

23    Q.   And did you do anything about it?

24    A.   No.  I mean, I'm sure I probably had something to say

25    back, yes.

1  Q.  And how about any of your -- I'm not going to ask names,

2  but any of your close family or friends been discriminated

3  against based on their race that you know of?

4  A.  I mean, I have a lot of older relatives, you know, that

5  grew up in the South, places like that, yes.  So I've heard

6  stories that they've told.

7  Q.  And were some of those at work?

8  A.  Yes.

9  Q.  Losing jobs or losing pay or losing promotions?

10 A.  I don't necessarily recall all the circumstances.

11 Q.  And when they tell you those stories, do they relate to

12 you their feelings about that?

13 A.  Yes.

14 Q.  And they feel upset about it?

15 A.  Yes.

16 Q.  Angry?

17 A.  That might happen, yes.

18 Q.  Embarrassed?

19 A.  I don't know about embarrassed, but once again, they were

20 upset or angry, yes.

21 Q.  And did they do anything about those instances of

22 discrimination?

23 A.  I think in those times it was oftentimes more difficult,

24 they found it more difficult to do anything about it.  I think

25 in many cases they suffered through them.

1  Q.  So you understand how Mark Broach is feeling; right?

2         MS. POWELL:  Objection.

3         THE COURT:  Overruled.  You can answer.

4  A.  I can't necessarily say I'm walking, I mean, in his shoes,

5  so no, I can't -- I don't understand how he is feeling, but

6  anybody that actually has been discriminated against, yeah, I

7  know that can be -- and if it was genuine discrimination,

8  yeah, I'm sure it's not a pleasant thing at all.

9  Q.  And if they felt that it was discrimination even if they

10 couldn't prove it, they'd still feel just as bad; right?

11 A.  I'm sure it would be difficult.

12 Q.  And if they thought they could prove it and their employer

13 didn't agree with them, it would feel even worse.

14 A.  I'm sure they wouldn't feel good, yes.

15        MS. BRANCH:  May I have a moment?

16        THE COURT:  Yes.

17    (Pause in proceedings.)

18        MS. BRANCH:  No further questions for Chief Winston.

19 Thank you.

20        THE COURT:  Thank you.

21    Miss Powell.

22                   REDIRECT EXAMINATION

23 BY MS. POWELL:

24 Q.  Plaintiff's Exhibit 17, is this your administrative

25 transfer memo?

1  A.  Yes, ma'am.

2  Q.  Okay.  And you testified earlier that the chief okayed

3  your -- signed off on this memo; correct?

4  A.  Yes.

5  Q.  Even though he signed off on it, was the administrative

6  transfer processed?

7  A.  No.

8  Q.  And was there any question that you -- that the Fire

9  Department wasn't going to bring Lieutenant Broach back?

10 A.  No.  After we got the evaluation, our intent or our plan

11 was to bring him back.

12 Q.  Okay.  You were asked about the efforts that the HR

13 Division could take to find out how to reach its employees;

14 right?

15 A.  Yes.

16 Q.  What are the obligations of firefighters to keep their

17 personal information current?

18 A.  It's part of our policies and procedures to do that, to

19 maintain accurate information.

20 Q.  And do you expect your division to have to call around to

21 different departments in the City to find out employees'

22 whereabouts?

23 A.  No.  I mean, we appreciate if we had -- like I said, it is

24 part of our procedures and policies to have accurate contact

25 information.

1  Q.  Do you ever feel like you have to send a public records

2  request to the City to find out where one of your employees

3  is?

4  A.  At times.

5  Q.  Do you think you should have to?

6  A.  No.

7  Q.  How about hiring a private investigator, you could do that

8  as well; right?

9  A.  Could.

10  Q.  I'm sorry, I couldn't hear you.

11  A.  I could, but we would not do that.

12  Q.  Okay.  You heard Ron Clemons, the PEAP counselor, testify

13  his opinion that Lieutenant Broach could have come back to

14  work from stress leave as early as April of 2010; right?

15  A.  Yes.

16  Q.  If Lieutenant Broach had come back that early, would he

17  have used up all of his sick time?

18  A.  No.

19  Q.  His vacation time?

20  A.  No.

21  Q.  And during the time that Lieutenant Broach was out on

22  stress leave, was he receiving a paycheck?

23  A.  During 2010?  Yes, he was.

24  Q.  Okay.  And was -- even though he was out on sick leave,

25  was he accruing his vacation and other sick leave and other

WINSTON - REDIRECT EXAMINATION BY MS. POWELL

1  days?

2  A.  Yeah.  When you're out on sick leave, you would accrue all

3  the same benefits as if you were working regularly.  The only

4  thing that's different is you're burning the time, burning

5  that sick time out of your bank, but all your benefits and

6  fringe benefits are the same.

7  Q.  We've seen the EHS report that was completed is dated

8  November the 21st, 2011; right?

9     I'm sorry, let me -- strike that.

10    The completed psyche evaluation for Lieutenant Broach is

11  dated November the 21st, 2011; correct?

12  A.  Yes, ma'am.

13  Q.  And does that go directly to Fire or does it go to any

14  other departments before it reaches you?

15  A.  I think it went to Financial, Risk Management before it

16  ever came to us.

17  Q.  Did Lieutenant Broach ever call you to ask you about the

18  status of his ability to come back to work?

19  A.  Not that I'm aware, no.

20  Q.  Did he ever call you to ask you for a copy of the

21  psychological evaluation report?

22  A.  No.

23  Q.  If he had called you, what would you have told him?

24  A.  As far as the?

25  Q.  If he had called you to ask you about the status of his

1  ability to get back to work, what would you have told him?

2  A.  I would have just discussed with him like I did when he

3  came in January, just, you know, how we were going about doing

4  it.  We would, no doubt, had a discussion at least to let him

5  know or inform him what we were doing in anticipation of him

6  coming back to work.

7  Q.  Can you remind me, how many years have you been with the

8  City?

9  A.  Twenty-five.

10 Q.  And all 25 of those at the Fire Department?

11 A.  Yes, ma'am.

12 Q.  Have you ever equated the City or the City Fire Department

13 to the injustices of 1960s South?

14 A.  I never have, no.

15      MS. POWELL:  No questions.

16      THE COURT:  Thank you.

17  Miss Branch, do you have any additional questions?

18      MS. BRANCH:  No, Your Honor.

19      THE COURT:  All right.

20  At this time, the jury may ask questions of this witness.

21 Miss Lahley will collect them when you're done.

22 SIDEBAR CONFERENCE

23      THE COURT:  Okay.  "Have you been aware of any

24 complaints from African Americans at Engine 34 about Mark

25 Broach or Ron Evans since March 2010?"

```
 1              MR. GERHARDSTEIN:  Since?

 2              THE COURT:  Yes.

 3              MS. POWELL:  Can you read that again?

 4              THE COURT:  "Have you been aware of any complaints

 5    from African American firefighters at Engine 34" -- I think it

 6    should read -- "about Mark Broach or Ron Evans since March

 7    2010?"

 8              MS. POWELL:  We have had every variation of this

 9    question.  I don't have any objections.

10              MS. BRANCH:  Neither of them have been there since

11    then, so whatever complaints they'd heard wouldn't be based on

12    --

13              THE COURT:  That time.

14              MS. BRANCH:  Yeah.  I think Ron left, and Mark never

15    went back to 34.

16              MR. GERHARDSTEIN:  Good point.

17              MS. BRANCH:  So I don't think it would be relevant to

18    our timeframe.

19              THE COURT:  Yeah, I agree.  Okay.  I'm not going to

20    ask that question.

21         Number two.  "Why was it so important to the Fire

22    Department not to contact anyone on stress leave?  Please give

23    concrete reasons."

24              MS. BRANCH:  No objection.

25              MS. POWELL:  No objection.
```

1      MS. BRANCH:  Are you going to read it just like that?

2      THE COURT:  Yeah.

3      MS. BRANCH:  With emphasis.

4      THE COURT:  "How many firefighters were off track six

5  or more months at the time Winston and Burkert reviewed that

6  situation in 2011?"

7      MR. GIGLIO:  Fine, if he knows.

8      MS. POWELL:  No objection.

9      THE COURT:  "Can you provide examples of what kind of

10  problems people have had with Risk Management seeing the full

11  results from fitness-for-duty evaluations?"

12      MR. GIGLIO:  I think that might be a problem because

13  it goes to their medical conditions.  Is that what they're

14  asking?

15      MS. POWELL:  And I could see asking are you aware of

16  whether --

17      MS. BRANCH:  I think he already did.

18      THE COURT:  Yeah, he did testify.

19      MS. BRANCH:  That's why he was okay with taking

20  Texter's name off.  I don't think you could say without

21  violating anybody's privacy.  No objection.

22      MS. POWELL:  No objection.

23      THE COURT:  "Do you feel the disparity in discipline

24  between black and white firefighters is due to racism?"

25      MS. POWELL:  No objection.

```
 1              MS. BRANCH:  No objection.

 2              THE COURT:  This is the number four.  It's the last

 3    one.  But there are several.

 4        "What area of Human Resources for the Fire Department

 5    monitors time off?"

 6              MS. BRANCH:  No objection.

 7              MR. GIGLIO:  Fine.

 8              THE COURT:  "Is six months a long time for any City

 9    employee to be off?"

10              MS. BRANCH:   No objection.

11              MR. GIGLIO:  Any City employee or just Fire?

12              THE COURT:  It says "City."

13              MR. GIGLIO:  If he would have the knowledge to answer

14    that.

15              THE COURT:  Okay.  We'll see what he says.

16        "Does the City have a third-party department that handles

17    time off matters?  Examples, short-term disability, doctor

18    requirement, outside agency, fitness for duty."

19              MS. BRANCH:  No objection.

20              MR. GIGLIO:  No objection.

21              THE COURT:  Do you want me to read the examples as

22    well?  "Short-term disability, doctor requirement"?

23              MS. BRANCH:  That's okay.

24              THE COURT:  Okay.

25        "How often do the supervisors get together and attend
```

1   diversity classes together?"

2          MS. BRANCH:  No objection.

3          MS. POWELL:  No objection.

4          THE COURT:  "Does the City offer classes on how to

5   coach and discipline employees equally across the board?"

6          MS. BRANCH:  No objection.

7          MR. GIGLIO:  No objection.

8          THE COURT:  All right.  As far as timing, is he your

9   last witness?

10          MS. POWELL:  We are not going to call anyone else.

11   It's our last.

12          THE COURT:  So we'll deal with the exhibits outside

13   the presence of the jury if -- -

14          MS. BRANCH:  No rebuttal.

15          THE COURT:  Okay.  So we'll -- do you want to rest

16   today?

17          MR. GIGLIO:  We'd like to move our exhibits in.

18          THE COURT:  You could rest on the record today in

19   front of them.

20          MR. GERHARDSTEIN:  Yeah.  We aren't going to play

21   gotcha.  It's subject to --

22          MR. GIGLIO:  Subject to us -- that would be fine.  I

23   just want to make sure -- I'd like to do it in the presence of

24   the jury.

25          THE COURT:  Do you want to do it today?

```
 1              MR. GIGLIO:  We can do it today.

 2              THE COURT:  And then we'll do the charge conference

 3    tonight.  Do you want to start what time tomorrow?

 4              MR. GERHARDSTEIN:  Nine.

 5              MS. POWELL:  Do we want to move our exhibits in

 6    tonight or tomorrow?

 7              MR. GIGLIO:  Can we do that in the morning?

 8              THE COURT:  Yes, we can do that in the morning.

 9    We'll have to come early.

10              MS. POWELL:  Okay.

11              MR. GERHARDSTEIN:  You have to get the book ready for

12    going back then.

13              THE COURT:  Unless we can -- I don't mind doing it

14    today before the charge conference either.

15              MS. BRANCH:  It's three-quarters ready.  I think I

16    have my list.

17              MR. GIGLIO:  Pretty much.  I just want to make sure

18    --

19              THE COURT:  We'll discuss it afterwards.

20              MS. POWELL:  Okay.

21              MR. GIGLIO:  Thank you, Judge.

22    CONCLUSION OF SIDEBAR CONFERENCE

23              THE COURT:  I have some questions to read for you.

24        Why was it so important for the Fire Department not to

25    contact anyone on stress leave?  Please give concrete reasons.
```

```
 1              THE WITNESS:  I think a lot of it had to do with the
 2   type of the reason for the stress.  If the Department felt
 3   that they were the cause of the stress, they didn't want to
 4   put anymore undue stress on the individual, you know, further,
 5   I guess make that anymore difficult.  So that was their -- the
 6   chief at that time, that was his rationale as to why.  That
 7   was kind of his policy, and he advised the HR to carry that
 8   out.
 9              THE COURT:  How many firefighters were off track six
10   or more months at the time you and Burkert reviewed that
11   situation in 2011?
12              THE WITNESS:  I think we sent options letters to 18
13   individuals.
14              THE COURT:  Without violating anyone's privacy, can
15   you provide examples of what kind of problems people have had
16   with Risk Management seeing the full results from
17   fitness-for-duty evaluations?
18              THE WITNESS:  I think more -- I don't know what the
19   actual problems.  I think it's more just anybody that's coming
20   into your -- what they view more as their personal life.  In
21   this case, it's your mental health or your physical
22   well-being.  Because I think a lot of times people feel that
23   if something isn't right, they will move to separate them
24   either medically or mentally to some degree.
25         So I think just that perception that exists that there is
```

1    a chance that something is wrong with me, HR will move to

2    separate me.  I think that's really what people -- I don't

3    think it's any specific thing.  I think it's just they know

4    that down the road if we were looking to terminate you if

5    there was something found.

6            THE COURT:  Do you feel disparity and discipline

7    between black and white firefighters is due to racism?

8            THE WITNESS:  I don't think it's necessarily due to

9    racism.  I think a lot of it is -- you know, the Fire

10   Department is diverse.  People come from a lot of different

11   backgrounds.  They are raised a different way.  I don't think

12   -- sometimes the way people treat certain individuals, I don't

13   think they necessarily see it that way.  I don't think it's

14   racist motives.  Is it unfair?  Absolutely, it can be.  I

15   don't necessarily think that we have a tremendous racial

16   problem, but I think we have -- we have some work to do when

17   it comes to -- in essence, since we live with one another, so

18   the way that we treat one another, we have some work to do in

19   that area.

20           THE COURT:  What area of Human Resources for the Fire

21   Department monitors time off?

22           THE WITNESS:  At a lower level, it's really

23   Operations.  Operations Bureau actually monitors the time off

24   for those people in their Bureau.  More than 700 firefighters,

25   probably, belong to what's called the Operations Bureau.  It's

1    really their job to monitor time.

2        HR usually gets it when it becomes an issue, when there is

3    excessive absenteeism or excessive sick with pay.  That's

4    usually when it's turned over to the Human Resources Bureau,

5    and then we have to do deal with it.

6            THE COURT:  Is six months a long time for any City

7    employee to be off?

8            THE WITNESS:  Yes.

9            THE COURT:  Does the City have a third-party

10    department that handles time off matters?  For example,

11    short-term disability, doctor requirements, outside agencies

12    or fitness-for-duty.

13            THE WITNESS:  We have -- the Risk Management handles

14    the majority of those, but our contract allows people, at

15    times when there is a third-party dispute, that they can

16    actually have an outside doctor weigh in.  That doctor will

17    end the dispute either on the City side or on the member side.

18            THE COURT:  How often do the supervisors get together

19    and attend diversity classes together?

20            THE WITNESS:  I don't think there is any regular

21    scheduled diversity.  I think through the years they've had

22    classes, but nothing that has been of a regular or consistent

23    schedule.

24            THE COURT:  Does the City offer classes on how to

25    coach and discipline employees equally across the board?

1          THE WITNESS:  The City HR does offer some classes

2     that would apply to that.  The problem with the Fire

3     Department attending a lot of those is, we are -- we backfill

4     our members.  So anybody that would go to training, we would,

5     in essence, have to pay overtime for that.  And so if I was --

6     the administrative staff, yeah, we can attend those types of

7     sessions, but it's much more difficult for our frontline

8     individuals to go.  So I would say that is definitely lacking

9     on their part.

10          THE COURT:  Thank you.  Those are all the questions I

11    have.

12       Based upon those questions, Miss Powell, do you have any

13    follow-up?

14          MS. POWELL:  No, Your Honor.

15          THE COURT:  Miss Branch?

16          MS. BRANCH:  One second.

17          THE COURT:  Okay.

18       (Pause in proceedings.)

19          MS. BRANCH:  No questions, Your Honor.

20          THE COURT:  All right.  Thank you.

21       Thank you, Mr. Winston.

22       (The witness was excused.)

23          THE COURT:  Does the City have any additional

24    witnesses they would like to call?

25          MR. GIGLIO:  No, Your Honor.

1          THE COURT:  Thank you.  All right.  Is there anything

2     else you would like to put on the record at this time?

3          MR. GIGLIO:  Your Honor, the only thing we would put

4     on the record, the City would rest subject to our ability to

5     move certain exhibits into evidence.

6          THE COURT:  All right.  Thank you.

7       Miss Branch, do you have any rebuttal witnesses?

8          MS. BRANCH:  No, we don't, Your Honor.

9          THE COURT:  All right.  Thank you.

10       All right.  Ladies and gentlemen, at this time we have

11    reached the conclusion of the evidence.  The attorneys and I

12    need to spend some time going over the jury instructions, and

13    we will do that this evening.

14          Tomorrow we would like to start at nine a.m.  The plan

15    will be I will read most of the jury instructions to you at

16    that time.  We'll have closing arguments, and then I will read

17    the remainder of the jury instructions after the conclusion of

18    the closing arguments. Then you'll be able to deliberate after

19    that.

20       Anyone have any questions or problems with that plan to

21    start at nine?  Is that all right?

22          MEMBERS OF THE JURY:  Yes.

23          THE COURT:  Okay.  All right.  Let me give you the

24    recess instruction, which may be my last time.

25       During this recess you must not discuss this case with

1    anyone including your fellow jurors, members of your family,

2    anyone involved in the case or anyone else.  If anyone tries

3    to talk to you about the case, let us know immediately.  Do

4    not read, watch or listen to any news reports on the case.  Do

5    not get on the Internet to research the case or discuss the

6    case or enter chat rooms or blogs to do that.  Also, do not

7    use social media applications to research the case or discuss

8    the case.

9        Finally, you must keep an open mind until you have not

10   only heard all the evidence but also have heard the views of

11   your fellow jurors during deliberations.

12       Thank you.  We'll see you tomorrow morning at nine a.m.

13       (The jury was excused at 5:00 p.m.  Trial to be continued

14   on Thursday, August 29, 2013, at 9:00 a.m.)

15       (Jury charge conference were reported but not ordered

16   transcribed herewith.)

17                          * * *

18

19       (Conclusion of requested transcript of proceedings.)

20

21

22

23

24

25

1                            **I N D E X**

2

3       **WITNESS**                                        **Page**

4    KEVIN CAMPBELL

5    Cont'd Direct Examination by Mr. Giglio........   **134**

6    Cross-Examination by Mr. Gerhardstein..........   **153**

7    Redirect Examination by Mr. Giglio............   **178**

8    Recross-Examination by Mr. Gerhardstein........   **186**

9    Juror Questions................................   **187**

10

11   ROY WINSTON

12   Direct Examination by Ms. Powell..............   **203**

13   Cross-Examination by Ms. Branch...............   **232**

14   Redirect Examination by Ms. Powell............   **260**

15   Juror Questions................................   **264**

16

17   Defense Rests..................................   **274**

18

19

20                   **C E R T I F I C A T E**

21       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

22   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24   S/MARYANN T. MAFFIA, RDR

25   Official Court Reporter